UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

'09 CV 8904

——————————————— x

LAWRENCE F. GLASER, on Behalf of
Himself and All Others Similarly Situated,

                             Plaintiff,

      vs.

THE9, LTD., XIAOWEI CHEN, GEORGE
LAI, HANNAH LEE, TONY TSE and JUN
ZHU,

                         Defendants.

——————————————— x

:   Civil Action No.
:
:
:
:   CLASS ACTION COMPLAINT
:
:
:
:
:
:
:
:
:

Plaintiff alleges the following based upon the investigation of counsel, which included a review of the United States Securities Exchange Commission ("SEC") filings of The9, Ltd. ("The9" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about The9, press releases and other public statements issued by The9 and the other defendants named herein, and media reports about The9, and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of American Depositary Shares ("ADS's") (as evidenced by American Depositary Receipts ("ADRs")) of The9 between November 15, 2006 and July 15, 2009, inclusive (the "Class Period"), against The9 and certain of the officers and/or directors of The9 for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject mater of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practice complained of herein occurred in substantial part in this District.

5.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.    Plaintiff Lawrence F. Glaser, as set forth in the accompanying certification incorporated herein, purchased the stock of The9 during the Class Period and has been damaged thereby.

7.    Defendant The9 is an online game operator and developer in China. During the Class Period, the Company, directly and through its affiliates and/or subsidiaries, operated licensed massively multiplayer online role-playing games ("MMORPGs") and advanced casual games in China, including World of Warcraft ("WoW"), Soul of The Ultimate Nation, Granado Espada, EA SPORTS FIFA Online 2, and Atlantica. It also operated other licensed games in mainland China, including Audition 2 and Field of Honor. Additionally, the Company developed or was developing various proprietary games, including World of Fighter, Jiu Zhou Zhan Ji, MUX, Monster of War, Tiny Tribe, and other MMORPGs and advanced causal games. The9's stock is publicly traded, in the form of ADSs on the NASDAQ Global Stock Market (the "NASDAQ") (as evidenced by ADRs), under the symbol "NCTY."[1]

8.    (a)    Defendant Jun Zhu ("Zhu"), a co-founder of the Company, has served as Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") of the Company since its inception. He owns and controls Incsight, Ltd. ("Incsight"), an entity that holds virtually all of his shares in the Company and which, as of May 31, 2008, beneficially owned more

---

[1]    Each ADS represents one ordinary share.

than 20% of the Company's outstanding ordinary shares. In turn, Incsight has a longstanding voting agreement ("Voting Agreement") with Bosma, Ltd. ("Bosma"), which owned more than 17% of the Company's outstanding ordinary shares as of May 31, 2008, pursuant to which Zhu exerted substantial influence over Bosma's interaction with the Company during (and after) the Class Period. Incsight and Bosma collectively held approximately 53.1% of the Company's outstanding ordinary shares at or near the start of the Class Period – with Incsight holding 26.9%, and Bosma holding 26.2%, of such stock – prior to the massive insider sell-off described herein.

(b)    Defendant Hannah Lee ("Lee") served as The9's Chief Financial Officer ("CFO") and a Vice President ("VP") (later, Senior VP) from January 2004 through February 2008, when Defendant Tony Tse ("Tse") assumed the position of CFO as a result of Lee's resignation. Although the Company claimed that Lee had resigned to "pursue other interests," The9 later disclosed that deficient internal controls required the replacement of the CFO.

(c)    Defendant Tse served as The9's CFO from April of 2008 to July 3, 2008, when Defendant George Lai ("Lai") assumed the position as a result of Tse's resignation. As noted herein, although the Company claimed that the resignation occurred "due to personal and family reasons," The9 later disclosed that deficient internal controls required the replacement of the CFO.

(d)    Defendant Lai served as The9's CFO from July 3, 2008 through the remainder of the Class Period.

(e)    Defendant Xiaowei Chen ("Chen") was appointed President effective May 16, 2008, and continued to serve in that capacity for the remainder of the Class Period. By the end of the Class Period, however, numerous reports arose that Chen would resign. Chen, who the Company claimed was "responsible for managing [its] operations and strategic development," reported to Zhu.

- 3 -

(f)    Defendants Zhu, Lee, Tse, Lai and Chen are collectively referred to herein as the "Individual Defendants," and, together with The9, as the "Defendants."

9.    Because of their positions with the Company, the Individual Defendants had access to adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and the reports of actual operation compared thereto), conversations and connections with other corporate officers, employees, and licensors of the Company, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their positions of control and authority over the Company, the Individual Defendants were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.

10.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein, are the collective work of the narrowly defined group of Defendants identified above. Each of the above officers and/or directors of The9, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential and proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.

11.    The Individual Defendants were also involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were

- 4 -

aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. Moreover, each of the Individual Defendants was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants was, at all relevant times, responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

12.     As officers and controlling persons of a publicly-held company whose stock is traded on the NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information concerning the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of The9's stock by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme: (i) deceived the investing public regarding The9's business, operations, management, and the intrinsic value of its stock; (ii) caused Plaintiff and other public shareholders to purchase The9 stock at artificially inflated prices; (iii) allowed certain of the Defendants and their affiliates to sell millions of dollars of

their personally-held Company stock at artificially inflated prices; and (iv) proximately caused substantial losses to Plaintiff and the Company's other public shareholders.

## CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all purchasers of The9 stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are Defendants and, at all relevant times, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity which the defendants have or had a controlling interest.

15.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, The9's shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained trough appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by The9 or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.    Plaintiff's claims are typical of the clams of the members of the Class as all members of the Class are similarly affected by the defendants' wrongful conduct in violation of federal law that is complained of herein.

17.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including, *inter alia*, the following:

(a)    Whether the federal securities laws were violated by the Defendants' acts as alleged herein;

(b)    Whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of The9;

(c)    Whether Defendants failed to disclose material facts about the business, operations, and management of The9 during the Class Period; and

(d)    To what extent the members of the Class have sustained damages and the proper measure of damages.

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulties in managing this action as a class action.

## BACKGROUND

20.    On February 3, 2004, an affiliate of The9 entered into an agreement with Vivendi Universal Games ("Vivendi"), pursuant to which it obtained an exclusive license from Vivendi to operate WoW in China. The contract's term commenced on the date of its formation and continued for four years following the commercial launch of WoW in China, which occurred on or about June 5, 2005.[2]

---

[2]    The contract was first amended in January 2007, at which time Blizzard Entertainment Inc. ("Blizzard"), a Vivendi subsidiary, became a party thereto. Pursuant to that amendment, The9 agreed to rollout the Burning Crusade, WoW's first expansion pack. The contract was further amended in March 2008, pursuant to which The9 agreed to rollout Wrath of the Lich King, WoW's second expansion pack.

- 7 -

21.    On August 5, 2005, The9 filed a Form 6-K in which it reported its second quarter

results, the first quarter in which The9 operated WoW. The Form 6-K reported that "[n]et revenue

attributable to the operation of [WoW] for the second quarter of 2005 was [$6.3 million] following

its commercial launch on June 7, 2005." Further, in the Form 6-K, CFO Lee was quoted, in

pertinent part, as follows:

> While our financial results show a net loss for the second quarter, we are confident
> that The9 has built a solid foundation for the future. Costs incurred prior to the June
> launch of WoW followed by intensified marketing and promotional activities were
> the primary factors accounting for the net loss for the quarter. However, we believe
> that solid investment in the initial stages of the game lifecycle will be beneficial to
> The9 in the long run.

22.    On November 5, 2005, The9 filed a Form 6-K in which it reported its third quarter

results. This was the first full quarter in which The9 could report earnings from WoW game-play.

Specifically, the Company reported that WoW operations generated net revenues of $22.3 million

for the quarter. Commenting on these results, CFO Lee stated, in pertinent part, as follows:

> The revenue and earnings potential of World of Warcraft® in the China market is
> becoming more evident. Net revenues were US$22.8 million in the third quarter of
> 2005 and operating profit was US$6.2 million. Although we accounted for two
> months of minority interest in China The9 Interactive Limited ("C9I"), our
> subsidiary that operates WoW in China, before we completed the acquisition of the
> remaining 31.1% interest in C9I in late August 2005, we recorded net income of
> US$4.7 million. Starting from this quarter, we will begin presenting adjusted
> earnings before interest, taxes, depreciation and amortization ("adjusted EBITDA")
> as we believe this information will be useful to the company and investors by
> highlighting the major expenses that will not result in cash settlement in the future
> nor impact the company's future cash earnings or cash flows.

23.    On February 23, 2006, The9 filed a Form 6-K in which it reported its fourth quarter

and fiscal year 2005 unaudited financial results.[3]  Specifically, The9 reported the following:

---

[3]    The9's business is primarily conducted in China and almost all of its revenues are
denominated in RMB. The prevailing rate at July 10, 2009 for each U.S. dollar was RMB6.8325.

- 8 -

Net revenues attributable to the operation of World of Warcraft® ("WoW"), including game playing time, merchandise sales and other related revenues, were RMB211.2 million (US$26.2 million) in the fourth quarter of 2005, a 15% increase from RMB183.5 million (US$22.7 million) in the third quarter of 2005.*

The asterisk explained that:

We sell prepaid WoW playing time and recognize revenues from such sales based upon the actual usage of WoW playing time by end users. We are provided with data on end users' actual usage of WoW playing time by the licensor of WoW and do not otherwise have direct access to such information pursuant to the license agreement with the licensor.

This was the first time that The9 had revealed to the investing public that it had no controls in place to ensure that its revenue reports concerning WoW were accurate. At the same time, this disclosure underscored The9's extraordinary reliance on Vivendi/Blizzard, not only with respect to generating revenue but also with respect to reporting it.

24.     In early March 2006, James Ransom-Wiley reported that "[g]ame unions have threatened to quit playing WoW, as players continue to post their complaint on Internet forums and make personal calls to fellow member to join the cause." Moreover, the article stated that "Gamers have citied 'server time delays, long queue times, and frozen servers' as the primary causes of concern." These problems were particularly troubling to the Company because it charged the consumer from the time the consumer logged onto The9's server. So, when the consumer logged into The9's server, the consumer was being billed for delays caused by The9.

25.     On March 23, 2006, Brian Ashcraft of the website kataku.com, reported the following:

The9 and Blizzard/VUG are in a dispute over The Burning Crusade, the expansion for World of Warcraft. Blizzard/VUG is apparently taking that stance that The9 does not get it as part of their original deal, and that the Chinese operator needs to pay an additional license fee and/or give Blizzard/VUG shares in the company. According to our insider, things have gotten to the point where Blizzard is even threatening to turn Burning Crusade into WoW 2 and find another partner for China.

- 9 -

26.    On April 5, 2006, The9 issued a press release announcing that it had entered into an

agreement with NCsoft Corporation to provide the same services to NCsoft Corporation for a game

entitled "Guild Wars."  As a result of the agreement The9 agreed to provide the same services to a

direct competitor of Blizzard for a game in direct competition with WoW.  The press release issued

by The9 stated the following:

> The9 Limited, a leading online game operator in China, announced that it has entered
> into an agreement with NCsoft Corporation, a world leading developer and publisher
> of online games, for an exclusive license to operate the Guild Wars(R) game, a
> Competitive Online Role-Playing Game ("CORPG"), in mainland China.  The term
> of the license is three years from the date of commercial launch of Guild Wars(R) in
> mainland China.

27.    On April 14, 2006, Simon Carless of Gamasutra published an article concerning a

press release issued by Blizzard.  The article provided, in pertinent part, as follows:

> In an intriguingly cryptic press release, World Of Warcraft creator Blizzard
> Entertainment has announced that it "is currently actively exploring and discussing
> cooperation opportunities and further expansion of its business with local potential
> partners for mainland China", implying that it may be evaluating other partners than
> current Chinese distributor The9.

> In fact, Blizzard's statement also indicated that it has invited The9 to negotiate in a
> bid to distribute the upcoming World of Warcraft expansion set, World of Warcraft:
> The Burning Crusade, and to discuss its release in mainland China, which is
> currently planned for next year.

28.    On June 30, 2006, The9 filed its annual report on Form 20-F which included The9's

audited consolidated statement of operations data for the years ended December 31, 2003, 2004 and

2005, and consolidated balance sheet data as of December 31, 2004 and 2005.  According to The9's

Form 20-F filed on June 30, 2006, The9 generated revenue in the amount of $60,617,000 in 2005.

This revenue reflected only a half-year of revenue generated through WoW online gaming.

## SUBSTANTIVE ALLEGATIONS[4]

29.    The Class Period commences on November 15, 2006.  On that date, The9 hosted a

conference call to report its third quarter earnings for 2006.  In this conference call, The9 had the

following to say about its relationship with Blizzard and the WoW contract:

> Dick Wei, JP Morgan Analyst:
>
> I have a question on Burning Crusade. I wonder if you have any read on when is the
> Burning Crusade upgrade going to launch in China? And also has there been any new
> negotiations regarding revenue sharing change or licensing change -- licensing fee
> change regarding Burning Crusade?
>
> A second question is, can you share your view on the next quarter revenue, from the
> early read that you see in October.  I would think that next quarter revenue would be
> up, but some color would be great. Thanks.
>
> Jun Zhu (Interpreted):
>
> I would like to take this opportunity to clarify some of the rumors that are running on
> the China market. ***Based on all of our communications with [Blizzard], we always —
> the two parties have both always believed that Burning Crusade is part of our
> original licensing agreement with them. During the four years of exclusive license
> there's no possibility that a company other than The9 can operate Burning
> Crusade in China.***
>
> ***Now we are active in discussion rather than renegotiation with Blizzard, refining
> the marketing arrangement and the timetable for the Burning Crusade in China
> Market. The first line of communication has always been ongoing since day one of
> our operation of the World of Warcraft and we'll continue to communicate with
> them in the coming two and a half years***.

30.    In response to this highly positive news, on November 16, 2006, The9's stock closed

at $28.36 per share, a 21% increase per share from the closing price on November 15, 2006, $23.44.

31.    From November 16, 2006, to January 29, 2007, The9's stock increased by 33% to

$37.30 per share.

32.    On January 30, 2007, The9 filed a Form 6-K which announced that:

---

[4] All emphasis is added unless otherwise noted.

The9 Limited (NASDAQ: NCTY), a leading online game operator in China, today announced that it has entered into an amendment to the original license agreement with Vivendi Games, Inc. and Blizzard Entertainment®, to rollout The Burning Crusade™, the highly anticipated expansion pack for the World of Warcraft® game in mainland China. The9 is the exclusive operator of the World of Warcraft® game in mainland China pursuant to the license agreement entered into between Vivendi Games, Inc. and The9 in February 2004.

33.    The Form 6-K filed on January 30, 2007 made no mention of a licensing agreement between The9 and Blizzard with regard to future expansion packs of WoW in China.

34.    On May 21, 2007, The9 announced that Electronic Arts Inc. ("EA"), a leading developer and publisher of interactive entertainment, made a $167 million equity investment in the Company by purchasing nearly 15% of its ordinary shares. EA and Blizzard are in direct competition with each other in the gaming industry.

35.    Defendant Zhu denied that the equity investment of EA would have any impact on its contract with Blizzard in a May 21, 2007 earnings teleconference:

> For your second question *I don't think the equity investment from EA will have any impact on our relationship with Blizzard because EA's franchise portfolio is mainly on the casual game and the sports game area, but Blizzard they are focused on the 3D and RPG areas, so I think it's no conflict there*. And the second, I believe The9 is a comprehensive platform for all kinds of games whether it's an RPG or casual game. We are open to operate all kinds of games and bring them to China and make a very success story in China. *So for the above mentioned two reasons I believe the partnership with EA and our relationship with Blizzard will be no conflict*. Thank you.

36.    However, when asked, Zhu acknowledged that the Company had not engaged in discussions with Blizzard:

> Lin Shi, Lehman Brothers Analyst:
>
> Hi. Thanks for taking my follow up. This is a question about World of Warcraft license. It is still quite early to talk about this, but the license will expire in '09 which is not that far away. I just wondered, based on your current discussion with Vivendi, how do you see the possibility of extending the license? Thanks.
>
> Jun Zhu [Interpreted]:

Blizzard and us [sic] have been very focusing on the upcoming launch of the Burning Crusade and we both expect it to be a success in China. *And the relationship between the two parties are very good, but currently we haven't talked about the things beyond '09.* Thank you.

37.    On June 28, 2007, The9 filed its annual report on Form 20-F which included The9's audited consolidated statement of operations data for the year ended December 21, 2006. The first full year with which The9 operated under the WoW contract, The9 increased its revenue to $133,049,000. WoW amounted to 99% of The9's revenue in 2006.

38.    On July 13, 2007, The9 stock closed at a Class Period high of $51.97 a share.

39.    On August 29, 2007, an article by Shang Koo was published on Gamasutra, The Art & Business of Making Games. This article provided, in pertinent part, as follows:

> By the end of August, *rumors abounded that The9 may face early termination for half of its licensed games, including WoW*, as well as games from Webzen and Korean distributor HanbitSoft. *Rumors pointed to poor operation of the games (in particular delays in The Burning Crusade) as the reason for termination.* All rumors were denied by The9 and the games' license owners.

40.    The9 initiated a conference call discussing its third quarter earnings on November 15, 2007. In this conference call, an analyst asked The9 about the status of The9's contract renewal with Blizzard and the WoW contract, and the following dialogue took place:

> Paul Keung, CIBC World Markets Analyst:
>
> Hi Hannah and Jun Zhu. Just a question on the World of Warcraft. What's the timing of the addition that you have in your CapEx forecast for the next couple of servers for the game?
>
> And second, related to that, are you in active discussions with Blizzard to maybe perhaps extend the contract? Or is this something you intend to just -- you would probably initiate discussions later in the year?
>
> Hannah Lee:
>
> Paul, it's Hannah. I'll answer the first part of your question regarding capital expenditure for World of Warcraft. And I will leave it for Mr. Zhu to answer your second question about the renewal -- the attempt to renew the contract.

We are planning or already planning to add another new server site for World of Warcraft because with the anticipated demand we have and we are also aware that there is going to be a new expansion pack which we are anticipating also. So in Q1 most likely we will be launching a new server site for World of Warcraft, i.e. the ninth server site. And a server site for World of Warcraft will cost about $7m.

*          *          *

Jun Zhu [Interpreted]:

Before Q3 we have been concentrating on cooperation discussion with Blizzard regarding the launch of the Burning Crusade. But *after that was launched we started discussions with them regarding the renewal of the contract as you mentioned.* But so far we don't have any comment in that regard.

*But we are very confident to eventually renew the contract of WOW with Blizzard. As there is a second expansion pack for WOW called The Wrath of the Lich King, that launch schedule is not yet announced by Blizzard. If that was to be launched before June '09, according to the contract that's still entitled to The9.* And this expansion pack has a lot of features such as increased maximum level from 70 to 80 and also adding a new [career] of characters and also some character customization services and things like that. We think this is very good content upgrade. Both The9 and Blizzard hope that this expansion pack will be launched globally at the same time. Thank you.

41.    Investors were surprised to learn that The9 still had not participated in any discussions with Blizzard about the renewal of the WoW contract. Indeed, in less than a week, The9's stock fell from $31.65 per share on November 15, 2007 to $20.46 per share on November 21, 2007 – a 35% drop.

42.    Defendant Zhu's statement on November 15, 2007 about the WoW contract was particularly perplexing to investors, because although he had not spoken with Blizzard about the WoW contract, he claimed to be confident that Blizzard would eventually renew the contract.

43.    On February 21, 2008, Defendants conducted a conference call concerning The9's fourth quarter earnings, in which the following dialogue took place in reference to the renewal of the WoW contract between The9 and Blizzard:

Echo He, Oppenheimer Analyst:

- 14 -

Hi. Hi, everyone. These results are very good. Congratulations . . . . I just want to ask could you give us some idea on the renewal of license with Blizzard on World of Warcraft?

Jun Zhu [Interpreted]:

Actually, I remember that, about one year ago, a lot of people are asking and also are concerned about The Burning Crusade expansion pack. *At that time, I already very firmly told everybody that I was very confident that The9 will continue to work with Blizzard regarding The Burning Crusade*.

And also, back in 2005, when everybody was asking me about the impact -- the possible impact of the anti-fatigue system, I said I believe this policy will be a long-term benefit to the overall industry growth and also will not have any impact on WoW. And actually, now, if you look at the implementation of this system, it has not had any impact on our WoW game, so that proves my promise and my belief is very correct.

*So regarding your current question regarding the WoW renewal, what I can say is WoW has been in very strong growth during the past few years and also we are always in very good relationship with Blizzard. And we always have a very common unanimous opinion regarding the operation of WoW in China. So I was [sic] very confident that we believe that we can renew the contract in '09*.

44.     In response to this highly positive news, The9's stock price rose 9.6% from $17.99 to $19.71 on higher than normal volume of 789,4000. Moreover, as the market digested this information, the Company's stock price periodically rose over the next several days, increasing 3.4% to $20.38 per share, 1.8% to $20.74 per share, 6.5% to $22.10 per share, and .3% to $22.90 per share, on February 25, 26, 27, and 28 respectively. Overall, as a result of the Defendants' comment, The9's stock rose 27.3% in a week.

45.     The February 21, 2008 statements set forth above were materially false and misleading because, *inter alia*: (i) it was becoming increasingly less likely that the Company would be renewing the WoW contract with Blizzard; (ii) The9 had not even begun formal negotiations with Blizzard regarding the contract renewal; (iii) The9 and Blizzard had been at odds regarding The9's operation of WoW in China; and (iv) the equity investment by EA in The9 had made it less likely

that Blizzard would renew the WoW contract because Blizzard would essentially be doing business with one of its greatest competitors.

46.    On April 14, 2008, The9 issued a Form 6-K which announced that it and Blizzard had "expanded their original license agreement to include the rollout of Wrath of the Lich King™, the highly anticipated second expansion pack for Blizzard Entertainment®'s World of Warcraft®, in mainland China."

47.    In response to this news, the price of The9's stock rose 34.4% to $26.75 over the course of the next month.

48.    The April 14, 2008 Form 6-K set forth above was materially false and misleading because this statement led investors to believe that the WoW contract had been renewed. Indeed, because Defendants had repeatedly stated that The9 had already maintained a license to the Wrath of the Lich King until June of 2009, an expansion of this agreement would lead investors to believe that the WoW contract had been renewed or was close to being renewed.

49.    On August 13, 2008, Blizzard and Netease, a competitor of The9, issued a press release stating, in pertinent part, as follows:

> August 13, 2008 – Blizzard Entertainment, Inc. and NetEase.com, Inc. (NASDAQ: NTES) today announced an agreement to license Blizzard Entertainment®'s StarCraft® II, Warcraft® III: Reign of Chaos™, Warcraft III: The Frozen Throne™, and Battle.net® platform, which provides online multiplayer services for these games, to Shanghai EaseNet Network Technology Limited, an affiliated company of NetEase.com, Inc. Blizzard Entertainment and NetEase have also established a joint venture, which will provide support for the operation of the licensed games and Battle.net platform in China.

50.    In response to this news, The9's stock dropped 20.5% to $18.16 per share on heavy trading volume of approximately 1.6 million shares.

51.    Blizzard and NetEase's press release led to wide speculation in the marketplace that The9 would not be renewing its contract with Blizzard, a contract that accounted for over 90% of

The9's revenue over the last three years. In response to this speculation, The9 issued a press release

on September 5, 2008 that purported to provide "clarification against the rumor regarding the World

of Warcraft's renewal contract," as follows:

> The9 is currently in contract negotiations regarding World of Warcraft's future operations in China. ***Recently, there have been rumors that surfaced regarding the contract negotiations. These rumors are completely unfounded. The9 encourages all parties to refrain from believing in such rumors.*** The9 is actively conducting the contract extension negotiations, and will announce to the market once a final decision is made.

52.    These firm denials resulted in a 7.7% increase in The9's stock price, to $19.38 per

share.

53.    The September 5, 2008, press release set forth above was materially false and

misleading because it was ultimately a foregone conclusion that Blizzard would not be renewing its

contract with The9.

54.    On November 17, 2008, The9 filed a Form 6-K announcing its third quarter financial

results. In the Form 6-K Defendant Zhu announced:

> *As we prepare for the launch of Wrath of the Lich King*™, Blizzard Entertainment®'s second World of Warcraft® expansion, in China, we see anticipation of the game continue to mount and expect increasing number of new players to sign up for subscription. We're also working with our other developer partners to launch new games, including FIFA Online 2, Audition 2 and Atlantica. And we are proud of our efforts in in-house game development with five games underway," Mr. Zhu continued. "Among them, Warriors of Fate Online has started close-beta test in Nantong City and we have received very positive feedback from players. We believe by focusing on our core strength of operational excellence and developing proprietary games, we will continue to solidify our leading position in the Chinese gaming market.

55.    On December 30, 2008, an article written by Joel Tan reported the following about a

leak of the long awaited World of Warcraft, Wrath of the Lich King:

> Officials of The9, operator of the renowned Blizzard creation World of Warcraft in China, are baffled over the appearance on the Internet of download links to a supposed copy of the Chinese client of World of Warcraft: Wrath of the Lich King. The9 has yet to release the client pending review and approval of the government.

Here's the juicy tidbit from online games portal 17173:

The Chinese client of World of Warcraft: Wrath of the Lich King surfaced on the Internet on December 25. Blizzard and The9, the Chinese operator of WoW said they were investigating the case.

The download links to the client, which is rumored to be 1.7 gigabytes, appeared on the evening of December 25. The client, however, does not connect to World of Warcraft China but to the North American servers. The links have already been removed.

World of Warcraft: Wrath of the Lich King was released in North America and Europe in mid-November. The Chinese version is still being reviewed by the Chinese government.

56.    On January 8, 2009, The9 announced that it had adopted a Shareholder Rights Plan, which is the functional equivalent of a poison pill.

57.    On January 21, 2009, The9 announced that it had declared a special cash dividend in an aggregate amount of $29,410,000 or approximately $1.11 per share on its ordinary shares.

58.    On February 23, 2009, The9 filed a Form 6-K which announced its fourth quarter and fiscal year 2008 unaudited financial results. Specifically, the Form 6-K indicated that for fiscal year 2008, gross profit increased by 35% to $114,400,000 from $84,900,000 – an increase that The9 attributed to "increased revenues." In addition, net income for fiscal year 2008 was $51.1 million, a 45% increase from $35.3 million for fiscal year 2007.

59.    In its earnings press release, The9 began to allude to the fact that it would not be renewing its contract with Blizzard as Defendant Chen, the Company's President, stated, in pertinent part, as follows:

Given our strong pipeline of new games scheduled to be launched in 2009, including EA SPORTSTM FIFA Online 2, Audition 2, Atlantica and our proprietary game Warriors of Fate OnlineTM, we believe The9 is well positioned to leverage the tremendous growth of China's online game market and provide solid long term value to our shareholders. In recognition of the continued support of our shareholders, we paid $1.11 dividend per share in early February 2009, amounting to US$29.4 million, to our shareholders. As well as actively repurchased shares in the open market

throughout 2008. We have full confidence that we will provide significant value to our shareholders . . . .

60.    In a conference call following the issuance of this press release, Defendant Chen informed investors that the Company could not comment on the progress of negotiations with Blizzard about the WoW contract and that it intended to launch Wrath of the Lich King as soon as possible, stating, in pertinent part, as follows:

Number one, about update on renewal of the World of Warcraft license, at this point we regret that we cannot disclose any detail regarding that ongoing negotiation of renewal. We will disclose details of once a conclusion is reached and we appreciate your interest and understanding.

Number two, launch of Wrath of Lich King. We are actively preparing for the localization of Wrath of Lich King and the material has already been submitted for authorities' review. *At this point we're working very actively to make every preparation possible from content to technical and we hope to launch it as soon as possible*.

*            *            *

Blizzard Entertainment's second World of Warcraft expansion, Wrath of the Lich King was released in other regions in last November. More than 2.8m[illion] copies were sold in the first 24 hours of availability, making it the fastest-selling PC game of all time. Wrath of the Lich King was also awarded The Most Anticipated Online Game of the Year in the Chinese Game Annual Forum held in January 2009. *We're now actively preparing for its launch in China*.

61.    Also, during the February 23, 2009 conference call, analysts began trying to pin down the launch date for the Wrath of the Lich King, while Defendants misled investors to believe that the Company was still gearing up for its release:

Andrey Glukhov, Brean Murray, Carret & Co. Analyst:

Yes, thanks for taking the question. Xiaowei, it looks like you guys are currently thinking about launching the Wrath of Lich King and Audition 2 more like in Q2. In light of that, you started to turn the dial up on sales and marketing in Q4, which seems to be a bit early. So maybe can you give us some insight as to why did you guys decide to step up the marketing so far in advance of the launch for those two games?

Xiaowei Chen:

Andrey, thanks for your question. Number one, I cannot principally agree with you that it looks like we're launching Wrath of Lich King in Q2. The launch date of The Wrath of Lich King has not been determined yet at this point. And I regret that I cannot give you a specific date at this point. It is not scheduled for Q2 at this point either.

In terms of why we cranked up the dial on increasing sales and marketing in Q4, actually we cranked up the dial very strongly especially in the area of increasing the ground promotion forces. If you remember by the end of the year we had 370 ground promotion forces. And that more than doubled from the point when I entered The9 back in May, 2008. So in less than half a year we more than doubled the personnel in ground promotion forces, as well as their training and monitoring system, to monitor the effects of their ground promotion.

And going over, in 2009, we further look to triple, or more than triple that number to close to 1,200 by the end of 2009. And so a lot of the preparational work has to be done starting even Q3 and Q4 for the increase of personnel numbers because the monitoring system has to be in, the training system has to be in. Over and over -- so the increase of sales and marketing, some of it was for Wrath of Lich King, but in Q4 especially the majority of it was just for keeping up our ground promotion system. And it's something that it has to do all along the year and continue to do in 2009.

What we have observed is that the game that we have now, World of Warcraft, is such a big brand game that advertising can only do so much. And especially in coming 2009 games such as FIFA Online 2 and Audition 2 all have well recognized brand awareness in China.

***We think that the key thing actually to attract new users for both Wrath of Lich King as well as FIFA as well as Audition 2 is not necessarily just advertisement, but actually providing access to players***, whether he or she is in a big city like Shanghai or in a rural village, to provide access to them in the sense of getting point cards to their local Internet cafe or even teaching the players in local, rural areas how to play. And for that you really need a strong and well trained ground promotion force.

62.     As a result of these statements, the The9's stock price rose 8.3% to $13.22.

63.     The disclosures made in the February 23, 2009 Form 6-K and conference call were materially false and misleading because Defendants knew or should have known that Blizzard would not renew the Company's WoW contract and that it would have to restate earning for 2008 as a result of the non-renewal.

64.     On or about April 15, 2009, unofficial reports emerged that Blizzard had awarded the WoW contract to Netease, which reportedly had been adding new servers to accommodate the anticipated capacity of operating the online game.  In response, The9's trading volume spiked and the stock shed more than 20% of its value.

65.     Then, on April 16, 2009, The9 officially announced in a Form 6-K that "it has learned that Blizzard Entertainment's World of Warcraft will be licensed to another China-based online game company following the expiration of the current license agreement."  The very same day, Netease issued a press release which confirmed that Blizzard had licensed WoW to a Netease affiliate "in mainland China for a term of 3 years following the expiration of the current license agreement."  During the three day period from April 14 to 16, 2009, The9's stock dropped by approximately 32%, to $8.95 per share.

66.     The9 did not timely file its second quarter financial results.

67.     Within the month of April 2009, The9 launched a game called "World of Fight" at www.wofchina.com, an apparent knock-off of World of Warcraft.  In fact, the website address for WoW was www.wowchina.com, which is identical in all respects to The9's "World of Fight" website except for one letter.  Thereafter, it was widely reported that Netease would own the operation rights to WoW *and* its second expansion, Wrath of the Lich King, after The9's contract with Blizzard expired in June 2009.

68.     As a result of the expiration of the WoW contract, The9 was forced to shutter its Beijing business, reportedly leaving more than 2,000 of its Shanghai subsidiary's employees, who conducted operations for WoW, without work.  Moreover, reports surfaced that the Company had restructured its top management and that Defendant Chen, The9's President, would resign – accounts which the Company denied.

- 21 -

69.    On July 1, 2009, The9 filed a Notification of its inability to timely file its Form 20-F.

In connection with such notification, The9 filed a Form 6-K which provided, in pertinent part, as

follows:

> On April 16, 2009, The9 announced that it had learned that Blizzard Entertainment's
> World of Warcraft would be licensed to another China-based online game company
> following the expiration of the license agreement between Blizzard Entertainment
> and the Company on June 7, 2009. World of Warcraft accounts for a substantial
> majority of The9's revenue. The Company is finalizing its financial reporting
> treatment and related disclosures resulting from the non-renewal as reflected in its
> financial statements as of and for the year ended December 31, 2008.
>
> *As a result of the non-renewal of the World of Warcraft license agreement,* as well
> as taking into consideration certain other events that occurred subsequent to year-end
> in connection with certain other licensed games and lower than expected operating
> performance of one of its games, *the Company will record impairment and certain
> other charges in its financial statements for the year ended December 31, 2008. As
> a result of these charges, net income for the year ended December 31, 2008
> presented in its annual report on Form 20-F is expected to be between 55% and
> 75% lower than net income for the same period presented in the Form 6-K filed by
> the Company on February 24, 2009.* The Company intends to file the Form 20-F on
> or before July 15, 2009.

70.    Then, on July 15, 2009, The9 filed its Form 20-F, in which it reported its financial

results for the year ended December 31, 2008, as follows:

> Net income in 2008 decreased by 59.8% to RMB96.8 million (US$14.2 million)
> from RMB240.9 million in 2007, as a result of the cumulative effect of the above
> factors. The net impact resulting from loss of the WoW license and other charges
> listed above was a reduction in net income of approximately RMB251.5 million
> (US$36.9 million).
>
> *            *            *
>
> Revenue from operation of WoW accounted for approximately 99%, 92% and 91%
> of total revenue for the years ended December 31, 2006, 2007 and 2008. The WoW
> license was not renewed upon expiration on June 7, 2009. Accordingly, the Company
> ceased operating WoW and will not have revenue derived from the on-going
> operation of WoW beyond June 7, 2009.
>
> *Through end of March 2009, the Company and Blizzard were conducting ongoing
> negotiations, which formally commenced in April 2008 with respect to the
> Company continuing to operate WoW in mainland China. On April 16, 2009, the
> Company learned that WoW license would be licensed to another China-based*

- 22 -

> *online game company, the Company believed that an agreement by which the*
> *Company would continue to operate WoW beyond the expiration of the then*
> *existing license was imminent.*

71.    The Form 20-F further disclosed that "the Company recorded impairment and certain other charges in its financial statements for the year ended December 31, 2008 . . . [a]s a result of the non-renewal of the World of Warcraft license agreement beyond June 7, 2009 . . . ." These impairments and charges included, among other things, the following:

- A RMB19.4 million (US$2.8 million) provision for accounts receivable deemed to be uncollectible (Note 2<7>);

- A RMB3.9 million (US$0.6 million) provision for prepaid royalties (Note 14);

- A RMB22.7 million (US$3.3 million) charge to increase the valuation allowance for deferred tax assets representing incremental income taxes as a result of non-renewal of the WoW license (Note 15);

- RMB68.4 million (US$10.0 million) of additional depreciation expense related to computer equipment (Note 2<8>);

- A RMB46.5 million (US$6.8 million) provision for prepayment for equipments and a RMB8.7 million (US$1.3 million) provision on advances to suppliers (Note 16); and

- RMB7.3 million (US$1.1 million) provision on prepayments and other current assets, including a RMB5.6 million (US$0.8 million) provision on a receivable (Note 22) and a RMB1.7 million (US$0.3 million) provision on inventories.

72.    Thus, the Company reported a $36.9 million – or 72% – reduction in net income for 2008 from $51.1 million in net income that it had reported for that period on February 23, 2009. Moreover, The9 admitted that it had not even *begun* negotiations with Blizzard concerning the renewal of the WoW contract as of the date that it previously represented to investors that it had. As the Company disclosed, however, the WoW contract accounted for "approximately 91% of our total revenue in 2008 . . . ."

73.    In response to this news, shares of The9's stock dropped 18% to $8.34.

74.    The market for The9 stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions, The9's stock traded at artificially inflated prices during the Class Period. Moreover, at all relevant times, these misstatements and omissions directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As detailed herein, Plaintiff and other members of the Class purchased The9 stock in reliance upon the integrity of its market price and market information relating to The9, and have been damaged thereby.

### Additional Scienter Allegations

75.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or document as primary violations of federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information.

76.    In addition, during the Class Period, certain of Defendants and other Company insiders sold shares of their personally-held stock for proceeds in excess of $125 million. These sales were unusual and suspicious in timing and amount, and were executed by the following insiders: (i) Defendant Lee, CFO; (ii) Gary Lai ("G. Lai"), a director; (iii) He Xudong, a VP; (iv)-(vi) Davin A. Mackenzie ("Mackenzie"), Chao Y. Wang ("Wang") and Ka Keung Yeung (Yeung"), each of whom is a director and, together, comprise the three members of the Board's Audit Committee ("AC"); (vii) Stephen Law ("Law"), a director that Bosma appointed to the Board pursuant to the Voting Agreement with Incsight; (viii) Jun Yao ("Yao"), a Senior VP; (ix) Incsight, an entity solely owned and controlled by CEO Defendant Zhu, which, together with Bosma, owned a

majority of the Company's shares prior to the massive sell-off described herein[5]; and (x) Bosma, an entity over which Zhu exercises significant influence and control, both directly and indirectly.

77.    The Class Period sales that these insiders made, set forth in chronological order, are depicted in the following chart:

| Name | Position | Date | Shares | Price | Proceeds |
|------|----------|------|--------|-------|----------|
| BOSMA | 10%+ Owner, | 11/20/06 | 250,000 | $27.70 | $6,925,000 |
| | 50%+ Owner | 11/21/06 | 100,000 | $26.96 | $2,696,000 |
| | with Incsight | 11/22/06 | 927,769 | $27.84 | $25,829,089 |
| | | 09/10/07 | 1,000,000 | $35.58 | $35,580,000 |
| | | 03/17/08 | 3,201 | $18.18 | $58,192 |
| | | 03/18/08 | 40,700 | $18.01 | $733,125 |
| | | 03/19/08 | 25,100 | $18.11 | $454,594 |
| | | 03/20/08 | 2,456 | $17.75 | $43,594 |
| | | 03/20/08 | 86,819 | $17.48 | $1,517,596 |
| | | 08/13/08 | 500,000 | $22.60 | $11,300,000 |
| | | | 2,936,045 | | $85,137,190 |
| | | | | | |
| INCSIGHT | 10%+ Owner, | 11/16/06 | 30,000 | $26.37 | $791,238 |
| | 50%+ Owner | 11/17/06 | 4,310 | $27.75 | $119,624 |
| | with Bosma, | 11/17/06 | 22,189 | $28.00 | $621,292 |
| | Zhu Controls | 11/24/06 | 30,000 | $28.00 | $840,000 |
| | | 12/04/06 | 30,000 | $28.00 | $840,000 |
| | | 12/05/06 | 17,811 | $28.75 | $512,066 |
| | | 12/07/06 | 190,000 | $29.89 | $5,680,000 |
| | | 04/02/07 | 1,700 | $35.02 | $59,535 |
| | | 04/03/07 | 30,000 | $35.41 | $1,062,213 |
| | | 04/04/07 | 30,000 | $37.03 | $1,110,756 |
| | | 04/05/07 | 30,000 | $35.72 | $1,071,543 |
| | | 04/09/07 | 100,000 | $40.00 | $4,000,000 |
| | | 06/16/08 | 30,000 | $25.94 | $778,200 |
| | | 06/17/08 | 30,000 | $25.24 | $757,200 |
| | | 07/02/08 | 200,000 | $22.45 | $4,490,000 |
| | | 07/09/08 | 100,000 | $25.00 | $2,500,000 |
| | | 09/18/08 | 100,000 | $25.00 | $2,500,000 |
| | | | 976,010 | | $27,733,667 |

---

[5]    In fact, at the time that certain of these sales were made, Incsight may have held *all* of Defendant Zhu's shares.

| Name | Position | Date | Shares | Price | Proceeds |
|------|----------|------|--------|-------|----------|
| G. LAI | Director | 12/05/06 | 7,000 | $29.50 | $206,500 |
| | | 12/07/06 | 7,300 | $29.53 | $215,570 |
| | | 12/12/06 | 8,611 | $29.60 | $254,899 |
| | | 12/15/06 | 199 | $27.00 | $5,373 |
| | | 12/15/06 | 5,490 | $26.66 | $146,376 |
| | | 12/27/06 | 10,000 | $32.16 | $321,574 |
| | | 01/11/07 | 10,000 | $33.81 | $338,097 |
| | | 01/16/07 | 10,000 | $34.52 | $345,183 |
| | | 03/16/07 | 30,000 | $34.99 | $1,049,700 |
| | | | 88,600 | | $2,883,271 |
| LAW | Director | 06/12/07 | 12,214 | $42.98 | $524,958 |
| | | | 12,214 | | $524,958 |
| LEE | CFO | 12/27/06 | 10,104 | $32.08 | $324,139 |
| | | 01/11/07 | 10,601 | $33.45 | $354,601 |
| | | 01/16/07 | 5,399 | $34.59 | $186,763 |
| | | 04/18/07 | 9,999 | $41.44 | $414,334 |
| | | 05/21/07 | 3,212 | $39.47 | $126,778 |
| | | 06/21/07 | 2,500 | $45.10 | $112,750 |
| | | 06/22/07 | 3,500 | $45.64 | $159,750 |
| | | 07/06/07 | 5,009 | $49.89 | $249,899 |
| | | 03/11/08 | 64,218 | $21.14 | $1,357,470 |
| | | | 114,542 | | $3,286,484 |
| MACKENZIE | Director, AC Member | 12/31/06 | 7,150 | $27.39 | $195,839 |
| | | 04/09/07 | 2,979 | $41.00 | $122,139 |
| | | | 10,129 | | $317,978 |
| WANG | Director, AC Member | 12/26/06 | 6,000 | $30.60 | $183,629 |
| | | 12/28/06 | 7,704 | $32.59 | $251,060 |
| | | | 13,704 | | $434,689 |
| XUDONG | VP | 03/05/07 | 53,000 | $33.15 | $1,757,000 |
| | | 04/09/07 | 23,000 | $40.04 | $920,851 |
| | | 06/04/07 | 30,000 | $42.67 | $1,280,000 |
| | | | 106,000 | | $3,957,851 |
| YAO | Senior VP | 12/26/06 | 5,000 | $30.86 | $154,286 |
| | | 12/27/06 | 6,212 | $32.23 | $200,217 |
| | | | 11,212 | | $354,504 |
| YEUNG | Director, AC Chairman | 06/20/07 | 5,000 | $44.06 | $220,300 |
| | | 06/21/07 | 9,000 | $45.00 | $405,000 |
| | | | 14,000 | | $625,300 |

| Name | Position | Date | Shares | Price | Proceeds |
|------|----------|------|--------|-------|----------|
|      |          | **Total:** | **4,282,456** |  | **$125,255,891** |

78.     Moreover, as disclosed in the July 15, 2009 Form 20-F for fiscal year 2008, on November 20, 2008, the Company's Board approved an increase in the maximum aggregate number of ordinary shares – from 2,449,614 to 4,449,614 shares – which may be subject to option or stock purchase rights pursuant to The9's 2004 Share Option Plan. According to the Form 20-F, the Board elected to follow "home country practices" of the Cayman Islands, which would not require shareholder approval for such action, as opposed to NASDAQ requirements, which would:

> We understand Nasdaq Marketplace Rule 4350(i) requires us to obtain shareholder approval prior to adopting or materially amending an equity compensation plan (including stock option plans). We also understand we can elect to follow "home country practices" in lieu of the requirements of Nasdaq Marketplace Rule 4350(i). The Companies Law (2007 Revision) of the Cayman Islands does not require us to obtain shareholder approval for amending existing equity incentive plans, nor is doing so required under our amended and restated memorandum and articles of association. *In this instance we elected to follow "home country practice" and did not seek shareholder approval in connection with amending the 2004 Share Option Plan.*

79.     Accordingly, Defendants were strongly incentivized to make false and misleading statements in order to exploit The9's artificially inflated stock price.

80.     Furthermore, The9's management was aware of internal control deficiencies during the Class Period, which the Company acknowledged in the July 15, 2009 Form 20-F. To remediate these deficiencies, the Company purportedly "hired a new chief financial officer, a new financial director and a new internal audit director, each of whom has solid knowledge of and experience with U.S. GAAP and SOX compliance[.]"  In fact, Defendant Lee resigned as CFO effective late-February 2008, and her replacement, Defendant Tse, resigned effective early-July 2008. Although the Company claimed that Lee had resigned to "pursue other interests" and that Tse had resigned

only four months later "due to personal and family reasons," The9's internal control deficiencies, coupled with the ongoing fraudulent scheme, clearly played a part in both resignations.

## Fraud on the Market Doctrine

81.     At all relevant times, the market for The9's stock was an efficient market for the following reasons among others:

(a)     The9 stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)     The9 filed periodic public reports with the SEC and the NASDAQ;

(c)     The9 regularly communicated the public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newsier services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     The9 was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

82.     As a result of the foregoing, the market for The9's stock promptly digested current information regarding The9 from all publicly available sources and reflected such information in The9's stock price. Under these circumstances, all purchaser of The9's stock during the Class Period suffered similar injury through their purchase of The9's stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

83.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward looking statements"

- 28 -

when made. To the extent there were any forward looking statements there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of The9 who knew that those statement were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

84. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

85. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made not misleading.

86. Defendants: (a) employed devices, scheme, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchaser of the Company's stock during the Class Period.

87. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices of The9 stock, Plaintiff and the Class would not have

purchased The9 stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

88.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damage in connection with their purchase of The9 stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

89.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

90.     The Individual Defendants acted as controlling persons of The9 within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of The9, and their ownership of The9 stock, the Individual Defendants had the power and authority to cause The9 to engage in the wrongful conduct complained of herein.

91.     By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred

in this action, including counsel fees and expert fees; and

(d)     Awarding such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

DATED:  October 21, 2009                    COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                            SAMUEL H. RUDMAN
                                            DAVID A. ROSENFELD
                                            JOSEPH RUSSELLO


                                            _____
                                            SAMUEL H. RUDMAN

                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone:  631/367-7100
                                            631/367-1173 (fax)

                                            WALDEN LAW FIRM, PLLC
                                            RICHARD E. WALDEN
                                            8201 Cantrell, Suite 315
                                            Little Rock, AR  72227
                                            Telephone:  501/907-7000
                                            888/220-7933 (fax)

                                            *Attorneys for Plaintiff*

- 31 -

## PLAINTIFF'S CERTIFICATION

Larry Glaser ("Plaintiff") declares under penalty of perjury, as to claims asserted under the federal securities laws, that:

1.      Plaintiff has viewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in The9, Ltd., during the Class Period on behalf of himself specified in the Complaint are as follows:

See attached Spreadsheet.

5.      During the three years prior to the date of this Certificate, Plaintiff has participated in *Glaser v. Enzo, et al, U.S. District Court Eastern District of Virginia - (Alexandria) 1:02-cv-01242-GBL*P as a representative plaintiff in a case which involved the violation of federal securities laws.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the Class beyond the Plaintiff's pro rata share of any recovery, expect such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of October, 2009.

_____
Larry Glaser

**PURCHASES**
**Page 2 of 3**

Glaser, Larry

| DATE | SHARES | PRICE | TOTAL |
|---|---|---|---|
| 12/6/07 | 218 | $ 25.1000 | $ 5,471.80 |
| 12/6/07 | 282 | $ 24.1800 | $ 6,818.76 |
| 12/6/07 | 400 | $ 23.9500 | $ 9,580.00 |
| 12/6/07 | 400 | $ 24.1000 | $ 9,640.00 |
| 12/6/07 | 400 | $ 25.0000 | $ 10,000.00 |
| 12/6/07 | 500 | $ 23.8500 | $ 11,925.00 |
| 12/6/07 | 600 | $ 23.2300 | $ 13,938.00 |
| 12/6/07 | 600 | $ 23.4100 | $ 14,046.00 |
| 12/6/07 | 1,000 | $ 23.5100 | $ 23,510.00 |
| 12/6/07 | 1,000 | $ 23.8500 | $ 23,850.00 |
| 12/6/07 | 2,000 | $ 23.8300 | $ 47,660.00 |
| 12/6/07 | 3,800 | $ 22.9900 | $ 87,362.00 |
| 12/6/07 | 3,800 | $ 23.1300 | $ 87,894.00 |
| 12/6/07 | 5,000 | $ 23.3900 | $ 116,950.00 |
| 12/10/07 | 2,000 | $ 23.8600 | $ 47,720.00 |
| 12/11/07 | 200 | $ 23.3900 | $ 4,678.00 |
| 12/11/07 | 300 | $ 23.4900 | $ 7,047.00 |
| 12/12/07 | 200 | $ 24.1600 | $ 4,832.00 |
| 12/12/07 | 200 | $ 24.9600 | $ 4,992.00 |
| 12/12/07 | 500 | $ 23.6600 | $ 11,830.00 |
| 12/13/07 | 98 | $ 25.8300 | $ 2,531.34 |
| 12/13/07 | 100 | $ 25.4400 | $ 2,544.00 |
| 12/13/07 | 100 | $ 25.8400 | $ 2,584.00 |
| 12/13/07 | 302 | $ 25.8340 | $ 7,801.87 |
| 12/14/07 | 100 | $ 25.0000 | $ 2,500.00 |
| 12/14/07 | 100 | $ 25.6500 | $ 2,565.00 |
| 12/14/07 | 100 | $ 25.7300 | $ 2,573.00 |
| 12/14/07 | 300 | $ 25.7200 | $ 7,716.00 |
| 12/14/07 | 300 | $ 25.7400 | $ 7,722.00 |
| 12/14/07 | 400 | $ 25.6400 | $ 10,256.00 |
| 12/14/07 | 500 | $ 24.5320 | $ 12,266.00 |
| 12/14/07 | 1,300 | $ 25.7500 | $ 33,475.00 |
| 12/18/07 | 500 | $ 24.0000 | $ 12,000.00 |
| 12/18/07 | 500 | $ 24.2600 | $ 12,130.00 |
| 12/27/07 | 4,500 | $ 25.0000 | $ 112,500.00 |
| 1/2/08 | 500 | $ 23.1300 | $ 11,565.00 |
| 1/2/08 | 1,000 | $ 22.5200 | $ 22,520.00 |
| 1/2/08 | 1,000 | $ 22.6300 | $ 22,630.00 |
| 1/3/08 | 100 | $ 21.9740 | $ 2,197.40 |
| 1/3/08 | 100 | $ 22.0080 | $ 2,200.80 |
| 1/3/08 | 200 | $ 21.9500 | $ 4,390.00 |
| 1/3/08 | 500 | $ 21.4540 | $ 10,727.00 |
| 1/3/08 | 600 | $ 21.9000 | $ 13,140.00 |
| 1/4/08 | 500 | $ 21.9280 | $ 10,964.00 |
| 1/9/08 | 100 | $ 21.0800 | $ 2,108.00 |
| 1/9/08 | 200 | $ 20.8980 | $ 4,179.60 |
| 1/9/08 | 300 | $ 20.9700 | $ 6,291.00 |
| 1/10/08 | 200 | $ 20.5640 | $ 4,112.80 |
| 1/10/08 | 200 | $ 20.5920 | $ 4,118.40 |
| 1/10/08 | 300 | $ 20.3700 | $ 6,111.00 |
| 1/10/08 | 700 | $ 20.8000 | $ 14,560.00 |
| 1/23/08 | 900 | $ 22.6600 | $ 20,394.00 |
| 1/24/08 | 42 | $ 19.5800 | $ 822.36 |
| 1/24/08 | 250 | $ 22.0000 | $ 5,500.00 |
| 1/24/08 | 400 | $ 18.8680 | $ 7,547.20 |
| 1/24/08 | 600 | $ 18.8700 | $ 11,322.00 |
| 1/24/08 | 958 | $ 19.5680 | $ 18,746.14 |
| 1/24/08 | 2,000 | $ 22.5000 | $ 45,000.00 |
| 3/28/08 | 300 | $ 19.3100 | $ 5,793.00 |
| 4/29/08 | 100 | $ 20.8940 | $ 2,089.40 |
| 4/29/08 | 400 | $ 20.8880 | $ 8,355.20 |
| 5/9/08 | 100 | $ 22.3730 | $ 2,237.30 |
| 5/9/08 | 100 | $ 22.3900 | $ 2,239.00 |
| 5/9/08 | 200 | $ 22.3640 | $ 4,472.80 |
| 5/19/08 | 100 | $ 24.2820 | $ 2,428.20 |
| 5/20/08 | 500 | $ 25.0880 | $ 12,544.00 |
| 5/21/08 | 150 | $ 24.9100 | $ 3,736.50 |
| 5/21/08 | 200 | $ 24.7200 | $ 4,944.00 |
| 5/21/08 | 200 | $ 24.8100 | $ 4,962.00 |
| 5/21/08 | 450 | $ 24.6700 | $ 11,101.50 |
| 5/21/08 | 1,000 | $ 25.0000 | $ 25,000.00 |
| 5/21/08 | 1,000 | $ 25.1130 | $ 25,113.00 |
| 7/9/08 | 310 | $ 24.1900 | $ 7,498.90 |
| 7/15/08 | 100 | $ 25.1340 | $ 2,513.40 |
| 7/15/08 | 100 | $ 25.1440 | $ 2,514.40 |
| 7/15/08 | 100 | $ 25.3940 | $ 2,539.40 |
| 7/15/08 | 300 | $ 25.1380 | $ 7,541.40 |
| 7/29/08 | 100 | $ 24.0260 | $ 2,402.60 |
| 7/29/08 | 100 | $ 24.0320 | $ 2,403.20 |
| 7/29/08 | 100 | $ 24.0320 | $ 2,403.20 |
| 7/29/08 | 100 | $ 24.0340 | $ 2,403.40 |
| 7/29/08 | 100 | $ 24.0400 | $ 2,404.00 |
| **Total:** | **50,460** | | **$ 1,181,695.27** |

Glaser, Larry

| DATE | NUMBER SOLD | PRICE | TOTAL |
|---|---|---|---|
| 2/1/08 | 800 | $ 17.7600 | 14,208.00 |
| 2/1/08 | 796 | $ 17.7500 | 14,129.00 |
| 2/1/08 | 700 | $ 17.7900 | 12,453.00 |
| 2/1/08 | 600 | $ 17.7800 | 10,668.00 |
| 2/1/08 | 500 | $ 17.8100 | 8,905.00 |
| 2/1/08 | 200 | $ 17.9000 | 3,580.00 |
| 2/1/08 | 200 | $ 17.9100 | 3,582.00 |
| 2/1/08 | 200 | $ 17.8000 | 3,560.00 |
| 2/1/08 | 104 | $ 17.9200 | 1,863.68 |
| 2/1/08 | 100 | $ 17.8400 | 1,784.00 |
| 2/1/08 | 100 | $ 17.8300 | 1,783.00 |
| 2/1/08 | 100 | $ 17.9400 | 1,794.00 |
| 2/4/08 | 1,100 | $ 18.2700 | 20,097.00 |
| 2/4/08 | 200 | $ 18.2900 | 3,658.00 |
| 2/5/08 | 200 | $ 17.5100 | 3,502.00 |
| 2/5/08 | 100 | $ 17.5000 | 1,750.00 |
| 2/5/08 | 100 | $ 17.5700 | 1,757.00 |
| 2/6/08 | 100 | $ 17.7100 | 1,771.00 |
| 2/6/08 | 95 | $ 17.7000 | 1,681.50 |
| 2/7/08 | 120 | $ 18.8170 | 2,258.04 |
| 2/12/08 | 200 | $ 17.2660 | 3,453.20 |
| 2/12/08 | 200 | $ 17.3020 | 3,460.40 |
| 2/12/08 | 100 | $ 17.2560 | 1,725.60 |
| 2/22/08 | 235 | $ 18.0300 | 4,237.05 |
| 3/4/08 | 2,000 | $ 22.6600 | 45,320.00 |
| 3/14/08 | 1,700 | $ 18.7050 | 31,798.50 |
| 3/14/08 | 300 | $ 18.7140 | 5,614.20 |
| 3/17/08 | 1,084 | $ 19.8860 | 21,556.42 |
| 3/17/08 | 1,000 | $ 18.8950 | 18,895.00 |
| 3/17/08 | 516 | $ 20.0030 | 10,321.55 |
| 3/17/08 | 200 | $ 20.0100 | 4,002.00 |
| 3/17/08 | 100 | $ 19.9530 | 1,995.30 |
| 3/17/08 | 100 | $ 19.9130 | 1,991.30 |
| 3/17/08 | 100 | $ 19.9040 | 1,990.40 |
| 3/26/08 | 2,500 | $ 17.6500 | 44,125.00 |
| 3/26/08 | 2,500 | $ 17.4720 | 43,680.00 |
| 3/26/08 | 2,000 | $ 17.5400 | 35,080.00 |
| 3/26/08 | 2,000 | $ 17.5200 | 35,040.00 |
| 3/26/08 | 1,312 | $ 17.4810 | 22,935.07 |
| 3/26/08 | 600 | $ 17.4910 | 10,494.60 |
| 3/26/08 | 500 | $ 17.4820 | 8,741.00 |
| 3/26/08 | 400 | $ 17.4920 | 6,996.80 |
| 3/26/08 | 188 | $ 17.4910 | 3,288.31 |
| 3/27/08 | 1,800 | $ 18.3990 | 33,102.00 |
| 3/27/08 | 700 | $ 18.0640 | 12,644.80 |
| 3/27/08 | 600 | $ 17.9400 | 10,764.00 |
| 3/27/08 | 200 | $ 17.9350 | 3,587.00 |
| 3/27/08 | 100 | $ 18.2530 | 1,825.30 |
| 3/27/08 | 100 | $ 18.0470 | 1,804.70 |
| 3/27/08 | 100 | $ 18.0380 | 1,803.80 |
| 3/27/08 | 100 | $ 17.9450 | 1,794.50 |
| 3/27/08 | 100 | $ 17.9440 | 1,794.40 |
| 5/21/08 | 600 | $ 25.1000 | 15,060.00 |
| 5/21/08 | 200 | $ 24.9600 | 4,992.00 |
| 5/21/08 | 149 | $ 24.9500 | 3,717.55 |
| 5/21/08 | 50 | $ 25.0000 | 1,250.00 |
| 5/21/08 | 1 | $ 25.2500 | 25.25 |
| 7/1/08 | 95 | $ 22.3100 | 2,119.45 |
| 7/1/08 | 200 | $ 22.3660 | 4,473.20 |
| 7/1/08 | 200 | $ 22.3860 | 4,477.20 |
| 7/1/08 | 100 | $ 22.2850 | 2,228.50 |
| 7/3/08 | 90 | $ 22.5900 | 2,033.10 |
| 7/3/08 | 3,060 | $ 22.5160 | 68,898.96 |
| 7/3/08 | 400 | $ 22.5800 | 9,032.00 |
| 7/3/08 | 200 | $ 22.5250 | 4,505.00 |
| 7/3/08 | 100 | $ 22.5610 | 2,256.10 |
| 7/7/08 | 800 | $ 22.8100 | 18,248.00 |
| 7/7/08 | 300 | $ 22.8270 | 6,848.10 |
| 7/7/08 | 185 | $ 22.7200 | 4,203.20 |
| 7/7/08 | 100 | $ 22.8180 | 2,281.80 |
| 7/7/08 | 100 | $ 22.8090 | 2,280.90 |
| 7/7/08 | 100 | $ 22.7400 | 2,274.00 |
| 7/8/08 | 180 | $ 25.7310 | 4,631.58 |
| 7/8/08 | 100 | $ 25.7320 | 2,573.20 |
| 7/22/08 | 600 | $ 26.2700 | 15,762.00 |
| 7/29/08 | 50 | $ 23.5730 | 1,178.65 |
| 7/29/08 | 50 | $ 23.5000 | 1,175.00 |
| 7/29/08 | 4 | $ 23.5830 | 94.33 |
| 7/29/08 | 1,700 | $ 23.5410 | 40,019.70 |
| 7/29/08 | 1,300 | $ 23.5400 | 30,602.00 |
| 7/29/08 | 1,000 | $ 23.6500 | 23,650.00 |
| 7/29/08 | 1,000 | $ 23.5730 | 23,573.00 |
| 7/29/08 | 600 | $ 23.6520 | 14,191.20 |
| 7/29/08 | 600 | $ 23.2950 | 13,977.00 |
| 7/29/08 | 500 | $ 23.3320 | 11,666.00 |
| 7/29/08 | 450 | $ 23.5230 | 10,585.35 |
| 7/29/08 | 446 | $ 23.2430 | 10,366.38 |
| 7/29/08 | 400 | $ 23.6130 | 9,445.20 |
| 7/29/08 | 400 | $ 23.5640 | 9,425.60 |
| 7/29/08 | 300 | $ 23.5500 | 7,065.00 |
| 7/29/08 | 300 | $ 23.5210 | 7,056.30 |
| 7/29/08 | 300 | $ 23.5010 | 7,050.30 |
| 7/29/08 | 300 | $ 23.4810 | 7,044.90 |
| 7/29/08 | 300 | $ 23.2630 | 6,978.90 |
| 7/29/08 | 200 | $ 23.6700 | 4,734.00 |
| 7/29/08 | 200 | $ 23.5570 | 4,711.40 |
| 7/29/08 | 200 | $ 23.5110 | 4,702.20 |
| 7/29/08 | 200 | $ 23.5000 | 4,700.00 |
| 7/29/08 | 200 | $ 23.3810 | 4,676.20 |
| 7/29/08 | 200 | $ 23.2820 | 4,656.40 |
| 7/29/08 | 200 | $ 23.2550 | 4,651.00 |
| 7/29/08 | 100 | $ 23.6600 | 2,366.00 |
| 7/29/08 | 100 | $ 23.6410 | 2,364.10 |
| 7/29/08 | 100 | $ 23.6230 | 2,362.30 |
| 7/29/08 | 100 | $ 23.5530 | 2,355.30 |
| 7/29/08 | 100 | $ 23.5310 | 2,353.10 |
| 7/29/08 | 100 | $ 23.5220 | 2,352.20 |
| 7/29/08 | 100 | $ 23.3930 | 2,339.30 |
| 7/29/08 | 100 | $ 23.3400 | 2,334.00 |
| 7/29/08 | 100 | $ 23.3210 | 2,332.10 |
| 7/29/08 | 100 | $ 23.3120 | 2,331.20 |
| 7/29/08 | 100 | $ 23.3100 | 2,331.00 |
| **Total:** | **50,460** | | **$  1,029,614.12** |