UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x
LAWRENCE F. GLASER, on Behalf of  : Civil Action No. 1:09-cv-08904-RJH
Himself and All Others Similarly Situated,  : (**Consolidated**)
 :
                          Plaintiff,  : CONSOLIDATED COMPLAINT
 :
        vs.  :
 : <u>CLASS ACTION</u>
THE9, LTD., et al.,  :
 :
                          Defendants.  :
 :
—————————————————— x

Lead Plaintiffs Lawrence F. Glaser and Chen Kuang ("Lead Plaintiffs" or "Plaintiffs"), by their undersigned attorneys, on behalf of themselves and the class they seek to represent, for their Consolidated Complaint (the "Complaint"), allege the following upon knowledge as to their own acts, and upon the investigation conducted by Lead Plaintiffs' counsel as detailed below.

## NATURE OF THE ACTION

1.  Lead Plaintiffs bring this securities fraud class action against The9, Ltd. ("The9" or the "Company"), Jun Zhu, Xiaowei Chen, George Lai, Hannah Lee and Tony Tse on behalf of all purchasers of the American Depositary Shares ("ADS") (as evidenced by American Depositary Receipts) and options (collectively, "Securities") of The9 between November 15, 2006 and July 15, 2009, inclusive (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules and regulations promulgated thereunder.

2.  The9 is an online game operator and developer in China. World of Warcraft ("WoW"), one of the most popular online video games in the United States, was developed and owned by Vivendi Universal Games ("Vivendi"). On February 3, 2004, an affiliate of The9 entered into an agreement with Vivendi, pursuant to which it obtained an exclusive license from Vivendi to operate WoW in China (the "WoW Contract") for four years. The WoW Contract was first amended in January 2007, at which time Blizzard Entertainment Inc. ("Blizzard"), a Vivendi subsidiary, became a party thereto (the parties to the WoW Contract are referred to as "The9" and "Blizzard" herein unless otherwise indicated).

3.  The9 launched WoW in China during June 2005 and prior to the launch did not generate meaningful revenues. WoW was an instant success in China for The9 and generated significant revenues, cash and growth for the Company. Most of The9's revenues and earnings throughout the entire Class Period were from the operation of WoW. Indeed, The9 generated more than 90% of its revenues from WoW during the Class Period. As its core business, Defendants knew

that the loss of WoW would be detrimental to The9's Securities and financial prospects. Thus, throughout the Class Period, the Company was a "one-trick pony" and the Company's revenues, earnings and business prospects were dependent upon The9's ability to license WoW from Blizzard.

4.    Even though WoW was popular in China and generated significant revenues for The9, the Company encountered operational problems that frustrated WoW's users and hampered its growth and popularity. By March 2006, tensions developed between The9 and Blizzard due to The9's failure to properly manage WoW; thereafter, various disputes arose between The9 and Blizzard. As discussed below, according to a former senior executive of The9 interviewed during Plaintiffs' investigation, Defendant Zhu expressed to Company insiders by early 2007 that it would be nearly impossible to renew the WoW Contract.

5.    Defendants thus recognized that there was a finite window for them to benefit financially from WoW since the WoW Contract was set to expire in June 2009 and the Company did not have any games that could replace the revenues generated by WoW. To personally take advantage of this window of opportunity, Defendants engaged in various transactions to line their own pockets during the period that it was certain that The9 would operate WoW.

6.    Defendants engaged in various illegal and related-party transactions to benefit themselves at the expense of the Company and its shareholders. Defendant Zhu engaged in back-room deals with a computer vendor and received illegal kickbacks of more than $8 million from the Company's purchase of computer equipment. Similarly, Defendants caused The9 to invest $3.5 million in a Korean game development company only to secretly transfer the money and assets to another company and write-off The9's investment. Defendants set up separate corporate entities that provided services for WoW, caused the Company to make related-party investments and loaned insiders money generated from WoW.

7.    Furthermore, during the Class Period, Defendants made numerous false and misleading statements about the relationship between The9 and Blizzard and repeatedly told investors that it was highly likely that The9 would renew the WoW Contract. These false and misleading statements artificially inflated The9's stock and enabled Company insiders, including the Individual Defendants, to sell more than $125 million of The9 Securities. Contrary to their representations, Defendants knew, or recklessly disregarded, that it was not highly likely that The9 would renew the WoW Contract and that Defendants expected that the WoW Contract would not be renewed.

8.    Defendants represented that The9 had entered into discussions with Blizzard for renewal of the WoW Contract during the third quarter of 2007 – and that renewal was highly likely – even though they later stated that discussions had not even started until April or May 2008. Even after discussions had purportedly started, Defendants misrepresented how well the discussions were going and falsely portrayed the risk that The9 would not renew the WoW Contract. By the end of 2008, Defendants knew, or recklessly disregarded, that The9 would not renew the WoW Contract and that The9 Securities would plummet when investors learned the truth. In an effort to capitalize on this confidential information, the Individual Defendants, among other things, withdrew millions of dollars from the Company in the form of a special dividend and enacted a poison pill plan to prevent a third-party from acquiring control of the Company (and its cash generated from WoW) in the event of a significant decline in the Company's Securities.

9.    On April 15, 2009, public reports indicated that The9 would not be renewing the WoW Contract. In response to this news, shares of the Company's ADSs fell $3.26 per ADS, or 25%, from a close of $13.22 per ADS before the reports, to close at $9.96 per ADS, on extremely heavy trading volume. Then, The9 and Blizzard separately formally announced that Blizzard would

not be renewing the WoW Contract with The9.  In response to this news, on April 16, 2009, shares of the Company's ADSs fell an additional $1.01 per ADS, or 10%, from a close of $9.96 per ADS before the announcement, to close at $8.95 per ADS, on extremely heavy trading volume.  During the three day period from April 14 to 16, 2009, The9's stock dropped by $4.27 per ADS, or approximately 32%, from $13.22 per ADS to $8.95 per ADS, on extremely heavy trading volume. The9's ADS price dropped again in July, when The9 announced that its operating income for 2008, initially reported in February 2009, would be reduced by as much as 75%, primarily due to the loss of the WoW contract.  On July 16, 2009, The9 filed its form 20-F for fiscal 2008, reducing the net income figures reported several months earlier by a whopping 72%.

## BASIS OF ALLEGATIONS

10.     The allegations herein are based upon the investigation conducted by and under the supervision of Lead Plaintiffs' counsel, which included reviewing and analyzing information relating to the relevant time period obtained from numerous public and proprietary sources (such as LexisNexis®, Dow Jones and Bloomberg, Inc.) – including, *inter alia*, U.S. Securities and Exchange Commission ("SEC") filings, other regulatory filings and reports, publicly available annual reports, press releases, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services, in order to obtain the information necessary to plead Lead Plaintiffs' claims with particularity.  In the course of their investigation of the underlying claims, a number of individuals who possessed direct knowledge of the wrongdoing alleged herein were interviewed.  Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

12.    This Court has jurisdiction over the subject mater of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

13.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the false and misleading statements identified herein were distributed throughout this District and many of the acts and practices complained of herein occurred in substantial part in this District.  The9 ADSs traded over the NASDAQ Global Stock Market (the "NASDAQ"), which is based in this District.

14.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

15.    Lead Plaintiffs Lawrence F. Glaser and Chen Kuang, as set forth in the certifications previously filed with the Court and incorporated by reference herein, purchased the ADSs and/or options of The9 during the Class Period and have been damaged thereby.

16.    Defendant The9 is an online game operator and developer in China.  During the Class Period, the Company, directly and through its affiliates and/or subsidiaries, operated licensed massively multiplayer online role-playing games ("MMORPGs") and advanced casual games in China, including its primary revenue generator, WoW.  WoW was commercially launched in China in June 2005.  In 2006, 2007 and 2008, 99%, 92% and 91% of the Company's total revenues, respectively, were attributable to the operation of WoW in China, including game playing time,

merchandise sales and other related revenues.  The9's stock is publicly traded in the form of ADSs on the NASDAQ, under the symbol "NCTY."  Each ADS represents one ordinary share.

17.    (a)    Defendant Jun Zhu ("Zhu"), a co-founder of the Company, has served as Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") of the Company since its inception.  Zhu owns and controls Incsight, Ltd. ("Incsight"), an entity that holds virtually all of his shares in the Company and which, as of May 31, 2008, beneficially owned more than 20% of the Company's outstanding ordinary shares.  Incsight had a longstanding voting agreement with Bosma, Ltd. ("Bosma"), which owned more than 17% of the Company's outstanding ordinary shares as of May 31, 2008, pursuant to which Zhu exerted substantial influence over Bosma's interaction with the Company during (and after) the Class Period.  Incsight and Bosma collectively held approximately 53.1% of the Company's outstanding ordinary shares at or near the start of the Class Period – with Incsight holding 26.9%, and Bosma holding 26.2%, of such stock – prior to the massive insider sell-off described herein.

(b)    Defendant Hannah Lee ("Lee") served as The9's Chief Financial Officer ("CFO") and a Vice President ("VP") (later, Senior VP) from January 2004 through February 2008, when Defendant Tony Tse ("Tse") assumed the position of CFO as a result of Lee's resignation.  Although the Company claimed that Lee had resigned to "pursue other interests," The9 later disclosed that deficient internal controls required the replacement of the CFO.

(c)    Defendant Tse served as The9's CFO from April 2008 to July 3, 2008, when Defendant George Lai ("Lai") assumed the position as a result of Tse's resignation.  Although the Company claimed that the resignation occurred "due to personal and family reasons," The9 later disclosed that deficient internal controls required the replacement of the CFO.

(d)     Defendant Lai served as The9's CFO from July 3, 2008 through the end of the Class Period and thereafter.

(e)     Defendant Xiaowei Chen ("Chen") was appointed President of the Company effective May 16, 2008, and continued to serve in that capacity until the end of the Class Period and thereafter.

(f)     Defendants Zhu, Lee, Tse, Lai and Chen are collectively referred to herein as the "Individual Defendants."

18.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of The9, were privy to confidential and proprietary information concerning The9, its operations, finances, financial condition and present and future business prospects.  The Individual Defendants had access to material adverse non-public information concerning The9, as discussed in detail below.  Because of their positions with The9, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful

conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of The9's business.

20.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

21.     The Individual Defendants are senior executive officers and/or directors and controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded on the NASDAQ and governed by the federal securities laws.  The Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to The9's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of The9 Securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct which operated as a fraud or deceit on purchasers of The9 Securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding The9's business, operations and

management and the intrinsic value of The9 Securities; and (ii) caused Plaintiffs and members of the

Class to purchase The9 Securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

23.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and 23(b)(3) on behalf of all purchasers of The9 ADSs and options during the Class

Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the

officers and directors of the Company, at all relevant times, members of their immediate families and

their legal representatives, heirs, successors or assigns and any entity in which Defendants have or

had a controlling interest.

24.    The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, The9 ADSs were actively traded on the NASDAQ.

While the exact number of Class members is unknown to Plaintiffs at this time and can only be

ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of

members in the proposed Class.  Record owners and other members of the Class may be identified

from records maintained by The9 or its transfer agent and may be notified of the pendency of this

action by mail, using the form of notice similar to that customarily used in securities class actions.

25.    Plaintiffs' claims are typical of the claims of the members of the Class as all members

of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law

complained of herein.

26.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

and have retained counsel competent and experienced in class action and securities litigation.

27.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of The9;

(c)     whether the price of The9 Securities were artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company and its Business[1]

29.     On February 3, 2004, an affiliate of The9 entered into the WoW Contract with Vivendi, pursuant to which it obtained the license to WoW.  The WoW Contract's term commenced on the date of its formation and continued for four years following the commercial launch of WoW in China, which occurred on or about June 5, 2005.  The WoW Contract was set to expire on June 7, 2009.

---

[1]     All emphasis is added unless otherwise stated.

30.    The WoW Contract was first amended in January 2007, at which time Blizzard, a Vivendi subsidiary, became a party thereto. Pursuant to that amendment, The9 agreed to rollout The Burning Crusade, WoW's first expansion pack. The WoW Contract was further amended in March 2008, pursuant to which The9 agreed to rollout Wrath of the Lich King, WoW's second expansion pack.

31.    WoW was an instant success in China for The9 and generated significant revenues, cash and growth for the Company. The9 did not generate meaningful revenues until it launched WoW and most of The9's revenues and earnings throughout the entire Class Period were from the operation of WoW.

32.    The third quarter of 2005 was the Company's first full quarter that reflected revenues from WoW and the Company experienced a substantial increase from prior periods. For example, the Company reported that net revenues for the third quarter of 2005 grew by 2,096% year-over-year to $22.8 million.[2] Net revenues attributed to WoW accounted for $22.3 million of the $22.8 million. On February 23, 2006, The9 reported that net revenues attributed from WoW increased during the fourth quarter of 2005 to $26.2 million, a 15% increase from the third quarter of 2005.

**A Rift Develops and Worsens Between The9 and Blizzard**

33.    Even though WoW was popular in China and generated significant revenues for The9, the Company encountered operational problems that frustrated WoW's users and hampered its growth and popularity. These issues, and others, also caused problems between The9 and Blizzard and their relationship began on a path of deterioration that never recovered.

---

[2]    The9's business is primarily conducted in China and almost all of its revenues are denominated in the Chinese currency Renminbi ("RMB"). The9 reported its financial performance in both RMB and US Dollars. Unless otherwise indicated, all financial figures are expressed in US Dollars.

34.     On or about March 6, 2006, video game news website Joystiq.com reported that "[g]ame unions have threatened to quit playing WoW, as players continue to post their complaints on Internet forums and make personal calls to fellow members to join the cause."[3] Moreover, the article stated that "[g]amers have cited 'severe time delays, long-queue times, and frozen servers' as the primary causes of concern." These problems were particularly troubling because the Company charged the consumer from the time the consumer logged onto The9's server. So, when the consumer logged into The9's server, the consumer was being billed for delays caused by The9.

35.     By March 2006, tensions developed between The9 and Blizzard due to The9's failure to properly manage WoW. Thereafter, a dispute arose between The9 and Blizzard over whether The9 was entitled to The Burning Crusade, an expansion pack to the WoW game. An expansion pack is similar to an upgraded version of WoW.

36.     On March 23, 2006, gaming news website Kotaku.com reported the following:

> . . . .The9 and Blizzard/VUG are in a dispute over *The Burning Crusade*, the expansion for *World of Warcraft*. Blizzard/VUG is apparently taking [the] stance that The9 does not get it as part of their original deal, and that the Chinese operator needs to pay an additional license fee and/or give Blizzard/VUG shares in the company. According to our insider, things have gotten to the point where Blizzard is even threatening to turn *Burning Crusade* into *WoW 2* and find another partner for China.

37.     Then, on April 5, 2006, The9 agreed to partner with a direct competitor to Blizzard to provide the same services for a game in direct competition with WoW. That same day, The9 issued a press release announcing that it had entered into an agreement with NCsoft Corporation to provide the same services to NCsoft Corporation for a game entitled "Guild Wars." The press release stated the following:

---

[3]     Statements referenced herein may contain grammatical errors because the statements were translated by their authors from Chinese to English.

The9 Limited (NASDAQ: NCTY), a leading online game operator in China, announced that it has entered into an agreement with NCsoft Corporation, a world leading developer and publisher of online games, for an exclusive license to operate the *Guild Wars®* game, a Competitive Online Role-Playing Game ("CORPG"), in mainland China. The term of the license is three years from the date of commercial launch of *Guild Wars®* in mainland China.

38.    On April 14, 2006, Blizzard responded in kind, announcing that it was exploring business opportunities in China, including opportunities with companies other than The9. Gaming news website Gamasutra.com published an article that same day describing the press release issued by Blizzard, and stated, in pertinent part, as follows:

In an intriguingly cryptic press release, *World Of Warcraft* creator Blizzard Entertainment has announced that it "is currently actively exploring and discussing cooperation opportunities and further expansion of its business with local potential partners for mainland China", implying that it may be evaluating other partners than current Chinese distributor The9.

39.    Even though WoW was generating significant revenues for The9, tensions were mounting between The9 and Blizzard, increasing the likelihood that The9 would not renew the WoW Contract when it was set to expire in June 2009. Blizzard was becoming increasingly dissatisfied with the way that The9 was handling WoW and Blizzard executives believed that WoW should be more successful in China than it was with The9. Confidential Witness No. 1 ("CW1") was employed by Blizzard during 2005-2006 and thereafter served as a consultant to investment clients regarding market trends in the video game industry and specifically researched for clients whether The9 would renew the WoW Contract. Retained as a consultant, CW1 obtained information about whether The9 would renew the WoW Contract from various sources, including personal contacts. According to CW1, Blizzard was "not happy" with how The9 handled WoW and, during the Class Period, Blizzard "thought [WoW] would be a bigger success" if another entity handled the game. According to CW1, "the quality of game play" for WoW in China was poor. In fact, a July 2, 2008

article in *The Register* reported that "The9 officials have been forced to apologize for long-running server issues."

40.    Confidential Witness No. 4 ("CW4") was a senior executive and shareholder of The9 during the Class Period but is no longer employed by the Company. According to CW4, Defendant Zhu told Company executives in early 2007 that he viewed it as very unlikely if not impossible for The9 to be able to renew the WoW Contract. According to CW4, Defendant Zhu understood that The9's relationship with Blizzard had been "ruined" by early 2007 and Zhu indicated that he wanted to find another potential investor to support the Company. As discussed below, Electronic Arts, Inc. ("EA") became that investor.

### Recognizing That the WoW Contract Would Likely Expire in 2009, Defendants Hid the Truth from Investors and Reaped Millions of Dollars from Improper Transactions

41.    Defendants recognized that there was a finite amount of time in which they would be assured to financially benefit from WoW. In other words, Defendants knew that they had until June 2009 to reap as much financial benefit as possible from The9 because it was likely Blizzard would not renew the WoW Contract and The9 would be left without any means to generate meaningful revenues. Thus, Defendants embarked on their fraudulent scheme to misrepresent the future long-term prospects of the Company in order to sell millions of dollars worth of artificially inflated stock, engage in lucrative related-party transactions and withdraw millions of dollars in cash from the Company before the potentially devastating news of the non-renewal of the WoW Contract was disclosed to the market.

42.    Defendants engaged in numerous illegal and related-party transactions in order to line their own pockets at the expense of the Company and its shareholders, including, among others, the following:

- 14 -

(a)    According to CW4, Defendant Zhu and other people associated with Zhu engaged in a series of under-the-table agreements with Hewlett-Packard in China under which The9 acquired computer equipment and Defendant Zhu received illegal kickbacks of more than $8 million.

(b)    In January 2008, The9 invested $3.5 million in Korean game development company Ideas Corporation ("Ideas").  The9 wrote-off the investment in Ideas within 12 months of the closing of the deal.  According to CW4, senior executives of The9 "colluded with Ideas to transfer all funds, assets and employees to another Korean company named Polic Corporation Limited (which has the same registered office and board positions)," and The9 executives received substantial financial benefits.

(c)    During April 2008, through its subsidiary China Crown Technology Limited, The9 acquired approximately 12.34% of Korean game development company G10 Entertainment Corp. ("G10") (the holding company of T3 Entertainment) for $38 million.  According to CW4, simultaneously with the execution of the transaction, G10 acquired 1,205,616 Series A preferred shares held by an institutional investor in G10 (named IDG) and 620,000 ordinary shares held by senior management of G10 for a much higher price than paid by The9.  According to CW4, this was a "shady deal" and The9's senior executives used this transaction to embezzle the assets of The9 and line their own pockets.

(d)    These and other related-party transactions are discussed in ¶¶146 and 151-52 below.

### Materially False and Misleading
### Statements Made During the Class Period

43.    The Class Period commences on November 15, 2006.  On November 16, 2006, before the U.S. stock market opened, The9 announced its financial results for the third quarter of 2006

("3Q06") in a press release that was filed with the SEC on Form 6-K and disclosed that net revenues

attributable to WoW accounted for 99% of total revenues for the Company in 3Q06.

44.    On November 16, 2006, before the U.S. stock market opened, The9 held a conference

call with analysts (the "11/16/06 Conf Call") to report the Company's financial results for 3Q06.

Defendant Zhu discussed WoW and the Company's relationship with Blizzard on the 11/16/06 Conf

Call:

> **Dick Wei – *JP Morgan – Analyst***
>
> . . . I have a question on Burning Crusade. I wonder if you have any read on when is
> the Burning Crusade upgrade going to launch in China? And also has there been any
> new negotiations regarding revenue sharing change or licensing change – licensing
> fee change regarding Burning Crusade?
>
> A second question is . . . can you share your view on the next quarter revenue? From
> the early reads that you see in October, do you think that next quarter revenue will be
> up or down, or some color would be great? Thanks.
>
> **Jun Zhu – *The9 Limited – Chairman & CEO***
>
> (Interpreted) I would like to take this opportunity to clarify some of the rumors that
> are running on the China market. ***Based on all of our communications with
> [Blizzard], we always – the two parties have both always believed that Burning
> Crusade is part of our original licensing agreement with them. During the four
> years of exclusive license there's no possibility that a company other than The9
> can operate Burning Crusade in China.***
>
> ***Now we are active in discussion rather than renegotiation with Blizzard, refining
> the marketing arrangement and the timetable for the Burning Crusade in China
> Market. The first line of communication has always been ongoing since day one
> of our operation of the World of Warcraft and we'll continue to communicate with
> them in the coming two and a half years***.

45.    The statements referenced above in ¶44 were materially false and misleading when

made because they misrepresented and failed to disclose the following adverse facts, which were

known to Defendants or recklessly disregarded by them: (i) there were tensions between The9 and

Blizzard as a result of The9's operation of WoW and The9's partnership with competitors to

Blizzard (*e.g.*, on September 25, 2006, a Credit Suisse analyst noted that a "potential partnership

with EA could be negative for its relationship with Blizzard"); (ii) there was a significant undisclosed risk that The9 would not be able to renew the WoW Contract, which would have a devastating impact on the financial performance and prospects of the Company; (iii) the Individual Defendants and other Company insiders understood that there was likely a finite amount of time to financially benefit from WoW; and (iv) the Individual Defendants and other Company executives engaged in a scheme to personally benefit from WoW before the expiration of the WoW Contract to the detriment of the Company's shareholders.

46.     An analyst report from Deutsche Bank, dated November 16, 2006, reiterated its "Buy" rating on The9 and commented: "We believe The9 can strike a deal with Blizzard on Burning Crusade shortly, a catalyst for the stock and the key driver for 2007, in our view."  Another analyst report issued that day, from JPMorgan Chase, indicated: "Our view is that if Blizzard believes an additional fee is warranted, [it] should have already been discussed with The9 at this phase." Investors considered The Burning Crusade discussions positive for the Company and an indication of good relations between The9 and Blizzard, but did not realize that it was becoming increasingly likely that The9 would not renew the WoW Contract prior to expiration.

47.     In response to the Company's announcement on November 16, 2006, that same day, shares of the Company's ADSs increased $4.92 per ADS, or 21%, from a close of $23.44 per ADS before the announcement, to close at $28.36 per ADS.  The Company's ADSs continued to rise thereafter.

48.     Between November 15 and 24, 2006, with knowledge of the facts set forth in ¶45, above – facts that they did not disclose to investors – insiders Bosma and Incsight sold 1,364,268 ADSs, reaping proceeds of $36,982,243.

49.     On February 15, 2007, The9 announced its financial results for the fourth quarter and fiscal year ended December 31, 2006 ("4Q06" and "FY06," respectively) in a press release that was filed with the SEC on Form 6-K.  That same day, Defendants held a conference call with analysts to discuss the financial results for 4Q06 and FY06 (the "2/15/07 Conf Call").  On the 2/15/07 Conf Call, Defendant Lee stated, in part: "For fiscal year 2006, net revenues increased by 112% to $126.3m from $59.6m in fiscal year 2005.  The substantial year-on-year increase of revenue was primarily because The9 commenced commercial operations of World of Warcraft game in Mainland China in June 2005."  When asked about the terms of licensing with Blizzard concerning The Burning Crusade, Defendant Zhu stated: "[A]s I have been already saying, it's mostly regarding the marketing arrangement and the timetable, and also the server configurations and relevant arrangements."

50.     On February 15, 2007, a JPMorgan Chase analyst report indicated that, as expected, the Company confirmed that The Burning Crusade upgrade would not require payment of any additional one-time fee or increased royalties to Blizzard and that the two companies were currently in talks concerning the operating details of the upgrade.  Thus, investors were led to believe that relations with Blizzard were good, as Defendants had previously represented.

51.     According to CW4, however, Defendant Zhu indicated by early 2007 that The9 needed to partner with an investor to support the Company because of the strained relationship with Blizzard and because of Zhu's view that it would be very unlikely if not impossible for The9 to renew the WoW Contract.  EA became that investor/partner.

52.     On May 21, 2007, The9 announced that EA, a leading developer and publisher of interactive entertainment, made a $167 million equity investment in the Company by purchasing nearly 15% of its ordinary shares.  Concurrently with the equity investment, The9 obtained the

exclusive publishing rights for EA Sports FIFA Online in mainland China. The9 described EA at that time as "the world's leading developer and publisher of interactive entertainment." EA and Blizzard are in direct competition with each other in the gaming industry. EA's ownership in The9 negatively impacted The9's ability to be "game-developer neutral," which increased the likelihood that Blizzard would not renew the WoW Contract.

53.     Confidential Witness No. 2 ("CW2") served as a licensing manager at Blizzard during the Class Period. According to CW2, "loyalty" was important for Blizzard and the investment by EA in The9 would have been viewed as The9 not being loyal to Blizzard. Investors and analysts expressed concerns that the investment by EA would negatively impact The9's relationship with Blizzard and hamper its ability to renew the WoW Contract. As described below, however, Defendants denied that there was anything to be concerned about and said there would be no correlation between the investment by EA and the likelihood that The9 would renew the WoW Contract.

54.     On May 22, 2007, The9 announced its financial results for the first quarter ended March 31, 2007 ("1Q07") in a press release that was filed with the SEC on Form 6-K (the "5/22/07 Press Release") and reported net revenues of $35 million, $34.5 million of which was attributed to revenues from the operation of WoW.

55.     On May 22, 2007, The9 held a conference call with analysts and reiterated the financial results for 1Q07 contained in the 5/22/07 Press Release (the "5/22/07 Conf Call"). On the 5/22/07 Conf Call, Defendant Zhu stated, in part: "All in all, we believe The9 is well positioned for sustainable growth in the rapidly evolving Chinese online games market."

56.     The statements referenced above in ¶55 were materially false and misleading when made because of the reasons set forth in ¶¶45, 51 and 53, above. The statement that "The9 is well

positioned for sustainable growth" was materially false and misleading when made because there

was no reasonable basis to state that the growth was sustainable because of the tensions between

The9 and Blizzard and the fact that there was a real and significant risk that The9 would not renew

the WoW Contract.

57.    On the 5/22/07 Conf Call, Defendant Zhu denied that the equity investment of EA

would have any impact on its contract with Blizzard:

> For your second question *I don't think the equity investment from EA will have any*
> *impact on our relationship with Blizzard because EA's franchise portfolio is*
> *mainly on the casual game and the sports game area, but Blizzard they are focused*
> *on the 3D and RPG areas, so I think it's no conflict there*.   And the second, I
> believe The9 is a comprehensive platform for all kinds of games whether it's an RPG
> or casual game. We are open to operate all kinds of games and bring them to China
> and make a very success story in China. *So for the above mentioned two reasons I*
> *believe the partnership with EA and our relationship with Blizzard will be no*
> *conflict*. Thank you.

58.    The statements referenced above in ¶57 were materially false and misleading when

made because of the reasons set forth in ¶¶45, 51 and 53, above.  Furthermore, the statements

referenced above in ¶57 were materially false and misleading when made because there was no

reasonable basis for Defendant Zhu to represent that the equity investment from EA would not have

any impact on The9's relationship with Blizzard and that the EA investment did not create a

"conflict."  Indeed, EA was one of Blizzard's primary competitors and EA sought to compete with

Blizzard in the MMORPG video game segment in China.  The9 sought an investment from EA

precisely out of concern that the The9 would not be able to renew the WoW Contract.  Additionally,

since The9 and Blizzard had not yet discussed the renewal of the WoW Contract, there was no

reasonable basis to represent that the EA investment would not have a negative impact on the

renewal of the WoW Contract.

59.     On the 5/22/07 Conf Call, when asked about the possibility of extending the WoW Contract in 2009, Defendant Zhu described the very good relationship between The9 and Blizzard and gave the impression that there was no reason to doubt that the contract would be extended:

**Lin Shi** – *Lehman Brothers* – *Analyst*

Hi. Thanks for taking my follow up.  This is a question about World of Warcraft license.  It is still quite early to talk about this, but the license will expire in '09 which is not that far away.  I just wondered, based on your current discussion with Vivendi, how do you see the possibility of extending the license?  Thanks.

\*          \*          \*

**Jun Zhu** – *The9 Limited* – *Chairman & CEO*

(Interpreted) Blizzard and us have been very focusing on the upcoming launch of the Burning Crusade and we both expect it to be a success in China.  ***And the relationship between the two parties are very good, but currently we haven't talked about the things beyond '09***.  Thank you.

60.     The statements referenced above in ¶59 were materially false and misleading when made because of the reasons set forth in ¶¶45, 51 and 53, above.  Furthermore, the relationship between the two parties was not "very good," but was strained and had deteriorated.

61.     As a result of Defendants' words of comfort about the strong relationship between The9 and Blizzard, analysts viewed the EA investment as nothing more than a way for The9 to diversify its business.  A May 22, 2007 analyst report from CIBC World Markets stated, in part:

Equity investment from EA (Electronic Arts) and new additions of two top casual games (FIFA Online and Audition 2) further support our long-term bullish view.  We believe new games will expand NCTY's user base and add diversity to its attractive MMORPG pipeline.  We are adjusting '07 and '08 EPS for ~4.5M share dilution due to EA's equity investment, as well as new games contribution.

62.     On the news from May 21 and 22, 2007, The9's ADS price rose from $39.47 on May 18, 2007 to $44.23 on May 22, 2007, on heavy trading volume.

63.     On June 28, 2007, The9 filed its annual report on Form 20-F, which included The9's audited consolidated statement of operations data for FY06.  This was the first full year The9

operated under the WoW Contract, resulting in an increase in The9's revenues to $133,049,000. WoW amounted to 99% of The9's revenue in FY06.

64.     On July 13, 2007, The9 ADSs closed at a Class Period high of $51.97 per ADS.

65.     On August 1, 2007, The9 ADSs declined from $49 per ADS on July 31, 2007 to close at $42.07 on August 1, 2007.  The drop in The9 ADSs on August 1, 2007 was due to rumors of a lawsuit against The9 in connection with incomplete disclosures about licensing terms of a game called Audition.  A spokesperson from The9 denied the rumor. The9 ADSs rebounded the day after the drop to close at $46.75 per ADS on August 2, 2007.

66.     An August 2, 2007, a JP Morgan analyst report stated, in part:

Shares pulled back 14% yesterday.  We believe weakness is due to the rumored lawsuits against The9.  From Sina News, there are rumors that The9 is being sued for incomplete disclosures on Audition licensing terms (The9 announced Monday it will operate Audition starting Aug. 08).  The9 spokesperson denied the rumor.

67.     During the summer of 2007, various Chinese news reporting services reported on the rift between Blizzard and The9 and the fact that Blizzard was not satisfied with the way that The9 was operating WoW.  An August 3, 2007 article in *China IT & Telecom Report* stated, in part:

At the same time, in the last few days, a rumor regarding The9's relationship with Blizzard Entertainment, developers of The9's most important game World of Warcraft, emerged on forums including Chinabyte.com and Mop.com.  According to the rumor, Blizzard was preparing to sue The9 and suspend all its operation rights due to violations of it WoW licensee agreement, and failure to provide sufficient technical safeguards and supporting services for players.

68.     The August 3, 2007 article referenced in ¶67 above reported that The9 denied the reports:

"The media reports of disagreements between The9 and Blizzard Entertainment are groundless," Blizzard and The9 announced.  "Blizzard Entertainment and The9's cooperation has been smooth and friendly, and the two parties are striving to protect the interest of Chinese players.  We are preparing for an earlier release of the WoW expansion, Burning Crusade."  However, a source close to the situation had previously told Interfax that Blizzard Entertainment was also actually seeking for

- 22 -

independent and better development in China's online game market by setting up a joint venture with a local company, as required by Chinese regulations.

69.    The statements referenced above in ¶68 were materially false and misleading when made because the media reports of disagreements between The9 and Blizzard were not "groundless" because there had been deterioration in the relationship between The9 and Blizzard.

70.    On August 29, 2007, gaming news website Gamasutra.com reported on the disagreements among The9 and Blizzard.  This article stated, in pertinent part, as follows:

> By the end of August, *rumors abounded that The9 may face early termination for half of its licensed games, including WoW*, as well as games from Webzen and Korean distributor HanbitSoft. *Rumors pointed to poor operation of the games (in particular delays in The Burning Crusade) as the reason for termination*.  *All rumors were denied by The9 and the games' license owners*.

71.    On August 29, 2007, The9 announced its financial results for the second quarter ended June 30, 2007 ("2Q07") in a press release filed with the SEC on Form 6-K (the "8/29/07 Press Release) and reported net revenues of $35.5 million, most of which was attributed to revenues from the operation of WoW.  The 8/29/07 Press Release stated, in part:

> We are encouraged to see the gradual execution of our diversification strategy in the second quarter as The9 has successfully transited from one-game to multi-game operations.  We continued to expand and enhance our game portfolio.
>
> *        *        *
>
> We believe the World of Warcraft server upgrades and mergers and infrastructure enhancements are important and will *benefit the game in the long-run*.  Subsequent to the upgraded servers and infrastructure and the launch of a new server site, we worked with Blizzard Entertainment to release the World of Warcraft "Before the Storm" upgrade patch in late June and are seeing satisfactory results. With the soon-to-be-launched expansion pack, Blizzard Entertainment's World of Warcraft: The Burning Crusade™, we believe World of Warcraft will resume its strong growth momentum. . . .  Field of Honor and Audition are strong additions to our game pipeline, and together with all the other high-caliber games to be launched in the future, we are confident that The9 will continuously capitalize on its unparalleled game portfolio so as *to achieve long-term sustainable growth*."

72.    The statements referenced above in ¶71 were materially false and misleading when made because of the reasons set forth in ¶¶45, 51 and 53, above. The statements referenced above about "server upgrades" and "infrastructure enhancements" were materially false and misleading when made because Defendants failed to disclose that the upgrades were needed because of problems with The9's operation of the game and Blizzard's dissatisfaction thereof and that these problems caused a deterioration in The9's relationship with Blizzard. Furthermore, the statements that "enhancements . . . will benefit the game in the long-run" and that The9 "will . . . achieve long-term sustainable growth" were materially false and misleading when made because there was no reasonable basis to represent that The9's growth would be "sustainable" or that it would benefit in the "long-run" from enhancements. Indeed, The9 had not yet begun negotiations with Blizzard over the renewal of the WoW Contract and there was a significant risk that the WoW Contract would not be renewed.

73.    Even though Defendants made materially false and misleading statements in the 8/29/07 Press Release, The9 ADSs declined approximately 9% because The9 reported financial results well below consensus estimates by analysts. An August 29, 2007 analyst report on The9 from CIBC World Markets stated, in part:

> NCTY reported a soft quarter with revs and EPS of $35.5M and $0.25, lower than consensus of $38.7/$0.34. The weakness was primarily due to lost WoW revenue, from server shutdowns and infrastructure updates to get ready for The Burning Crusade (TBC) expansion pack to WoW.
>
> Mgt announced that it will launch TBC in Sept., which should increase ACU/PCU nos. in 4Q. Since NCTY's 8 servers can currently handle up to 1M PCUs, much higher than current ~665K, we believe NCTY is well equipped to handle a TBC demand spike before a 9th server addition in 4Q.
>
> *    *    *
>
> Thesis unchanged. We believe NCTY is one of the best positioned game companies in China with a further strengthened game pipeline to capture the strong secular

growth. Recommend L/T investors to take advantage of the temporary weakness, with >25% upside potential to our $50 target.

74.    Similarly, an August 30, 2007 analyst report on The9 from Credit Suisse stated, in part:

2Q dil. EPS were US$0.25, lower than consensus and our forecast due to lower than expected revenue led by WoW server upgrade and higher costs. . . .

*        *        *

WoW ACU in 2Q was 300,000, worse than expectations, due to server shutdown for upgrade. Burning Crusade is planned to be launched on 10 September. We expect Burning Crusade will drive WoW ACU in 3Q and 4Q by 360,000 and 500,000, respectively.

*        *        *

We view the server upgrade is a one-off issue, and WoW demand will remain strong after the launch of Burning Crusade.

75.    The Burning Crusade expansion pack was released in China on September 6, 2007, and, on October 4, 2007, Blizzard and The9 jointly announced that WoW had achieved peak concurrency of 800,000 – the highest since the game's launch in June 2005. The9 ADSs traded in the $30s during this time period.

76.    On November 16, 2007, The9 issued a press release (the "11/16/07 Press Release") that was filed with the SEC on Form 6-K and announced its financial results for the third quarter ended September 30, 2007 ("3Q07") and reported net revenues of $42.2 million, $37.2 million (or 87%) of which was attributed to revenues from the operation of WoW.

77.    On November 16, 2007, The9 held a conference call with analysts (the "11/16/07 Conf Call") and reiterated the financial results announced in the 11/16/07 Press Release. On the 11/16/07 Conf Call, Defendants represented that during 3Q07, The9 entered into discussions with Blizzard over the renewal of the WoW Contract and that it was likely that The9 would renew the WoW Contract in 2009:

**Paul Keung** – *CIBC World Markets – Analyst*

Hi Hannah and Jun Zhu.  Just a question on the World of Warcraft.

*        *        *

*And second, related to that, are you in active discussions with Blizzard to maybe perhaps extend the contract?  Or is this something you intend to just – you would probably initiate discussions later in the year?*

*        *        *

**Jun Zhu** – *The9 Limited – Chairman & CEO*

(Interpreted) Before Q3 we have been concentrating on cooperation discussion with Blizzard regarding the launch of the Burning Crusade.  But *after that was launched we started discussions with them regarding the renewal of the contract as you mentioned*.  But so far we don't have any comment in that regard.

*But we are very confident to eventually renew the contract of WOW with Blizzard. As there is a second expansion pack for WOW called The Wrath of the Lich King, that launch schedule is not yet announced by Blizzard.  If that was to be launched before June '09, according to the contract that's still entitled to The9*.  And this expansion pack has a lot of features such as increased maximum level from 70 to 80 and also adding a new [career] of characters and also some character customization services and things like that.  We think this is very good content upgrade.  Both The9 and Blizzard hope that this expansion pack will be launched globally at the same time.  Thank you.

78.     The statements referenced above in ¶77 were materially false and misleading when made because of the reasons set forth in ¶¶45, 51 and 53, above.  Furthermore, the statements referenced above in ¶77 were materially false and misleading when made because contrary to Defendant Zhu's statement, The9 had not "started discussions with [Blizzard] regarding the renewal of the [WoW Contract]" and  there was no reasonable basis to be "very confident" that The9 would renew the WoW Contract.  As described below, the Company eventually stated that discussions had not begun until April or May 2008, many months after the above statements.

79.     Analysts covering The9 commented favorably upon the fact that The9 represented it had begun discussions over contract renewal for WoW and that The9 was confident that the WoW

Contract would be renewed. An analyst report from Credit Suisse, dated November 19, 2007, maintained its "Outperform" rating on The9 and stated, in part:

> Management believes WoW has far from its peak and will launch next major expansion pack "Wrath of the Lich King" in the future. ***Also, management expects WoW contract will be renewed in 2009***. Thus, we has conservatively assumed WoW peak ACU at 480k in 3Q08.

80.    An analyst report from Brean Murray Carret & Co., dated November 16, 2007, reiterated its "Buy" rating on The9 and stated, in part:

> **Confident in *WoW* renewal.** The9 reiterated its confidence in the renewal of the operating license for *WoW* with Vivendi. ***Management stated it has already initiated the renewal discussions*** as well as is working on plans for the launch of the next major expansion pack for *WoW*.

81.    Even though Defendants made materially false and misleading statements about the renewal of the WoW Contract, The9 ADSs declined by approximately $10 per ADS on November 16, 2007 because the Company reported disappointing financial results below consensus estimates. The9 earned $5.1 million, or $0.17 per ADS, down 41% from $8.6 million, or $0.35 per ADS, in the same period a year earlier. Analysts expected earnings of $0.21 per ADS. As reported in a November 16, 2007 article by The Associated Press, Jason Brueschke, an analyst from Citi Investment Research, stated that "part of The9's problem . . . is that [The9] is using very expensive Hewlett-Packard servers to operate the game. The better it does, the more server farms have to be added, hurting profits." As alleged herein, millions of dollars that The9 paid to Hewlett-Packard were passed on to Defendant Zhu and others in illegal kickbacks.

82.    A November 19, 2007 analyst report from Independent International Investment Research PLC stated, in part:

> The sudden plummet in the ADR on 16 November 2007, following the release of lower than expected 3Q 07 results on 15 November 2007, led to the ADR declining to a 52 week low of US$20.75. We believe this decline in the ADR price reflects consistent variance from market expectations for the past few quarters. . . .

\*      \*      \*

> We view the sudden and significant decline in the NASDAQ ADR price as a short term market reaction to results missing expectations.  Although we will be revising our estimates downwards on account of 3Q 07 results variation, considering the strong potential growth in the Chinese online game industry and The9's expansive game pipeline, we maintain our BUY rating for the NASDAQ ADR.

83.    Also between November 16 and 19, 2007, it was reported on the Internet that Defendant Zhu was quoted in a Chinese newspaper as being in discussions with Blizzard about making WoW free-to-play – thereby abandoning its highly-lucrative time-based usage payment system.  In articles dated between November 19 and 25, 2007, MMORPG websites were reporting that The9 quickly back-tracked from Zhu's remarks, calling the statements gamer and media speculation.  Between November 19 and 30, 2007, The9 recovered almost half of its ADS price losses, to close at $25.77 per ADS.

84.    On December 3, 2007, it was announced that Vivendi planned to acquire control of video game developer Activision and combine it with Vivendi Games, creating a new company called Activision Blizzard that would rival video game publisher EA.  An article on Associated Press Financial Wire, dated December 3, 2007 and titled "The9 declines as analysts say Vivendi Activision deal could hurt Chinese online gaming company," described the negative implications of the Vivendi/Activision deal on The9, but also described The9's denial of any potential negative impact.  The article stated, in pertinent part:

> Shares of The9 Ltd. fell Monday as analysts predicted the Chinese online game operator which operates Vivendi SA's "World of Warcraft" in China may be hurt by Vivendi's intention to buy a controlling stake in Activision Inc.

\*      \*      \*

> Electronic Arts owns a 15 percent stake in The9, and *analysts expressed concerns Monday that the deal between Vivendi and Activision could affect future licensing negotiations and publishing decisions between Activision Blizzard and The9*.

"World of Warcraft" is the world's most popular online game and has more than 3.5 million subscribers in China. In a Monday client note, Goldman Sachs analyst Leah Hao said more than 80 percent of The9's revenue comes from publishing the game.

In her note, Hao called the deal between Vivendi and Activision a "potential negative" for The9. *The analyst noted that Activision Blizzard "may have reservations about a situation where its biggest franchise is published in one of the biggest markets by an entity partly owned by its chief global rival, Electronic Arts, with no equity involvement by Activision Blizzard*."

The analyst also said that The9's "World of Warcraft" publishing contract expires in June 2009, and the company wanted to renew it in the next six months. Activision Blizzard might be tied up with internal issues in that period, the analyst wrote.

Hao rates shares of The9 "Neutral" with a $23 price target.

Citi Investment Research analyst Jason Brueschke expressed similar views in a Monday client note. *Brueschke said it's too early to tell what kind of effect the deal will have, but "the changes could very well affect the timing, if not the ultimate outcome, of the 'World of Warcraft' renewal negotiations."*

Brueschke did note, though, that *The9's media spokesperson indicated they don't expect a change in "World of Warcraft" negotiations or timing because of the deal*.

85.    The9 ADSs declined from $21.76 to $18.89, when Senior VP and CFO Defendant Lee announced her resignation on January 18, 2008. Defendant Zhu praised Lee for transforming the Company into a "highly-regarded US-listed public company with substantially-improved financial reporting and internal control systems." Although the Company's management first executed Sarbanes-Oxley certifications concerning the adequacy of its financial controls as of December 31, 2006, fiscal 2007 was the first year that compliance was to be certified by outside auditors. (As later reported in the Company's Form 20-F, as of December 31, 2007, The9 lacked adequate internal controls to ensure the accuracy of its financial reporting.)

86.    As described below, however, by continuing their upbeat assessments the The9's chances of obtaining a contract renewal over the next several months, Defendants were able to boost The9's price up once again.

87.    On February 21, 2008, The9 issued a press release (the "2/21/08 Press Release") filed with the SEC on Form 6-K and announced its financial results for the fourth quarter and year ended December 31, 2007 ("4Q07" and "FY07," respectively) and reported net revenues of $58.1 million for 4Q07, most of which was attributed to revenues from the operation of WoW.  The 2/21/08 Press Release stated, in part:

> Commenting on the fourth quarter and fiscal year 2007 results, Jun Zhu, Chairman and Chief Executive Officer of The9 said, "We are very pleased to report record total net revenues and significant earnings growth for the fourth quarter. Our solid financial results were mainly due to the strong growth of player usage of Blizzard Entertainment®'s World of Warcraft® game with the launch of The Burning Crusade expansion pack, as well as a new revenue source from commercialization of our new game Granado Espada (GE) in late November."

> *    *    *

> For fiscal year 2007, gross revenues from online game services were RMB1,331.0 million (US$182.5 million), a 29% increase compared with RMB1,028.0 million (US$140.9 million) in fiscal year 2006.  The year-on-year increase was mainly due to revenue growth from Blizzard Entertainment's World of Warcraft, as well as revenues from two new massively multiplayer online role playing games (MMORPGs) launched in 2007.

88.    On February 22, 2008, The9 held a conference call with analysts (the "2/22/08 Conf Call") and reiterated the financial results announced in the 2/21/08 Press Release.  On the 2/22/08 Conf Call, Defendants discussed the renewal of the WoW Contract:

> **Echo He** – *Oppenheimer – Analyst*

> Hi.  Hi, everyone.  These results are very good.  Congratulations. . . .  I just want to ask could you give us some idea on the renewal of license with Blizzard on World of Warcraft?

> **Jun Zhu** – *The9 Ltd – Chairman and CEO*

> (Interpreted) Actually, I remember that, about one year ago, a lot of people are asking and also are concerned about The Burning Crusade expansion pack.  ***At that time, I already very firmly told everybody that I was very confident that The9 will continue to work with Blizzard regarding The Burning Crusade***.

And also, back in 2005, when everybody was asking me about the impact – the possible impact of the anti-fatigue system, I said I believe this policy will be a long-term benefit to the overall industry growth and also will not have any impact on WoW. And actually, now, if you look at the implementation of this system, it has not had any impact on our WoW game, so that proves my promise and my belief is very correct.

**So regarding your current question regarding the WoW renewal, what I can say is WoW has been in very strong growth during the past few years and also we are always in very good relationship with Blizzard. And we always have a very common unanimous opinion regarding the operation of WoW in China. So I was very confident that we believe that we can renew the contract in '09.**

89.    The statements referenced above in ¶88 were materially false and misleading when made because of the reasons set forth in ¶¶45, 51 and 53, above. Furthermore, the statements referenced above in ¶88 were materially false and misleading when made because there was no reasonable basis to be "very confident" that The9 would renew the WoW Contract or that The9 had a very good relationship with Blizzard. Indeed, at that time, contrary to Defendant Zhu's statement, The9 and Blizzard had not begun discussions over the renewal of the WoW Contract and Defendant Zhu knew, or recklessly disregarded, that The9 had a strained relationship with Blizzard. As described below, the Company eventually stated that discussions had not begun until April or May 2008, many months after the above statements.

90.    In response to the Company's statements on February 22, 2008, that same day, shares of the Company's ADSs rose $1.17 per ADS, or 9.6%, from a close of $17.99 per ADS before the announcement, to close at $19.71 per ADS, on extremely heavy trading volume. Furthermore, as the market digested this information, the Company's ADS price periodically rose over the next several days, increasing 3.4% to $20.38 per ADS, 1.8% to $20.74 per ADS, 6.5% to $22.10 per ADS, and 0.3% to $22.90 per ADS, on February 25, 26, 27 and 28, 2008, respectively. Overall, as a result of Defendants' statements, The9 ADSs rose 27.3% in a week.

91.     A Deutsche Bank analyst report, dated February 22, 2008, stated, in part:

The question on everybody's mind is the WoW contract license renewal. ***Management stated once again that they are confident about the renewal when the contract terminates in mid-2009. This is the third time management has expressed this positive view as the last time was at our DB Access China conference. Due to these statements, we are becoming more positive that The9 will be able to extend the license of WoW.***

92.     Thus, analysts that closely followed The9 believed that The9 would likely renew the WoW Contract with Blizzard based upon Defendants' representations that contract renewal discussions had begun and The9 would likely renew the WoW Contract.

93.     On May 20, 2008, The9 announced its financial results for the first quarter ended March 31, 2008 ("1Q08") in a press release (the "5/20/08 Press Release") that was filed with the SEC on Form 6-K and reported net revenues of $62.7 million for 1Q08, $56 million (or 89%) of which was attributed to revenues from the operation of WoW. The 5/20/08 Press Release stated, in part:

Commenting on the first quarter 2008 results, Jun Zhu, Chairman and Chief Executive Officer of The9 said, "We are very encouraged by our first quarter 2008 financial results with another record level of total revenues and strong earnings. ***The excellent financial results were achieved on back of resilient growth of Blizzard Entertainment®'s World of Warcraft® despite the seasonality impact we experienced as usual in the first quarter of the year.***

94.     On May 20, 2008, The9 held a conference call with analysts (the "5/20/08 Conf Call") and reiterated the financial results announced in the 5/20/08 Press Release. On the 5/20/08 Conf Call, Defendants discussed the renewal of the WoW Contract:

XIAOWEI CHEN: Thank you for your questions. In terms of our discussions with WoW – with Blizzard about WoW's expansion, our current license will expire in June 2009 and we have been in very close discussions with Blizzard and Blizzard's headquarters, about the extension of this license. This is all I can tell you. That the discussions are ongoing and very intense and that's all I can tell you. We do not have a timetable but we hope that through these discussions that we can continue WoW's operation in China and at conditions that are favorable and acceptable to all parties.

- 32 -

95. The statements referenced above in ¶94 were materially false and misleading when made because of the reasons set forth in ¶¶45, 51 and 53, above. The statements in ¶94 were also materially false and misleading when made because Defendant Chen made it appear that The9 had been in discussions for a long period of time with Blizzard over the WoW Contract renewal even though this was not true.

96. Wall Street analysts continued to believe that The9 would renew the WoW Contract. A May 22, 2008 analyst report on The9 from Deutsche Bank stated, in part:

> Discussion for WoW renewal, the license for which terminates mid-2009, are still on. Based on previous discussions, we believe the company should be able to renew the WoW license but it will come at a steep price considering the current royalty scheme of 22%.

97. Irrespective of the final terms of renewal, investors continued to view renewal as likely and very favorable. The9 ADSs closed at $24.80 on May 22, 2008, up almost $6 from the date of CFO Defendant Lee's resignation.

98. On June 7, 2008, The9 announced that Defendant Tse has resigned as CFO "due to personal and family reasons, effective July 4, 2008." In his place, The9 had appointed Defendant Lai – a senior auditor with eight years experience at Deloitte & Touche and "extensive knowledge in US GAAP" – as CFO of the Company, effective July 3, 2008.

99. On June 25, 2008, Oppenheimer reiterated its "Outperform" rating on The9 and issued a research report based upon information learned at its "recent meeting with management" and wrote that it saw an "upside for World of Warcraft, both from the continue[d] growth of user strength and the more likely renewed operating contract with Blizzard." Oppenheimer stated that based on discussions with management, it was "highly likely" that The9 would renew the WoW Contract. The research report also stated, in part:

**The license renewal of WoW is under process**.  Management confirmed to us that they just went through a preliminary talk with Blizzard last week on the issue of renewing license of WoW, which expires in June 2009.  ***Although they did not disclose any details on the talk, they are very optimistic that NCTY will still being operating WoW in 2H09***.  For the first time, the management suggested that the term of the WoW license will likely see higher payout to the game's developer, Blizzard.

*      *      *

**The9's profit margin may suffer more than expected after WoW license renewal in summer '09.  *We believe NCTY is highly likely to renew the license of WoW with Blizzard***.  The management expressed intention of finishing the negotiation of the license renewal by the end of 2008.  However, we think the royalty terms could go higher from the current 25% of gross sales.  The9 has a history of licensing uncertainties with Blizzard, including an April 2006 Blizzard press release, announcing that it has invited The9 to negotiate for the expansion pack The Burning Crusade.  The 2006 issue was resolved without additional payments to Blizzard.

100.    The statements referenced above in ¶99 attributed to The9 were materially false and misleading when made because of the reasons set forth in ¶¶45, 51 and 53, above.  Defendants did not have a basis to represent to Oppenheimer that it was "highly likely" or that they were "optimistic" that The9 would renew the WoW Contract.  Indeed, as expressed by Defendant Zhu internally at The9, by early 2007, it was unlikely that The9 would renew the WoW Contract.

101.    On August 8, 2008, The9 announced its financial results for the second quarter ended June 30, 2008 ("2Q08") in a press release that was filed with the SEC on Form 6-K (the "8/8/08 Press Release") and reported net revenues of $66.3 million for 2Q08, most of which was attributed to revenues from the operation of WoW.  The 8/8/08 Press Release stated, in part:

Commenting on the second quarter 2008 results, Jun Zhu, Chairman and Chief Executive Officer of The9, said, "We are very pleased to report record level of both total revenues and earnings for the second quarter 2008. Our solid financial results were driven by the continuing growth of Blizzard Entertainment®'s World of Warcraft ® and Soul of The Ultimate Nation, despite our closing of all servers for three days on observation and respect for those impacted by the earthquake tragedy.

102.    On August 8, 2008, The9 held a conference call with analysts (the "8/8/08 Conf Call") and reiterated the financial results announced in the 8/8/08 Press Release.  On the 8/8/08 Conf

- 34 -

Call, Defendants discussed the renewal of the WoW Contract and the strengthening of the

relationship between The9 and Blizzard:

**Tony Gikas – *Piper Jaffray – Analyst***

Thank you for taking my questions and congratulations on a good quarter. I was wondering if you had any update on the renewal of the World of Warcraft license as we move into 2009.

And second question, if you don't mind, do you expect that user trends could slow during the Olympic Games or do you expect that user trends will remain consistent?

**Xiaowei Chen – *The9 Limited – President***

Thank you, Tony, for your questions. Number one question about renewal of World of Warcraft license.  As we have mentioned in – during our last call, we at The9 have been in very active discussions with Blizzard top management.  ***And we most recently have completed one week of closed door discussion in Hong Kong and we're continuing our negotiations and we hope that we will have results very soon.  At this point, I cannot release any details, but let me just say that we are in very active discussion with top management from Blizzard.***

Two questions that are often asked about this is, one, does EA's shareholding in our Company have anything to do with our renewal of WoW license or if anything – if there's any negative impact?  This is often asked and let me just address it here, that no.  Both sides have discussed the issue.  It's not that we neglected the issue.  We have discussed the issue and we have both agreed that it's a non-issue.  ***In other words, EA's shareholding in The9 does not present a threat or negative conflict of interest to our renewing the license***.

And another question that is often asked is – let me think about this.  I will come back to this later, because I remember two points, but now I cannot remember the second point.

***Let me just say that, in the discussion that we carried out with top management of Blizzard, not only are we discussing renewing the license, but one thing that's very good that's coming out of the discussions is how we can strengthen our communications between The9 and Blizzard so that we can continue to push WoW's performance upward***.

So we have strengthened our communication mechanisms down to very specific levels, such as we're going to hold bi-weekly operational team meetings between Blizzard and The9.  And at the top management level, we're going to hold monthly communications, either via conference call or even person to person meetings, so that we understand – the developer and

- 35 -

the publisher understand what each other is doing. And when we need localization support, we can communicate our requests to Blizzard and their developers understand what we're doing.

***So overall, we're very positive and optimistic about WoW's continuing performance and growth in China***.

103.    The statements referenced above in ¶102 were materially false and misleading when made because of the reasons set forth in ¶¶45, 51 and 53, above.  The statements referenced in ¶102 that the EA investment did not "present a threat or negative conflict of interest" to The9 renewing the WoW Contract was materially false and misleading because, as confirmed by a former licensing manager for Blizzard, CW2, the EA investment did hamper the negotiations process because of perceived "loyalty" issues by Blizzard and conflicts of interest.  Indeed, The9 sought an investment from EA precisely out of concern that The9 would not be able to renew the WoW Contract.

104.    Based upon Defendants' representations, analysts covering The9 continued to strongly believe that The9 would renew the WoW Contract.  An August 8, 2008 analyst report from Credit Suisse stated, in part: "Recently, The9 had intensive meetings with Blizzard (private) on WoW contract renewal.  We still believe The9 will renew the contract, but assume revenue sharing percentage will be increased to 30% starting from 3Q09."

105.    On August 12, 2008, Blizzard and NetEase.com, Inc. ("NetEase"), a competitor of The9, issued a press release announcing an agreement between Blizzard and NetEase for NetEase to license several games, including MMORPGs similar to WoW.  The press release stated, in pertinent part:

> Blizzard Entertainment, Inc. and NetEase.com, Inc. (NASDAQ: NTES) today announced an agreement to license Blizzard Entertainment®'s *StarCraft® II, Warcraft® III: Reign of Chaos™, Warcraft III: The Frozen Throne™*, and Battle.net® platform, which provides online multiplayer services for these games, to Shanghai EaseNet Network Technology Limited, an affiliated company of NetEase.com, Inc.  Blizzard Entertainment and NetEase have also established a joint venture, which will provide support for the operation of the licensed games and Battle.net platform in China.

- 36 -

106.    In response to the Blizzard and NetEase announcement on August 12, 2008, on August 13, 2008, shares of the Company's ADSs fell $4.67 per ADS, or 20%, from a close of $22.83 per ADS before the announcement, to close at $18.16 per ADS, on extremely heavy trading volume.

107.    While in possession of knowledge of the facts set forth above, especially the fact that Defendant Zhu had acknowledged to CW4 (and others at The9) in early 2007 that the relationship with Blizzard had been "ruined" and that renewal was impossible, insider Bosma sold 500,000 shares on August 13, 2008, for proceeds of $11.3 million.

108.    Blizzard and NetEase's press release led to discussions among industry analysts that followed The9 and WoW that The9 would not be renewing the WoW Contract with Blizzard. In response, The9 issued a press release on September 5, 2008 that purported to provide "clarification against the rumor regarding the World of Warcraft's renewal contract," and stated as follows:

> The9 is currently in contract negotiations regarding World of Warcraft's future operations in China. ***Recently, there have been rumors that surfaced regarding the contract negotiations. These rumors are completely unfounded. The9 encourages all parties to refrain from believing in such rumors.*** The9 is actively conducting the contract extension negotiations, and will announce to the market once a final decision is made. The9 reserves all of the rights to take legal action to those parties that spread the rumors.

109.    In response to the Company's statements on September 5, 2008, that same day, shares of the Company's ADSs rose $1.40 per ADS, or 7.7%, from a close of $17.98 per ADS before the announcement, to close at $19.38 per ADS, on extremely heavy trading volume.

110.    The statements referenced above in ¶108 were materially false and misleading when made because of the reasons set forth in ¶¶45, 51 and 53, above. Furthermore, the statement that the "rumors are completely unfounded" was materially false and misleading when made because the rumors were not "unfounded," but were based upon fact and reflected what was occurring at the time. Indeed, the agreement between Blizzard and NetEase negatively impacted the likelihood that

The9 would renew the WoW Contract. In fact, as discussed below, Blizzard ultimately did not renew the WoW Contract with The9 and licensed WoW to NetEase.

111.    Analysts continued to rely on Defendants' statements and believed that it was only a matter of time before The9 renewed the WoW Contract with Blizzard. A September 26, 2008 analyst report from Deutsche Bank stated: "We infer, after recent checks with company management, that the negotiation [for renewal of WoW] is progressing well." This analyst report also stated, in part:

**WoW renewal – our confidence is improving**

We recently spoke with The9's senior management on various issues, including the ongoing contract renewal negotiation for *WoW* (which terminates June of 2009). The company has sought to dispel unconfirmed speculation about the progress of the negotiation (see Forbes, September 5, 2008), which has been under way for some months. However, mentions of topics such as resources and promotional budgets lead us to believe that the discussions are inching closer (albeit not yet complete).

We have always maintained the stance that the company is best positioned to renew the *WoW* game, as mentioned in our previous reports. The real question comes down to the new financial terms and how long the operating rights will last. Although Blizzard's JV with an industry peer does not bode well for The9 in the long term, we believe that the focus of this JV should not be on *WoW*.

Owing to these developments, our confidence in the company's ability to renew its biggest revenue driver game *WoW* has improved. As such, we believe the current valuation of 8.1x 2009E PE (4.7x PE ex-cash of US$200m as of end 2Q08) offers attractive risk/reward.

112.    An October 22, 2008 analyst report by Roth Capital Partners stated, in part:

**World of Warcraft renewal likely by year-end**. According to our sources, The9 remains the leading contender to renew WoW with Activision Blizzard and we believe an announcement by year-end is likely. We believe The9 and Blizzard will set-up a new joint-venture (majority owned by The9) to operate the game (similar to JV structure recently announced between NetEase and Blizzard). Financial terms are still being finalized, but our sources indicate a 4-year license term and 33% royalty rate (gross rev) is the most likely scenario.

113.    On November 17, 2008, The9 announced its financial results for the third quarter ended September 30, 2008 ("3Q08") in a press release filed with the SEC on Form 6-K (the

"11/17/08 Press Release") and reported net revenues of $60.2 million for 3Q08, most of which was attributed to revenues from the operation of WoW.

114.    On November 18, 2008, The9 held a conference call with analysts (the "11/18/08 Conf Call") and reiterated the financial results announced in the 11/17/08 Press Release. On the 11/18/08 Conf Call, Defendant Chen discussed the renewal of the WoW Contract:

> Regarding the WoW renewal discussion, you are absolutely right, we have been conducting the talks with Blizzard since actually May this year. At this point, we have to say we have no comment on the timing as well as the key issues under discussion on this – in this regard. The – when the decision has been made, the announcement will be made publicly and, at that time, everybody will know. At this point, we thank you for your patience and understanding for our remaining no comment on this issue.

115.    The statements referenced above in ¶114 were materially false and misleading when made because of the reasons set forth in ¶¶45, 51 and 53, above. The9 for the first time directly disclosed to the public that discussions with Blizzard over the renewal of the WoW Contract did not begin during 3Q07 but in fact started in May 2008, but coupled those statements with positive statements about the renewal process.

116.    Analysts continued to believe that The9 would renew the WoW Contract. A November 19, 2008 analyst report by JP Morgan commented: "We believe The9 still has the highest chance to [renew the WoW Contract];" and a report that same day by Deutsche Bank stated that Deutsche Bank "continue[s] to expect The9 to renew WoW." This Deutsche Bank report also recognized the materiality and importance of the WoW Contract renewal to The9's business and prospects:

> The inability to renew WoW contract would be detrimental to the company. WoW represents >90% of the company's total revenue and the current contract ends in June 2009. Given the company's high reliance on this game, a shorter-than-expected contract length for WoW renewal (the last contract was for four years) could also cause negative sentiment toward the company, affecting its stock price.

117.    On January 8, 2009, the Company's Board adopted a shareholder rights plan; *a.k.a.* a poison pill. Under the rights plan, one right was distributed with respect to each of the Company's ordinary shares outstanding at the close of business on January 22, 2009.  In the event a person or group obtains beneficial ownership of 15% or more of the Company's voting securities (including by acquisition of ADSs representing ordinary shares), or enters into an acquisition transaction without the approval of the Company's Board, these rights entitle the holders other than the acquiring person to purchase, for an exercise price of $19.50, a number of shares with a value twice that of the exercise price.  The rights plan served as a poison pill to prevent a third-party from acquiring control of the Company without consent of Defendants and Company insiders.

118.    Defendants knew, or recklessly disregarded, at the time of the rights offering that the WoW Contract would not be renewed or that renewal was very unlikely.  Defendants enacted the rights plan to prevent a third-party from acquiring control of the Company in the event its shares plunged after the market learned that the Company would not be renewing the WoW Contract.  In other words, Defendants enacted the rights plan to enable them to continue to control the Company after it was announced that The9 lost WoW and would not be renewing the WoW Contract.

119.    On January 15, 2009, gaming news website 17173.com reported on an interview of Defendant Chen at the Summit Forum of China Game Industry, at which Defendant Chen indicated that The9 would be renewing the WoW Contract:

> Q: How do you see the cooperation between Blizzard and NetEase?  How will The9 doing without World of Warcraft?
>
> A: The cooperation between Blizzard and NetEase is a natural outcome, which is also a normal business deal. I wish them get better and better.  If we had not licensed WoW, The9 would be company without WoW.  ***The renewal of license will be in this June. Because we have to wait until the contract due to renew it.  We are not in a hurry now***.

120.    The statements referenced above in ¶119 were materially false and misleading when made because of the reasons set forth in ¶¶45, 51 and 53, above.  Furthermore, the statement that the "renewal of the license will be in this June" was materially false and misleading because it was becoming increasingly likely if not certain that The9 would not be renewing the WoW Contract in June 2009.

121.    On January 21, 2009, The9 announced that it had declared, for the first time in the Company's history, a special cash dividend in an aggregate amount of $29,410,000, or approximately $1.11 per share on its ordinary shares.  Insiders at the Company, including the Individual Defendants, stood to reap millions of dollars from the dividend.  The dividend was to be paid on February 9, 2009, to holders of record as of February 2, 2009.  Defendants declared the dividend to enable them to personally benefit from the Company's large cash position because Defendants knew, or recklessly disregarded, that it was likely or certain that The9 would not renew the WoW Contract.

122.    According to CW1, by February 2009, it was widely believed by individuals that specialized in following video games that Blizzard would not renew the WoW Contract with The9, but would move forward with NetEase instead.

123.    Confidential Witness No. 3 ("CW3") served as a Global Customer Service Training Manager at Blizzard and was directly involved with Blizzard's transfer of Chinese licensing rights for WoW to NetEase and was involved with helping NetEase "ramp up" its customer service organization in anticipation of NetEase becoming the licensee of WoW.  According to CW3, Blizzard began training NetEase's customer service personnel about WoW in March 2009 and it would have been determined prior to that time that WoW would be licensed to NetEase and not The9.  According to CW2, The9 would have known these facts.

124.    On February 23, 2009, The9 announced its financial results for the fourth quarter and fiscal year ended December 31, 2008 ("4Q08" and "FY08," respectively) in a press release (the "2/23/09 Press Release") that was filed with the SEC on Form 6-K and reported net revenues of $250.4 million for FY08, most of which was attributed to revenues from the operation of WoW. The 2/23/09 Press Release stated that for FY08, gross profit increased by 35% to $114,400,000 from $84,900,000 – an increase that The9 attributed to "increased revenues."  In addition, net income for FY08 was $51.1 million, a 45% increase from $35.3 million in FY07.

125.    As described below, The9's financial statements referenced above in ¶124 were materially false and misleading when made. The9 ultimately reported net income of only $14.2 million when it filed its Form 20-F and accompanying financial statements, claiming that loss of the WoW license in June 2009 – which Defendants claimed not to have known about until April 2009 – required massive write-offs for FY08.

126.    On February 24, 2009, The9 held a conference call with analysts (the "2/24/09 Conf Call") and reiterated the financial results announced in the 2/23/09 Press Release.  On the 2/24/09 Conf Call, Defendant Chen informed investors that the Company could not comment on the progress of negotiations with Blizzard about the WoW Contract, but that it intended to launch Wrath of the Lich King as soon as possible, stating, in pertinent part, as follows:

> Number one, about update on renewal of the World of Warcraft license, at this point we regret that we cannot disclose any detail regarding that ongoing negotiation of renewal.  We will disclose details of once a conclusion is reached and we appreciate your interest and understanding.

> Number two, launch of Wrath of Lich King.  We are actively preparing for the localization of Wrath of Lich King and the material has already been submitted for authorities' review.  ***At this point we're working very actively to make every preparation possible from content to technical and we hope to launch it as soon as possible***.

*        *        *

Blizzard Entertainment's second World of Warcraft expansion, Wrath of the Lich King was released in other regions in last November. More than 2.8m[illion] copies were sold in the first 24 hours of availability, making it the fastest-selling PC game of all time. Wrath of the Lich King was also awarded The Most Anticipated Online Game of the Year in the Chinese Game Annual Forum held in January 2009. *We're now actively preparing for its launch in China*.

127.     Also during the 2/24/09 Conf Call, analysts began trying to pin down the launch date for Wrath of the Lich King, while Defendants misled investors to believe that the Company was still gearing up for its release:

**Andrey Glukhov – *Brean Murray, Carret & Co – Analyst***

Yes, thanks for taking the question. Xiaowei, it looks like you guys are currently thinking about launching the Wrath of Lich King and Audition 2 more like in Q2. In light of that, you started to turn the dial up on sales and marketing in Q4, which seems to be a bit early. So maybe can you give us some insight as to why did you guys decide to step up the marketing so far in advance of the launch for those two games?

**Xiaowei Chen – *The9 Limited – President***

Andrey, thanks for your question. Number one, I cannot principally agree with you that it looks like we're launching Wrath of Lich King in Q2. The launch date of The Wrath of Lich King has not been determined yet at this point. And I regret that I cannot give you a specific date at this point. It is not scheduled for Q2 at this point either.

In terms of why we cranked up the dial on increasing sales and marketing in Q4, actually we cranked up the dial very strongly especially in the area of increasing the ground promotion forces. If you remember by the end of the year we had 370 ground promotion forces. And that more than doubled from the point when I entered The9 back in May, 2008. So in less than half a year we more than doubled the personnel in ground promotion forces, as well as their training and monitoring system, to monitor the effects of their ground promotion.

And going over, in 2009, we further look to triple, or more than triple that number to close to 1,200 by the end of 2009. And so a lot of the preparational work has to be done starting even Q3 and Q4 for the increase of personnel numbers because the monitoring system has to be in, the training system has to be in. Over and over – so the increase of sales and marketing, some of it was for Wrath of Lich King, but in Q4 especially the majority of it was just for keeping up our ground promotion system. And it's something that it has to do all along the year and continue to do in 2009.

- 43 -

What we have observed is that the game that we have now, World of Warcraft, is such a big brand game that advertising can only do so much. And especially in coming 2009 games such as FIFA Online 2 and Audition 2 all have well recognized brand awareness in China.

***We think that the key thing actually to attract new users for both Wrath of Lich King as well as FIFA as well as Audition 2 is not necessarily just advertisement, but actually providing access to players***, whether he or she is in a big city like Shanghai or in a rural village, to provide access to them in the sense of getting point cards to their local Internet cafe or even teaching the players in local, rural areas how to play. And for that you really need a strong and well trained ground promotion force.

128.    The statements referenced above in ¶¶126 and 127 were materially false and misleading when made because of the reasons set forth in ¶¶45, 51, 53 and 122-23, above. The statements referenced above in ¶¶126 and 127 were materially false and misleading when made because it was becoming increasingly likely if not certain that The9 would not be renewing the WoW Contract. Additionally, the Company increased its sales and marketing in an effort to sell games other than WoW because Defendants knew, or recklessly disregarded, that it was certain or highly likely that The9 would not renew the WoW Contract.

129.    On or about April 15, 2009, unofficial reports emerged that Blizzard had awarded the WoW Contract to NetEase, which reportedly had been adding new servers to accommodate the anticipated capacity of operating the online game.

130.    In response to the reports on April 15, 2009, that same day, shares of the Company's ADSs fell $3.26 per ADS, or 25%, from a close of $13.22 per ADS before the reports, to close at $9.96 per ADS, on extremely heavy trading volume.

131.    On April 16, 2009, before the stock market opened, Blizzard and NetEase jointly announced that WoW would be licensed to an affiliate of NetEase for three years following the expiration of the WoW Contract on June 8, 2009. Then, that same day, The9 officially announced in a press release filed with the SEC on Form 6-K that it had "learned that Blizzard Entertainment's

World of Warcraft will be licensed to another China-based online game company following the expiration of the current license agreement with The9."

132.    In response to the announcements on April 16, 2009, that same day, shares of the Company's ADSs fell $1.01 per ADS, or 10%, from a close of $9.96 per ADS before the announcement, to close at $8.95 per ADS, on extremely heavy trading volume.

133.    Analysts that covered The9 issued reports describing the devastating impact that the non-renewal of the WoW Contract would have on The9's business and its prospects.  For example, an analyst report from Roth Capital Partners, dated April 16, 2009, commented, in part, as follows:

> **Can The9 still exist without WoW?**  In our opinion, the loss of WoW is detrimental to The9 as it currently accounts for ~92% of the company's revenue.  The9 currently operates two other licensed games SUN and GE and expects to release FIFA2, Audition2, and Atlantica this year.  We don't have very high expectations for any of these games and don't believe they will come close to filling the revenue gap left behind from WoW.

134.    During the three day period from April 14 to 16, 2009, The9 ADSs dropped by $4.27 per ADS, or approximately 32%, from $13.22 per ADS to $8.95 per ADS, on extremely heavy trading volume.

135.    Thereafter, it was widely reported that NetEase would own the operation rights to WoW *and* its second expansion, Wrath of the Lich King, after The9's WoW Contract with Blizzard expired in June 2009.

136.    As a result of the expiration of the WoW Contract, The9 was forced to shutter its Beijing business, reportedly leaving more than 2,000 of its Shanghai subsidiary's employees, who conducted operations for WoW, without work.  Moreover, reports surfaced that the Company had restructured its top management.

137.    On July 1, 2009, The9 filed a notification of its inability to timely file its Form 20-F.

In connection with this notification, The9 filed a Form 6-K, which provided, in pertinent part, as

follows:

> On April 16, 2009, The9 announced that it had learned that Blizzard Entertainment's World of Warcraft would be licensed to another China-based online game company following the expiration of the license agreement between Blizzard Entertainment and the Company on June 7, 2009. World of Warcraft accounts for a substantial majority of The9's revenue. The Company is finalizing its financial reporting treatment and related disclosures resulting from the non-renewal as reflected in its financial statements as of and for the year ended December 31, 2008.
>
> **As a result of the non-renewal of the World of Warcraft license agreement,** as well as taking into consideration certain other events that occurred subsequent to year-end in connection with certain other licensed games and lower than expected operating performance of one of its games**, the Company will record impairment and certain other charges in its financial statements for the year ended December 31, 2008. As a result of these charges, net income for the year ended December 31, 2008 presented in its annual report on Form 20-F is expected to be between 55% and 75% lower than net income for the same period presented in the Form 6-K filed by the Company on February 24, 2009.** The Company intends to file the Form 20-F on or before July 15, 2009.

138.    Then, on July 15, 2009, The9 filed its Form 20-F ("7/15/09 Form 20-F"), in which it

reported its financial results for FY08, as follows:

> Net income in 2008 decreased by 59.8% to RMB96.8 million (US$14.2 million) from RMB240.9 million in 2007, as a result of the cumulative effect of the above factors. The net impact resulting from loss of the WoW license and other charges listed above was a reduction in net income of approximately RMB251.5 million (US$36.9 million).
>
> *        *        *
>
> Revenue from operation of WoW accounted for approximately 99%, 92% and 91% of total revenue for the years ended December 31, 2006, 2007 and 2008. The WoW license was not renewed upon expiration on June 7, 2009. Accordingly, the Company ceased operating WoW and will not have revenue derived from the on-going operation of WoW beyond June 7, 2009.
>
> **Through end of March 2009, the Company and Blizzard were conducting ongoing negotiations, which formally commenced in April 2008 with respect to the Company continuing to operate WoW in mainland China. On April 16, 2009, the Company learned that WoW license would be licensed to another China-based**

*online game company, the Company believed that an agreement by which the Company would continue to operate WoW beyond the expiration of the then existing license was imminent.*

139.    The9 once again admitted that it had not even *begun* negotiations with Blizzard concerning the renewal of the WoW Contract until April 2008, approximately one year after Defendants previously stated that negotiations had begun and had made positive statements about the prospects of the Company renewing the WoW Contract.

140.    The 7/15/09 Form 20-F also stated:

Our license to operate the WoW game in China terminated on June 7, 2009. As of the date of this filing we have not identified a product or product offering to replace the WoW game.  If we are unable to acquire, develop or license a product to replace the WoW game, our revenues will be materially impacted in the next 12 months.

141.    The 7/15/09 Form 20-F further disclosed that "the Company recorded impairment and certain other charges in its financial statements for the year ended December 31, 2008 . . . [a]s a result of the non-renewal of the World of Warcraft license agreement beyond June 7, 2009. . . ." These impairments and charges included, among other things, the following:

- A RMB19.4 million (US$2.8 million) provision for accounts receivable deemed to be uncollectible (Note 2<7>);

- A RMB3.9 million (US$0.6 million) provision for prepaid royalties (Note 14);

- A RMB22.7 million (US$3.3 million) charge to increase the valuation allowance for deferred tax assets representing incremental income taxes as a result of non-renewal of the WoW Contract (Note 15);

- RMB68.4 million (US$10.0 million) of additional depreciation expense related to computer equipment (Note 2<8>);

- A RMB46.5 million (US$6.8 million) provision for prepayment for equipment and a RMB8.7 million (US$1.3 million) provision on advances to suppliers (Note 16); and

- A RMB7.3 million (US$1.1 million) provision on prepayments and other current assets, including a RMB5.6 million (US$0.8 million) provision on a receivable (Note 22) and a RMB1.7 million (US$0.3 million) provision on inventories.

142.    The Company reported a $36.9 million – or 72% – reduction in net income for FY08 from $51.1 million in net income that it had reported for that period on February 23, 2009.  Between June 30, 2009, the day before the Company announced it would record impairment and other charges (resulting in a hit to earnings), and July 16, 2009, the date after the 7/15/09 Form 20-F was finally filed, The9 ADSs dropped in value from $10.15 to $8.68.

143.    The market for The9 Securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and omissions, The9 Securities traded at artificially inflated prices during the Class Period.  Moreover, at all relevant times, these misstatements and omissions directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As detailed herein, Plaintiffs and other members of the Class purchased The9 Securities in reliance upon the integrity of their market price and market information relating to The9, and have been damaged thereby.

## Additional Scienter Allegations

144.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or document as primary violations of federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding The9, their control over, and/or receipt and/or modification of The9's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning The9, participated in the fraudulent scheme alleged herein.

- 48 -

145.    Defendants possessed knowledge of facts or had access to information contradicting their public statements.  Defendants knew, or recklessly disregarded, that The9 did not begin discussions about renewal of the WoW Contract with Blizzard during 3Q07 as represented by Defendants.  Thus, Defendants knew, or recklessly disregarded, that they had insufficient basis to represent that it was highly likely that The9 would renew the WoW Contract.  Furthermore, due to, among other things, the deterioration of the relationship between The9 and Blizzard, the conflict of interest that arose in connection with the EA investment in The9, Blizzard's deal with NetEase for NetEase to license games from Blizzard, and the substance of the negotiations between the The9 and NetEase, Defendants knew, or recklessly disregarded, that their positive statements about the renewal of the WoW Contract were materially false and misleading.  These facts that rendered Defendants statements materially false and misleading were communicated to Defendants and other senior executives of the Company.  Furthermore, Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud.

146.    Recognizing that there was a real and significant risk that The9 would not renew the WoW Contract, Defendants sought to personally profit from the success of WoW prior to the expiration of the WoW Contract.  Defendants made false and misleading statements about the likelihood of renewing the WoW Contract in order to sell millions of dollars worth of artificially inflated The9 Securities.  Furthermore, Defendants set up related-party transactions with companies controlled by certain Individual Defendants in order to profit from the revenues generated from WoW before the expiration of the WoW Contract.  When it became clear to Defendants that it was highly probable if not certain that The9 would not renew the WoW Contract, Defendants declared a special dividend to withdraw millions of dollars from the Company and enacted a poison pill to enable them to continue to control the Company once The9's stock dropped after investors learned

that The9 would be losing WoW. The poison pill would also enable Defendants to lock in gains in their The9 holdings in the event The9 was acquired. Finally, Defendants enacted a rights plan to enable them to acquire shares of the Company.

147. During the Class Period, certain Defendants and other Company insiders sold shares of their personally-held stock for proceeds in excess of $125 million. These sales were unusual and suspicious in timing and amount, and were executed by the following insiders: (i) Defendant Lee, CFO; (ii) Gary Lai ("G. Lai"), a director; (iii) He Xudong, a VP; (iv)-(vi) Davin A. Mackenzie ("Mackenzie"), Chao Y. Wang ("Wang") and Ka Keung Yeung ("Yeung"), each of whom is a director and, together, comprise the three members of the Board's Audit Committee ("AC"); (vii) Stephen Law ("Law"), a director that Bosma appointed to the Board pursuant to the Voting Agreement with Incsight; (viii) Jun Yao ("Yao"), a Senior VP; (ix) Shen "Chris" Kuoting ("Kuoting"), VP Marketing; (x) Incsight, an entity solely owned and controlled by CEO Defendant Zhu, which, together with Bosma, owned a majority of the Company's shares prior to the massive sell-off described herein; and (xi) Bosma, an entity over which Zhu exercises significant influence and control, both directly and indirectly.

148. The Class Period sales that these insiders made, set forth in chronological order, are depicted in the following chart:

| Name | Position | Date | Shares | Price | Proceeds |
|------|----------|------|--------|-------|----------|
| BOSMA | 10%+ Owner, | 11/20/06 | 250,000 | $27.70 | $6,925,000 |
| | 50%+ Owner | 11/21/06 | 100,000 | $26.96 | $2,696,000 |
| | with Incsight | 11/22/06 | 927,769 | $27.84 | $25,829,089 |
| | | 09/10/07 | 1,000,000 | $35.58 | $35,580,000 |
| | | 03/17/08 | 3,201 | $18.18 | $58,192 |
| | | 03/18/08 | 40,700 | $18.01 | $733,125 |
| | | 03/19/08 | 25,100 | $18.11 | $454,594 |
| | | 03/20/08 | 2,456 | $17.75 | $43,594 |
| | | 03/20/08 | 86,819 | $17.48 | $1,517,596 |
| | | 08/13/08 | 500,000 | $22.60 | $11,300,000 |
| | | | 2,936,045 | | $85,137,190 |

| Name | Position | Date | Shares | Price | Proceeds |
|------|----------|------|--------|-------|----------|
| INCSIGHT | 10%+ Owner, 50%+ Owner with Bosma, Zhu Controls | 11/16/06 | 30,000 | $26.37 | $791,238 |
| | | 11/17/06 | 4,310 | $27.75 | $119,624 |
| | | 11/17/06 | 22,189 | $28.00 | $621,292 |
| | | 11/24/06 | 30,000 | $28.00 | $840,000 |
| | | 12/04/06 | 30,000 | $28.00 | $840,000 |
| | | 12/05/06 | 17,811 | $28.75 | $512,066 |
| | | 12/07/06 | 190,000 | $29.89 | $5,680,000 |
| | | 04/02/07 | 1,700 | $35.02 | $59,535 |
| | | 04/03/07 | 30,000 | $35.41 | $1,062,213 |
| | | 04/04/07 | 30,000 | $37.03 | $1,110,756 |
| | | 04/05/07 | 30,000 | $35.72 | $1,071,543 |
| | | 04/09/07 | 100,000 | $40.00 | $4,000,000 |
| | | 06/16/08 | 30,000 | $25.94 | $778,200 |
| | | 06/17/08 | 30,000 | $25.24 | $757,200 |
| | | 07/02/08 | 200,000 | $22.45 | $4,490,000 |
| | | 07/09/08 | 100,000 | $25.00 | $2,500,000 |
| | | 09/18/08 | 100,000 | $25.00 | $2,500,000 |
| | | | 976,010 | | $27,733,667 |
| G. LAI | Director | 12/05/06 | 7,000 | $29.50 | $206,500 |
| | | 12/07/06 | 7,300 | $29.53 | $215,570 |
| | | 12/12/06 | 8,611 | $29.60 | $254,899 |
| | | 12/15/06 | 199 | $27.00 | $5,373 |
| | | 12/15/06 | 5,490 | $26.66 | $146,376 |
| | | 12/27/06 | 10,000 | $32.16 | $321,574 |
| | | 01/11/07 | 10,000 | $33.81 | $338,097 |
| | | 01/16/07 | 10,000 | $34.52 | $345,183 |
| | | 03/16/07 | 30,000 | $34.99 | $1,049,700 |
| | | | 88,600 | | $2,883,271 |
| LAW | Director | 06/12/07 | 12,214 | $42.98 | $524,958 |
| | | | 12,214 | | $524,958 |
| LEE | CFO | 12/27/06 | 10,104 | $32.08 | $324,139 |
| | | 01/11/07 | 10,601 | $33.45 | $354,601 |
| | | 01/16/07 | 5,399 | $34.59 | $186,763 |
| | | 04/18/07 | 9,999 | $41.44 | $414,334 |
| | | 05/21/07 | 3,212 | $39.47 | $126,778 |
| | | 06/21/07 | 2,500 | $45.10 | $112,750 |
| | | 06/22/07 | 3,500 | $45.64 | $159,750 |
| | | 07/06/07 | 5,009 | $49.89 | $249,899 |
| | | 03/11/08 | 64,218 | $21.14 | $1,357,470 |
| | | | 114,542 | | $3,286,484 |

| Name | Position | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| MACKENZIE | Director, | 12/31/06 | 7,150 | $27.39 | $195,839 |
|  | AC Member | 04/09/07 | 2,979 | $41.00 | $122,139 |
|  |  |  | 10,129 |  | $317,978 |
| WANG | Director, | 12/26/06 | 6,000 | $30.60 | $183,629 |
|  | AC Member | 12/28/06 | 7,704 | $32.59 | $251,060 |
|  |  |  | 13,704 |  | $434,689 |
| XUDONG | VP | 03/05/07 | 53,000 | $33.15 | $1,757,000 |
|  |  | 04/09/07 | 23,000 | $40.04 | $920,851 |
|  |  | 06/04/07 | 30,000 | $42.67 | $1,280,000 |
|  |  |  | 106,000 |  | $3,957,851 |
| YAO | Senior VP | 12/26/06 | 5,000 | $30.86 | $154,286 |
|  |  | 12/27/06 | 6,212 | $32.23 | $200,217 |
|  |  | 06/21/07 | 9,000 | $45.00 | $405,000 |
|  |  |  | 20,212 |  | $3759,504 |
| YEUNG | Director, | 06/20/07 | 5,000 | $44.06 | $220,300 |
|  | AC Chairman |  | 5,000 |  | $220,300 |
| KUOTING | VP Marketing | 09/22/08 | 30,000 | $8.55 | $256,500 |
|  |  |  | 30,000 |  | $256,500 |
|  | **Total:** |  | **4,312,456** |  | **$125,512,391** |

149.    As disclosed in the 7/15/09 Form 20-F for FY08, on November 20, 2008, the

Company's Board approved an increase in the maximum aggregate number of ordinary shares –

from 2,449,614 to 4,449,614 shares – which may be subject to option or stock purchase rights

pursuant to The9's 2004 Share Option Plan. According to the 7/15/09 Form 20-F, the Board elected

to follow "home country practices" of the Cayman Islands, which would not require shareholder

approval for such action, as opposed to NASDAQ requirements, which would:

> We understand Nasdaq Marketplace Rule 4350(i) requires us to obtain shareholder
> approval prior to adopting or materially amending an equity compensation plan
> (including stock option plans). We also understand we can elect to follow "home
> country practices" in lieu of the requirements of Nasdaq Marketplace Rule 4350(i).
> The Companies Law (2007 Revision) of the Cayman Islands does not require us to
> obtain shareholder approval for amending existing equity incentive plans, nor is
> doing so required under our amended and restated memorandum and articles of

association. ***In this instance we elected to follow "home country practice" and did not seek shareholder approval in connection with amending the 2004 Share Option Plan***.

150.    Furthermore, The9's management was aware of internal control deficiencies during the Class Period, which the Company acknowledged in the 7/15/09 Form 20-F.  To remediate these deficiencies, the Company purportedly "hired a new chief financial officer, a new financial director and a new internal audit director, each of whom has solid knowledge of and experience with U.S. GAAP and SOX compliance[.]"  In fact, Defendant Lee resigned as CFO effective late-February 2008, and her replacement, Defendant Tse, resigned effective early-July 2008.  Although the Company claimed that Lee had resigned to "pursue other interests" and that Tse had resigned only four months later "due to personal and family reasons," The9's internal control deficiencies, coupled with the ongoing fraudulent scheme, played a part in both resignations.

151.    As described above, on January 21, 2009, The9 announced that it had declared, for the first time in the Company's history, a special cash dividend in an aggregate amount of $29,410,000, or approximately $1.11 per share on its ordinary shares.  Insiders at the Company, including the Individual Defendants, earned millions of dollars from the dividend and Defendant Zhu alone received more than $7 million from the dividend in connection with his personal holdings in the Company.  Defendants declared the dividend to enable them to personally benefit from the Company's large cash position because Defendants knew, or recklessly disregarded, that it was likely or certain that The9 would not renew the WoW Contract.

152.    Certain of the Individual Defendants also reaped personal financial gain through related party transactions with the Company that were enabled by the fraud alleged herein.  These related-party transactions include, *inter alia*, the following:

(a)    According to CW4, Defendant Zhu and other people associated with Zhu engaged in a series of under the table agreements with Hewlett-Packard in China under which The9

acquired computer equipment and Defendant Zhu received illegal kickbacks of more than $8 million.

(b)    In January 2008, The9 invested $3.5 million in Korean game development company Ideas.  According to the 7/15/09 Form 20-F, The9 recognized a "full impairment" and wrote-off the entire investment in Ideas less than a year after the closing of the deal.  According to CW4, senior executives of The9 "colluded with Ideas to transfer all funds, assets and employees to another Korean company named Polic Corporation Limited (which has the same registered office and board positions)" and The9 executives received substantial financial benefits.

(c)    During April 2008, through its subsidiary China Crown Technology Limited, The9 acquired approximately 12.34% of Korean game development company G10 (the holding company of T3 Entertainment) for $38 million.  According to CW4, simultaneously with the execution of the transaction, G10 acquired 1,205,616 Series A preferred shares held by an institutional investor in G10 (named IDG) and 620,000 ordinary shares held by senior management of G10 for a much higher price than paid by The9.  According to CW4, this was a "shady deal" and senior The9 executives used this transaction to embezzle the assets of The9 and line their own pockets.  CW4 indicated that the value of the investment in G10 was overstated and that The9's assessment that there was no impairment as of December 31, 2008, based upon "a combination of internally developed income and market approach[es]," made The9's financial statements appear better than they actually were.

(d)    The9 conducted part of its activities through a series of agreements with Shanghai IT under which Shanghai IT, The9 Computer and 9Webzen Shanghai jointly operated the MU game in China and shared the revenues from MU before October 2006.  C9I Shanghai has entered into similar contractual arrangements with Shanghai IT and The9 Computer to jointly

operate WoW in mainland China and to share the revenues from operating WoW in China. Shanghai IT is owned by Defendant Zhu and Yong Wang, a VP of the Company.

(e)     *Master Agreement for WoW.*  The9 Computer, C9I Shanghai and Shanghai IT entered into a master agreement in connection with the operation of WoW in China and for providing services to customers jointly.  In May 2007, The9 Computer, C9I Shanghai and Shanghai IT amended the master agreement for WoW to add China The9 Interactive (Beijing), or C9I Beijing, as a party to the master agreement.  Under the agreement, The9 agreed to the following: The9 Computer acted as the technical service provider of Pass9, which is the membership management and payment system used in the Company's online game operation; C9I Shanghai acted as the exclusive licensee of WoW in China and the technical service provider for the operation of WoW; and C9I Beijing acted as the technical service provider for the user management system.  The revenues generated by WoW in China were shared by C9I Shanghai, Shanghai IT, C9I Beijing and The9 Computer pursuant to the revenue sharing provisions set forth in the master agreement for operating WoW in China.

(f)     In September 2008, TDC, a wholly owned subsidiary of the Company, approved its 2008 Stock Option Plan. On October 1, 2008, TDC granted options to Defendant Zhu and certain employees of TDC to purchase 18,961 ordinary shares of that company.  In November 2008, as approved by the Company's Board, The9 granted equity warrants to Incsight, a company wholly owned by Defendant Zhu, to purchase 552,196 ordinary shares in the Company.

(g)     In December 2008, the Company loaned approximately $150,000 to Company employees, who established a Nanjing-based game development company and agreed to pledge their equity interest in the Nanjing company to the Company.  In February 2009, the Company loaned

approximately $1.5 million to Company employees, who established another company located in Nanjing for the purpose of developing an online game.

## LOSS CAUSATION/ECONOMIC LOSS

153.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of The9 Securities and operated as a fraud or deceit on Class Period purchasers of The9 Securities.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of The9 Securities fell precipitously as the prior artificial inflation came out.  As a result of their purchases of The9 Securities during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

154.    Defendants' false and misleading statements had the intended effect and caused The9 Securities to trade at artificially inflated levels throughout the Class Period.

155.    As a direct result of Defendants' disclosures set forth above, the price of The9 Securities fell precipitously.  These drops removed the inflation from the price of The9 Securities, causing real economic loss to investors who had purchased The9 Securities during the Class Period.

156.    In response to reports on January 18, 2008, that The9's CFO, Defendant Lee, was leaving the Company – just a few weeks after the end of FY07, the first year for which outside auditors were required to certify the adequacy of The9's internal controls – The9's ADS price dropped $2.87, from $21.76 to $18.89, a decline of more than 13%.  The full extent of Defendants' fraud had not yet been revealed so The9 ADSs continued to remain artificially inflated.

157.    In response to the Blizzard and NetEase announcement on August 13, 2008, that NetEase would be licensing games from Blizzard, which increased the likelihood that The9 would not renew the WoW Contract, that same day, shares of the Company's ADSs fell $4.67 per ADS, or 20%, from a close of $22.83 per ADS before the announcement, to close at $18.16 per ADS, on

extremely heavy trading volume. The full extent of Defendants' fraud had not yet been revealed so The9 ADSs continued to remain artificially inflated. In response to reports on April 15, 2009 that The9 would not be renewing the WoW Contract, that same day, shares of the Company's ADSs fell $3.26 per ADS, or 25%, from a close of $13.22 per ADS before the reports, to close at $9.96 per ADS, on extremely heavy trading volume. The full extent of Defendants' fraud had not yet been revealed so The9 ADSs continued to remain artificially inflated.

158.    In response to the formal announcements before the stock market opened on April 16, 2009, that The9 would not be renewing the WoW Contract, that same day, shares of the Company's ADSs fell $1.01 per ADS, or 10%, from a close of $9.96 per ADS before the announcement, to close at $8.95 per ADS, on extremely heavy trading volume. During the three day period from April 14 to 16, 2009, The9 ADSs dropped by $4.27 per ADS, or approximately 32%, from $13.22 per ADS to $8.95 per ADS, on extremely heavy trading volume. The full extent of Defendants' fraud had not yet been revealed so The9 ADSs continued to remain artificially inflated.

159.    On July 1, 2009, The9 reported that its earlier-reported FY08 financial results would be radically altered to reflect, primarily, the loss of the WoW Contract in 2009. From June 30, 2009 through July 16, 2009, the day after the 7/15/09 Form 20-F was filed, reporting, *inter alia*, net income of $14.2 million – a 72% reduction from the earlier-reported figure of $51.1 million – The9's ADS price dropped from $10.15 to $8.68.

160.    The9 options, which are tied to the price of The9 ADSs, also dropped on the dates specified above.

161.    The declines in the price of The9 Securities after the disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price declines in The9 Securities negates any inference

that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of The9 Securities and the subsequent significant decline in the value of The9 Securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

162.    At all relevant times, the market for The9 Securities was an efficient market for the following reasons, among others:

(a)    The9 Securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    The9 filed periodic public reports with the SEC and the NASDAQ;

(c)    The9 regularly communicated the public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    The9 was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

163.    As a result of the foregoing, the market for The9 Securities promptly digested current information regarding The9 from all publicly available sources and reflected such information in the price of The9 Securities.  Under these circumstances, all purchasers of The9 Securities during the

Class Period suffered similar injury through their purchases of The9 Securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

164.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of The9 who knew that those statement were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

165.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

166.    This Count is asserted against all Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

167.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary

- 59 -

in order to make the statements made, in light of the circumstances under which they were made, not misleading.

168.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

169.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Securities during the Class Period in an effort to maintain artificially high market prices for the Company's Securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

170.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, and/or projections; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and liabilities at all relevant times; and (iv) each of the Individual Defendants was aware

of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

171.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing The9's operating condition, business prospects and the problems with the renewal of the WoW Contract from the investing public and supporting the artificially inflated price of its Securities.  As demonstrated by Defendants' misstatements of the Company's business and prospects, throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

172.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of The9 Securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of The9's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired The9 Securities during the Class Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

173.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the significant problems with The9's business prospects, which were not disclosed by Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their The9 Securities, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

174.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

175.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of The9 Securities during the Class Period.

### COUNT II

#### Violation of Section 20(a) of the Exchange Act
#### Against the Individual Defendants

176.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

177.    The Individual Defendants acted as controlling persons of The9 within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs

- 62 -

contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

178.    As set forth above, The9 and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's Securities during the Class Period.

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Declaring this action is a proper class action and certifying Plaintiffs, among others, as Class representatives and their counsel as Class counsel under Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring and determining that Defendants violated the federal securities laws by reason of their conduct as alleged herein;

C.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert's fees; and

E.    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  March 19, 2010

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN

_____
EVAN J. KAUFMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Co-Lead Counsel for Plaintiffs*

GLANCY BINKOW & GOLDBERG LLP
ROBIN B. HOWALD
1430 Broadway, Suite 1603
New York, NY  10018
Telephone:  212/382-2221
212/382-3944 (fax)

GLANCY BINKOW & GOLDBERG LLP
LIONEL Z. GLANCY
MICHAEL GOLDBERG
1801 Avenue of the Stars, Suite 311
Los Angeles, CA  90067
Telephone:  310/201-9150
310/201-9160 (fax)

*Co-Lead Counsel for Plaintiffs*

WALDEN LAW FIRM, PLLC
RICHARD E. WALDEN
8201 Cantrell, Suite 315
Little Rock, AR  72227
Telephone:  501/907-7000
888/220-7933 (fax)

*Additional Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Evan J. Kaufman, hereby certify that on March 19, 2010, I caused a true and correct copy of the attached:

Consolidated Complaint

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to all counsel of record.

Evan J. Kaufman