# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x
:
LAWRENCE F. GLASER, on Behalf of               :
Himself and All Others Similarly Situated,     :     Civil Action No. 1:09-cv-08904-RJH
               Plaintiff,     :     (Consolidated)
:
    vs.                                       :
:
THE9, LTD., XIAOWEI CHEN,                       :
GEORGE LAI, HANNAH LEE,                         :
TONY TSE and JUN ZHU,                           :
             Defendants     :
—————————————————————— x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

Peter A. Wald (*pro hac vice*)
David J. Schindler (*pro hac vice*)
Ethan Brown (*pro hac vice*)
Robert J. Malionek
Matthew L. Kutcher

LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
(212) 906-1200

*Counsel for Defendants The9, Ltd., Xiaowei Chen, George Lai, Hannah Lee, Tony Tse and Jun Zhu*

May 28, 2010

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................1

FACTUAL BACKGROUND ........................................................................................3

ARGUMENT .................................................................................................................6

I.      THE COMPLAINT FAILS TO PLEAD A SECTION 10(b) CLAIM ...............6

        A.      The Complaint Fails To Plead Any False Or Misleading Statements ....................6

                1.      Statements About The WoW License Renewal ...............................8

                2.      Statements About The9's "Good" Relationship With Blizzard ................11

                3.      Optimistic Statements About The9's Future Growth ...............................13

        B.      The Complaint Fails To Plead Facts Permitting A Strong Inference Of
                Scienter ........................................................................................14

                1.      The Complaint Fails To Plead Motive And Opportunity To
                        Commit Fraud ...........................................................................15

                        a.      Stock Sale Allegations ...................................................15

                        b.      Corporate Transaction Allegations ...............................18

                2.      The Complaint Alleges No Facts To Support A Strong Inference
                        Of Actual Knowledge Or Recklessness...................................19

                3.      The Non-Fraudulent Inference Is The Most Cogent And
                        Compelling...............................................................................21

        C.      The Complaint Fails To Plead Loss Causation....................................22

II.     THE COMPLAINT FAILS TO ESTABLISH CONTROL PERSON LIABILITY
        UNDER SECTION 20(a) .................................................................24

CONCLUSION...................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ............................................................................. 3, 14

*Avon Pension Fund v. GlaxoSmithKline PLC*,
  343 F. App'x 671 (2d Cir. 2009) ......................................................................... 22

*City of Brockton Ret. Sys. v. Shaw Group Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008) ................................................................. 17

*Coronel v. Quanta Capital Holdings, Ltd.*,
  No. 1:07-cv-01405-RPP, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) .................... 25

*Davidoff v. Farina*,
  No. 1:04-cv-07617-NRB, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) ............... 22

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ..................................................................................... 22, 23

*Elliott Assocs,. L.P. v. Covance, Inc.*,
  No. 00-cv-04115-SAS, 2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) ..................... 2

*Faulkner v. Verizon Commc'ns, Inc.*,
  189 F. Supp. 2d 161 (S.D.N.Y. 2002) ................................................................. 19

*Fort Worth Employers' Ret. Fund v. Biovail Corp.*,
  615 F. Supp. 2d 218 (S.D.N.Y. 2009) ................................................................. 23

*Halperin v. Ebanker USA.Com, Inc.*,
  295 F.3d 352 (2d Cir. 2002) ......................................................................... 11, 14

*In re Aegon N.V. Sec. Litig.*,
  No. 1:03-cv-00603-RWS, 2004 WL 1415973 (S.D.N.Y. June 23, 2004) ................. 7

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) ................................................................... 7

*In re Am. Express Co. Sec. Litig.*,
  No. 1:02-05533-WHP, 2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008),
  *aff'd sub nom. Slayton v. Am. Express Co.*, No. 08-5442-cv, 2010 WL 1960019 (2d Cir.
  May 18, 2010) ................................................................................................... 9

*In re Am. Int'l Group, Inc. Deriv. Litig.*,
  No. 1:07-cv-10464-LTS, 2010 WL 1245000 (S.D.N.Y. Mar. 30, 2010) ................. 16

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006) ........................................................................ 17

*In re Bristol-Myers Squib Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004) .......................................................... 17, 18, 19

*In re Corning Sec. Litig.*,
   No. 6:01-cv-06580-CJS, 2004 WL 1056063 (W.D.N.Y. Apr. 9, 2004),
   *aff'd*, No. 04-2845-cv, 2005 WL 714352 (2d Cir. Mar. 30, 2005).......................... 17

*In re Duane Reade Inc. Sec. Litig.*,
   No. 1:02-cv-06478-NRB, 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003),
   *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004)....................... 11

*In re Elan Corp. Sec. Litig.*,
   543 F. Supp. 2d 187 (S.D.N.Y. 2008) .......................................................... 19, 20, 22

*In re eSpeed, Inc. Sec. Litig.*,
   457 F. Supp. 2d 266 (S.D.N.Y. 2006) ........................................................................ 15

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009) ......................................................................................... 23

*In re FVC.com Sec. Litig.*,
   136 F. Supp. 2d 1031 (N.D. Cal. 2000),
   *aff'd*, 32 F. App'x 338 (9th Cir. 2002) ................................................................ 9, 13

*In re Gilat Satellite Networks, Ltd.*,
   No. 1:02-cv-01510-CPS-SMG, 2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005) ....................... 12

*In re Gildan Activewear, Inc. Sec. Litig.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009) ................................................................... 7, 16

*In re IAC/InterActiveCorp Sec. Litig.*,
   478 F. Supp. 2d 574 (S.D.N.Y.2007) ................................................................. 11, 16

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006) ........................................................................ 11

*In re Omnicom Group, Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ................................................................................ 23, 24

*In re Petco Animal Supplies Inc. Sec. Litig.*,
   No. 3:05-cv-00823-H-RBB, 2006 U.S. Dist. LEXIS 97927 (S.D. Cal. July 31, 2006) ........... 12

*In re PXRE Group, Ltd., Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009),
   *aff'd sub nom. Condra v. PXRE Group Ltd.*,
   No. 09-1370-cv, 2009 U.S. App. LEXIS 27949 (2d Cir. Dec. 21, 2009) ........................ 20, 21

*In re Retek Inc. Sec.*,
    No. 0:02-cv-04209-JRT-AJB, 2004 WL 741571 (D. Minn. Mar. 30, 2004) ............................. 9

*In re Sec. Capital Assurance, Ltd. Sec. Litig.*,
    No. 1:07-cv-11086-DAB, 2010 WL 1372688 (S.D.N.Y. Mar. 31, 2010)........................ 15, 25

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007) ............................................................................... 8

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ........................................................................ 17, 18

*In re Winstar Commc'ns*,
    No. 1:01-cv-03014-GBD, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ................................. 23

*In re Yukos Oil Co. Sec. Litig.*,
    No. 1:04-cv-05243-WHP, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ................................. 3

*Joffee v. Lehman Bros., Inc.*,
    209 F. App'x 80 (2d Cir. 2006) ...................................................................................... 24

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ..................................................................................... 6, 20

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) ........................................................................ 6, 22, 23, 24

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007),
    *aff'd*, 312 F. App'x 400 (2d Cir. 2009) ........................................................................ 9, 10

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ............................................................................ 6, 9, 12, 15

*Plumbers & Steamfitters Local 773 Pension Fund v.*
    *Canadian Imperial Bank of Commerce*,
    No. 1:08-cv-08143-WHP, 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) ................................. 16

*Pollio v. MF Global, Ltd.*,
    608 F. Supp. 2d 564 (S.D.N.Y. 2009) ............................................................................. 20

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ..................................................................................... 8, 14

*Rosner v. Star Gas Partners L.P.*,
    344 F. App'x 642 (2d Cir. 2009) .............................................................................. 12, 13

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ............................................................................... 7, 14, 19

*Slayton v. Am. Express Co.*,
    No. 08-5442-cv, 2010 WL 1960019 (2d Cir. May 18, 2010) ............................................ 8, 14

*Steinberg v. Ericsson LM Tel. Co.*,
    No. 1:07-cv-09615-RPP, 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) .............................. 14

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999) ..................................................................................................... 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................................. 6, 14, 21, 22

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998) ...................................................................................................... 7

## STATUTES

15 U.S.C. § 77z-2(c) ......................................................................................................................... 8

15 U.S.C. § 77z-2(c)(1) ..................................................................................................................... 8

15 U.S.C. § 78j-(b) ........................................................................................................................... 6

15 U.S.C. § 78t-(a) .......................................................................................................................... 25

15 U.S.C. § 78t-1(a) ........................................................................................................................ 25

15 U.S.C. § 78u-4(b)(2) ................................................................................................................... 14

15 U.S.C. § 78u-4(b)(3)(A) ............................................................................................................... 6

15 U.S.C. § 78u-4(b)(4) ................................................................................................................... 23

15 U.S.C. § 78u-5(a) ......................................................................................................................... 8

15 U.S.C. § 78u-5(c)(1) ..................................................................................................................... 8

## OTHER AUTHORITIES

AU § 560.07 ...................................................................................................................................... 13

## RULES

Fed. R. Civ. P. 9(b) ........................................................................................................................... 6

Fed. R. Civ. P. 12(b)(6) ..................................................................................................................... 1

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants The9 Limited ("The9") and Jun Zhu, Xiaowei Chen, Hannah Lee, Tony Tse, and George Lai (the "Individual Defendants" and, collectively with The9, "Defendants") submit this memorandum of law in support of their motion to dismiss the Consolidated Complaint ("Complaint," cited as ¶ _).

## PRELIMINARY STATEMENT

In April 2009, The9 announced that Blizzard Entertainment Inc. ("Blizzard") had opted not to renew The9's exclusive license (the "License") to operate the World of Warcraft ("WoW") videogame in China.  Looking back from that announcement, Plaintiffs allege that every statement made by The9 since late 2006 about its future performance, potential for License renewal, and relationship with Blizzard was false and misleading, and violated the securities laws.  The Complaint fails to state any such claim.

*First*, The9's statements of optimism about the potential for License renewal, and related statements regarding its relationship with Blizzard and prospects for growth, are not actionable as false statements.  Most of these are protected by the statutory safe harbor for forward-looking statements both because (1) Plaintiffs allege no facts (let alone particularized facts) supporting an assertion that Defendants *knew* these statements were false – *i.e.*, that Defendants were not optimistic about the potential for License renewal, and (2) The9 repeatedly and explicitly disclosed the risk that the License would not be renewed.[1]  Similarly, statements about The9's "good relationship" with Blizzard, and statements about The9's future business prospects generally, are not rendered false simply because the License was not renewed.  "The securities laws do not require that investors be treated like children . . . .  Investors know that the stock market is a risky business and that when a company's officer makes predictions . . . they are not

---

[1]    The specific cautionary language is summarized in the table attached as Exhibit 1 to the Declaration of Matthew L. Kutcher, dated May 28, 2010 ("Kutcher Decl.").

issuing guarantees." *Elliott Assocs., L.P. v. Covance, Inc.*, No. 1:00-cv-04115-SAS, 2000 WL 1752848, at *9 (S.D.N.Y. Nov. 28, 2000).

*Second*, the Complaint does not come close to alleging the requisite "strong inference" of scienter.  As an initial matter, Plaintiffs fail to allege a compelling inference of a fraudulent motive.  Plaintiffs attempt to plead motive simply by listing sales of The9 shares by nine individuals and two entities over a two-and-a-half year period.  Plaintiffs plead no connection – either in time or otherwise – between those sales and any purportedly misleading statement.  Furthermore, of the five Individual Defendants in this case, three are not alleged to have sold stock at all.  Another Defendant *increased* his holdings of The9 stock during the class period, and the remaining Defendant's "sales" were exercises of options pursuant to a 10b5-1 plan.  The last time any Defendant is alleged to have sold shares was nearly seven months *before* the announcement of non-renewal.

Contrary to any plausible (let alone compelling) inference of motive, The9 was purchasing its own stock in the market during late 2008 and early 2009.  That would make no sense if the Company knew that its "artificially inflated" stock would decline in price once non-renewal was announced.  The9 also heavily invested in computer and business infrastructure to support its continuing operation of WoW – another action that would make no sense if the Company knew the License would not be renewed.

Plaintiffs likewise fail to present any facts, much less particularized facts, to support an inference that Defendants *knew*, or recklessly disregarded, that the License would not be renewed – months (indeed, years) before renewal negotiations had run their course.  Plaintiffs' only alleged bases for asserting such "knowledge" are (1) rumors of tensions between The9 and Blizzard – published in videogame press and from a handful of poorly described confidential

witnesses ("CWs") – and (2) a fully disclosed equity investment made in The9 by another game manufacturer.  Neither of those "facts" supports an inference that Blizzard had decided not to renew the License before the announcement was made, let alone that Defendants knew or recklessly disregarded this fact.

*Finally*, Plaintiffs fail to plead loss causation.  The Complaint alleges only that after several announcements, including that the License would not be renewed, The9's stock price dropped.  None of those announcements, scattered over nearly two years, were "corrective disclosures" because none revealed any false statement by Defendants.  Without the revelation of a false statement, Plaintiffs cannot demonstrate their losses were caused by Defendants' alleged fraud.

## FACTUAL BACKGROUND[2]

**The9.**  The9 is a leading online game operator and developer incorporated in the Cayman Islands with its principal place of operations in China.  Its American Depository Shares (ADSs) trade on the Nasdaq Global Market.  (The9 2008 Form 20-F (Kutcher Decl. Ex. 6) at 1.)

**Individual Defendants.**  Jun Zhu is The9's co-founder and Chief Executive Officer. (¶ 17(a).)  Xiaowei Chen served as The9's President from May 16, 2008 to the end of the proposed class period.  (¶ 17(e).)  Hannah Lee served as The9's Chief Financial Officer and Vice President from January 2004 until resigning in February 2008.  (¶ 17(b).)  Tony Tse assumed the

---

[2]     For the purposes of this motion, Defendants assume the truth of well-pled allegations in the Complaint.  *In re Yukos Oil Co. Sec. Litig.*, No. 1:04-cv-05243-WHP, 2006 WL 3026024, at *12 (S.D.N.Y. Oct. 25, 2006).  In deciding a motion to dismiss, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

CFO position from April 2008 until July 2008, at which time Defendant George Lai became CFO. (¶ 17(c).) Lai remained CFO through the end of the class period. (*Id.*)

**The WoW License.** On February 3, 2004, The9, through an affiliate, entered into an exclusive four-year license with Vivendi Universal Games ("VUG") to operate WoW, a massively multiplayer online role-playing game, in mainland China. (¶ 29.) WoW launched commercially in China on June 5, 2005, setting the License's expiration date as June 7, 2009. (*Id.*) WoW proved to be a great success under The9's management, attracting over 1.5 million players within months of its release, and generating revenue of over $22.3 million in the first full quarter of operation. (7/20/05 The9 Press Release (Kutcher Decl. Ex. 8) at 1; ¶ 32.) The License was amended in January 2007 and March 2008 to add VUG's subsidiary, Blizzard, as a licensor and to address the rollout of WoW's expansion packs. (¶ 30.)

After launching WoW in June 2005, The9 executed a diversification strategy to expand its game portfolio. (2/23/06 The9 6-K (Kutcher Decl. Ex. 9) at 5.) Analysts applauded this approach, as it "reduce[d] concentration risk for the company as it no longer relie[d] on one single game." (11/16/06 Deutsche Bank report (Kutcher Decl. Ex. 32) at 3.) Over the next several years, The9 obtained licenses to operate close to a dozen games, including Electronic Arts, Inc.'s ("EA") FIFA Online. (¶ 52.) On May 21, 2007, The9 announced that EA had made a $167 million equity investment, acquiring 15 percent of The9's common shares. (*Id.*)

**Disclosure of the Risk of Non-Renewal of the WoW License.** In each of its annual Form 20-F SEC filings, The9 prominently disclosed the risk that it might not be able to renew the License at the end of its term. The9's 2006 Form 20-F cautions:

> If we are unable to maintain a satisfactory relationship with Blizzard . . ., or if Blizzard or any of our other online game licensors either establishes similar or more favorable relationships with our competitors . . ., our operating results and our business would be harmed, because our business depends significantly upon

our exclusive licenses to operate WoW and other online games in China.  While we have obtained from Blizzard a license for the Burning Crusade, an expansion pack for the WoW game, *we cannot assure you that Blizzard or any of our other online game licensors will renew its license agreement with us . . . .*  Any deterioration of our relationship with Blizzard . . . could harm our future results of operations or the growth of our business.

(The9 2006 Form 20-F (Kutcher Decl. Ex. 4) at 9 (emphasis added).)  Each of the Company's annual 20-Fs contained substantially similar language.[3]  This "key downside risk" –  the potential "[i]nability to renew WoW" – was repeatedly highlighted by analysts.  (*See, e.g.,* 9/26/08 Deutsche Bank report (cited in ¶ 111) (Kutcher Decl. Ex. 34) at 5.)

**Renewal Negotiations.**  On a November 16, 2007 conference call with investors, The9 revealed that it had "started" discussing renewal of the License with Blizzard.  (¶ 77.)  The9 expressly declined to comment further on those discussions, but said that it was "very confident" in its ability "eventually" to renew the License.  (*Id.*)  Formal negotiations between The9 and Blizzard commenced in April 2008.  (¶ 138.)  Over the course of the next year, The9 repeatedly informed investors that it was in "intense" negotiations with Blizzard.  (¶¶ 94, 102, 108, 114, 126.)  As negotiations progressed, The9 disclosed that it had made significant investments in the operation of WoW, including the acquisition of additional servers dedicated to the game and the retention of marketing personnel in anticipation of the launch of a new expansion pack in 2009.  (11/18/08 The9 Conference Call Transcript (cited in ¶ 114) (Kutcher Decl. Ex. 30) at 2; ¶ 127.)  Plaintiffs do not contend those disclosures were false.

On April 16, 2009, after a year of negotiations, The9 announced it had "learned that [WoW] [would] be licensed to another China-based online game company."  (¶ 131.)  On July 15, 2009, The9 filed its Form 20-F for the year ended December 31, 2008, disclosing that as a

---

[3]     The9 2004 Form 20-F (Kutcher Decl. Ex. 2) at 9; The9 2005 Form 20-F/A (Kutcher Decl. Ex. 3) at 7; The9 2007 Form 20-F (Kutcher Decl. Ex. 5) at 1, 6-7.

result of non-renewal "the Company recorded impairment and certain other charges in its financial statements for the year ended December 31, 2008." (¶ 141.)

The9 remains a leading online game operator and developer in China as it continues to expand its game portfolio. As of December 31, 2009, The9 owned or obtained licenses to operate twelve games in China, five of which were developed by The9 itself. (The9 2009 Form 20-F (Kutcher Decl. Ex. 7) at 28.)

## ARGUMENT

## I.     THE COMPLAINT FAILS TO PLEAD A SECTION 10(b) CLAIM

To state a claim under Section 10(b), Plaintiffs must plead that Defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (citation omitted); 15 U.S.C. § 78j(b). Such claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (noting the "[e]xacting pleading requirements" of the PSLRA). Under this exacting standard, a complaint must plead "with particularity" sufficient facts to support its claims. *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). Where a complaint fails to satisfy these pleading requirements, the PSLRA mandates dismissal. 15 U.S.C. § 78u-4(b)(3)(A).

### A.     The Complaint Fails To Plead Any False Or Misleading Statements

The Complaint alleges that three types of statements by Defendants were false or misleading: (1) optimistic forward-looking statements regarding future renewal of the License (¶¶ 57, 77, 88, 94, 102, 108, 114, 119); (2) positive statements regarding The9's relationship

with Blizzard (¶¶ 44, 57, 59, 68, 88); and (3) optimistic forward-looking statements regarding

The9's future performance (¶¶ 55, 71, 102).[4]

None of these statements are actionable.  Plaintiffs merely look back from the

announcement of non-renewal in April 2009 and contend that The9 knew or must have known as

early as 2006 that it would not renew the License.[5]  That is a classic example of inactionable

"fraud by hindsight."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("We

have rejected the legitimacy of 'alleging fraud by hindsight.'") (citation omitted); *In re Gildan*

*Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 273 (S.D.N.Y. 2009) ("Corporate officials need

not be clairvoyant . . . [A]llegations that defendants should have anticipated future events and

made certain disclosures earlier than they actually did do not suffice to make out a claim for

securities fraud.'").  For that reason, and the reasons below, the Complaint must be dismissed.

---

[4]     The claims against Mr. Tse should be dismissed because Plaintiffs do not allege a single misstatement made during the time when he was employed by The9.  (*See* ¶ 17 (Tse employed between 4/08 to 7/3/08).)  Plaintiffs cannot plead liability for statements made when Mr. Tse was not an employee, even under the demanding group pleading doctrine.  *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 449 (S.D.N.Y. 2005) ("[T]he Complaint must allege that the statements were made . . . when the particular defendant held a high level position . . . .").  Moreover, the alleged oral misstatements by Defendants Zhu or Chen (¶¶ 44, 49, 55, 57, 59, 77, 102, 114, 126) cannot be attributed to Defendants Tse, Lee, or Lai under the strict Second Circuit standard for group pleading.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (oral statements can be attributed only to the speaker).

[5]     The Complaint is replete with quotes from analyst reports and media articles in an apparent attempt to hold Defendants liable for statements made by others.  (*See* ¶¶ 34, 38, 45, 46, 50, 61, 66, 67, 70, 73, 74, 79, 80, 81, 82, 84 91, 96, 99, 104, 111, 112, 116, and 133.)  These third party statements, however, are not actionable absent indication that Defendants adopted them.  *In re Aegon N.V. Sec. Litig.*, No. 1:03-cv-00603-RWS, 2004 WL 1415973, at *15 (S.D.N.Y. June 23, 2004) ("An analyst report is not attributable to a corporation or corporate officials, and they have no duty to correct or update any statements therein, unless they (1) 'adopted or placed their 'imprimatur' on the report[s]' or (2) 'intentionally fostered a mistaken belief concerning a material fact that was incorporated into the report[s].'").  Moreover, Plaintiffs err in attributing certain statements to The9.  For example, in one instance, they allege The9 represented to Oppenheimer that renewal was "highly likely."  (¶ 100.)  However, the preceding paragraph of the analyst report makes clear that Oppenheimer, not The9, made that statement.  (¶ 99 ("We [Oppenheimer] believe [The9] is highly likely to renew the license of WoW with Blizzard.").)

### 1.   Statements About The WoW License Renewal

Plaintiffs claim that Defendants' optimistic forward-looking statements about the possibility of License renewal were false.  Plaintiffs cite to Zhu's statement on November 16, 2007 (over a year and a half before the License expired) that "we are very confident to eventually renew the contract of WoW with Blizzard" (¶ 77), and a similar statement on February 22, 2008 that Zhu was "very confident that we believe that we can renew the contract in '09" (¶ 88).  Plaintiffs also point to Zhu's and Chen's statements about the effect of EA's investment on The9's relationship with Blizzard, such as "I don't think the equity investment from EA will have any impact on our relationship with Blizzard."  (¶¶ 57, 102.)  The Complaint fails to adequately allege that those and other similar statements were false or misleading.

The9's statements about renewal are forward-looking statements protected by the PSLRA's safe harbor.  15 U.S.C. §§ 77z-2(c), (c)(1), 78u-5(a) & (c)(1).  Pursuant to the safe harbor, a "defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  *Slayton v. Am. Express Co.*, No. 08-5442-cv, 2010 WL 1960019, at *5 (2d Cir. May 18, 2010).

*First*, the statements are protected because the Complaint does not plead particularized facts to support that Zhu or Chen *knew* the License would not be renewed until negotiations ended in April 2009.  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 373 (S.D.N.Y. 2007) (dismissing complaint because plaintiffs did not allege that defendant "represented to the public that it expected to win the new . . . contract while knowing that, in fact, it had not won that business").  Plaintiffs offer no internal or external communications demonstrating that Blizzard had already decided not to

renew the License at some prior point in time – let alone particularized facts showing knowledge of such a decision by the Defendants.

Instead, Plaintiffs cite a handful of vague and generalized "rumors" and speculation on websites and by market analysts. (*See* ¶¶ 38, 70, 84.) They also rely on CW4, who asserts only that Defendant Zhu "viewed it as very unlikely" in "early 2007" – before negotiations had even begun, and before he had made any public statements on the subject – that Blizzard would renew the License. (¶ 40.) However, CW4 does not claim to have personally heard Zhu make this statement, nor does he allege that Zhu continued to hold this alleged view when, many months later, Zhu expressed confidence in the prospects for renewal. Moreover, CW4 is described only as a "senior executive," a description not sufficient to establish that he was in position to know what Zhu knew in early 2007. *See Novak*, 216 F.3d at 313; *In re Am. Express Co. Sec. Litig.*, No. 1:02-05533-WHP, 2008 WL 4501928, at *7-8 (S.D.N.Y. Sept. 26, 2008), *aff'd sub nom. Slayton v. Am. Express Co.*, No. 08-5442-cv, 2010 WL 1960019 (2d Cir. May 18, 2010). In short, Plaintiffs allege no particularized facts supporting an assertion that anyone at The9 knew the License would not be renewed when the challenged forward-looking statements were made. *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 140 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (explaining that "[g]eneric and conclusory allegations based upon rumor or conjecture" do not state a claim) (citation omitted).[6]

---

[6]     *See also In re Retek Inc. Sec.*, No. 0:02-cv-04209-JRT-AJB, 2004 WL 741571, at *7 (D. Minn. Mar. 30, 2004) ("[J]ust because Retek made optimistic statements about AOL while AOL was 'in the process' of terminating some portion of its contract, it does not follow that the optimistic statements were misleading when made without more information."); *In re FVC.com Sec. Litig.*, 136 F. Supp. 2d 1031, 1037 (N.D. Cal. 2000), *aff'd*, 32 F. App'x 338 (9th Cir. 2002) (complaint failed to identify any communications indicating defendant's knowledge that relationship with major manufacturer would change).

Similarly, rumors concerning the implications of EA's investment in The9 for License renewal do not count as particularized facts suggesting that Defendants knew the License would not be renewed. (¶ 84 (citing rumors that VUG's merger with Activision could have detrimental consequences for The9 as a result of EA's investment).) Such rumors are nothing more than that: mere speculation by third parties who do not purport to have first-hand knowledge. *See Malin*, 499 F. Supp. 2d at 140.[7] In any event, the EA investment was fully disclosed to the market, and investors were in position to evaluate any risks the investment might have presented.

*Second*, the statements about License renewal were the subject of explicit cautionary language addressing the risk of non-renewal. In its Form 20-F for 2006, The9 cautioned investors that it could not "assure . . . that Blizzard . . . will renew its license agreement with [The9]" and if The9 was "unable to maintain a satisfactory relationship with Blizzard or any other online game developer that has licensed a game to [The9], [The9's] future results of operations or the growth of [The9's] business may suffer." (*See* The9 2006 Form 20-F (Kutcher Decl. Ex. 4) at 9.) Similarly, The9's Form 20-F for 2007 stated that The9 "derived substantially all of [its] revenues from WoW. If [it is] unable to renew this license . . . [its] future results of operations will be materially adversely affected. . . . [W]e cannot assure you that Blizzard . . . will renew its license agreement with us." (The9 2007 Form 20-F (Kutcher Decl. Ex. 5) at 6-7.) Each press release referenced in the Complaint included a specific "Safe Harbor Statement" warning that "forward-looking statements," which include "statements about The9's beliefs and

---

[7]     CW2, identified only as a "licensing manager" for Blizzard, asserts that "loyalty" was important to Blizzard and that the EA investment "would have been viewed" as disloyal. (¶¶ 53, 103.) Notably, CW2 does not say that EA's equity investment in The9 was *in fact* viewed by anyone at Blizzard as disloyal – or that this perceived disloyalty was communicated to The9. More profoundly, CW2 does not even purport to quote anyone at Blizzard concerning the effects of this investment on the prospects for renewal, or suggest that any such views were communicated to The9.

expectations," "involve inherent risks and uncertainties" and "[a] number of important factors could cause actual results to differ materially from those contained in any forward-looking statement." (*See, e.g.*, 11/16/06 The9 Press Release (cited in ¶ 43) (Kutcher Decl. Ex. 11) at 9.) The9's conference calls also began with an explicit caution about forward-looking statements. (*See, e.g.*, 11/16/06 The9 Conference Call Transcript (cited in ¶ 44) (Kutcher Decl. Ex. 23) at 2.).[8] Plaintiffs do not mention any of this.

These cautionary statements, which specifically address the risk of non-renewal that Plaintiffs allege was "undisclosed" (¶ 45), include precisely the type of cautionary language that courts in the Second Circuit have held insulates accompanying forward-looking statements from liability. *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 397, 401 (S.D.N.Y. 2006) (press release "clearly and unequivocally cautioned investors that statements preceded by words such as 'expect' are forward looking that involve risks and uncertainties"); *In re Duane Reade Inc. Sec. Litig.*, No. 1:02-cv-06478-NRB, 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004) (defendant adequately "couch[ed] its statements with specific cautionary language").[9]

### 2.   Statements About The9's "Good" Relationship With Blizzard

Plaintiffs allege The9 misrepresented that it had a "very good" or "friendly" relationship with Blizzard (¶¶ 59, 68, 88), or otherwise made statements that failed to disclose "tensions" between The9 and Blizzard (¶¶ 44-45). Plaintiffs do not adequately plead that those statements –

---

[8]   Each of the other press releases and conference call transcripts cited by Plaintiffs contained similar cautionary language. (*See* Kutcher Decl. Exs. 8-10, 12-22, 24-31.)  The specific cautionary language is summarized in the table attached as Exhibit 1 to the Kutcher Declaration.

[9]   The "bespeaks caution" doctrine similarly provides that statements are immaterial as a matter of law if "it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same [document]." *Halperin v. Ebanker USA.Com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007).

which are "sufficiently vague and generalized that no reasonable investor would have relied upon them," *Rosner v. Star Gas Partners L.P.*, 344 F. App'x 642, 644 (2d Cir. 2009) – were false when made. Plaintiffs rely primarily upon quotations from videogame publications in which rumors of tensions and disagreements between The9 and Blizzard were reported, some coming three full years before the License expired. (¶¶ 36, 38, 67, 70.) Rumors such as those are not sufficient to plead falsity. *See In re Petco Animal Supplies Inc. Sec. Litig.*, No. 3:05-cv-00823-H-RBB, 2006 U.S. Dist. LEXIS 97927, at *80 (S.D. Cal. July 31, 2006) ("Rumors of operational problems do not come close to showing falsity . . . ."). Indeed, the Complaint concedes that in an August 3, 2007 article in China IT & Telecom Report, *Blizzard itself* refuted the rumors by announcing publicly: "'The media reports of disagreements between The9 and Blizzard . . . are groundless,' . . . '[Blizzard] and The9's cooperation has been smooth and friendly.'" (¶ 68.)

The Complaint also cites a single confidential witness ("CW1") who alleges, contrary to Blizzard's own public statement, that Blizzard was "not happy" with The9. (¶ 39.) But CW1 was merely a "consultant to investment clients regarding market trends in the video game industry" – not an employee of either Blizzard or The9 – during the period when these "tensions" allegedly developed. (*Id.*) Plaintiffs provide no facts to support a conclusion that CW1 was in "position to know" about the relationship between The9 and Blizzard – and certainly not sufficient to contradict the statement that Plaintiffs cite from Blizzard itself. *Novak*, 216 F.3d at 314 (confidential sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"); *In re Gilat Satellite Networks, Ltd.*, No. 1:02-cv-01510-CPS-SMG, 2005 WL 2277476, at *9 (E.D.N.Y. Sept. 19, 2005) (requiring examination of "the detail provided by the

confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia") (citation omitted).

Further, Plaintiffs claim that The9 made false and misleading statements when it indicated its discussions with Blizzard about License renewal "started" in November 2007. (*See* ¶¶ 77-78, 139.) That allegation makes no sense. That The9 later announced that negotiations had "formally commenced" in April 2008, (¶ 138), does not render false its prior statements that The9 and Blizzard had "started discussions" about renewal six months earlier. (¶ 77.)[10]

### 3.    Optimistic Statements About The9's Future Growth

Plaintiffs attempt to rely on a series of generically positive statements about The9's expected future growth: (1) "[a]ll in all, we believe The9 is well positioned for sustainable growth in the rapidly evolving Chinese online games market" (¶ 55); (2) "we're very positive and optimistic about WoW's continuing performance and growth in China" (¶ 102); and (3) "we are confident that The9 will continuously capitalize on its unparalleled game portfolio so as to achieve long-term sustainable growth." (¶ 71.) Those statements are precisely the type of "ordinary corporate optimism, or 'puffery'" that is not actionable. *Rosner*, 344 F. App'x at 644

---

[10]    Plaintiffs also allege that The9's February 23, 2009 announcement of unaudited financial results for the fourth quarter and year ended December 31, 2008 were false and misleading because those unaudited results failed to reflect the effects of non-renewal. (¶¶ 124-25.) But plaintiffs fail to allege particularized facts suggesting that Defendants knew that the License would not be renewed in February 2009 when they issued those financial results. Moreover, the fact that The9 later incurred impairments and charges when it released its audited results in July 2009 (in order to take into account the financial impact of non-renewal) has no bearing on what Defendants knew in February 2009. When The9 did know about non-renewal, it acted appropriately by adjusting its financial results. *See In re FVC.com*, 136 F. Supp. 2d at 1037-38 (finding that "the relevant professional literature suggests that FVC's 'restatement' of its unaudited financial statements based upon events happening subsequent to the close of the reported period was entirely proper") (citing AU § 560.07 ("Subsequent events affecting the realization of assets such as receivables or inventories . . . ordinarily will require adjustment of financial statements.")).

(holding optimistic statements about business improvement plan not actionable because they were "mere 'expressions of puffery and corporate optimism'") (quoting *Rombach*, 355 F.3d at 174); *Shields*, 25 F.3d at 1129-30 ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.").[11]  Those forward-looking statements are also protected by the PSLRA safe harbor because there are no allegations the speakers had actual knowledge that these general predictions of future growth were false when made, and because they were accompanied by explicit cautionary language.[12]  *See Slayton*, 2010 WL 1960019, at *4; *Halperin*, 295 F.3d at 357.

**B.      The Complaint Fails To Plead Facts Permitting A Strong Inference Of Scienter**

The PSLRA requires Plaintiffs to plead particularized "facts giving rise to a strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2).  In the Second Circuit, scienter can be established by alleging (1) defendants had motive and opportunity to commit fraud, or (2) a "strong inference" of conscious misbehavior or recklessness.  *ATSI Comms., Inc.*, 493 F.3d at 99. A "strong inference" of intent must be more than just plausible or even reasonable – it must be "cogent" and "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  On a motion to dismiss, the Court must consider non-culpable inferences that can be "rationally drawn from the facts alleged." *Id.*

---

[11]     *See also Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) ("Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud.") (citations omitted); *Steinberg v. Ericsson LM Tel. Co.*, No. 1:07-cv-09615-RPP, 2008 WL 5170640, at *9 (S.D.N.Y. Dec. 10, 2008) (statements that the company would "continue to do well" and "outperform the competition" do not give rise to a securities violation).

[12]     The cautionary language was provided before the two conference calls on May 22, 2007 and August 8, 2008, and in the August 29, 2007 Form 6-K.  (*See* Kutcher Decl. Exs. 14, 25, 29.) The relevant language is summarized in a table attached to the Kutcher Declaration as Ex. 1.

1.     **The Complaint Fails To Plead Motive And Opportunity To Commit Fraud**

Plaintiffs assert Defendants "sought to personally profit from the success of WoW prior to the expiration of the WoW Contract" by selling "millions of dollars worth of artificially inflated The9 Securities" and engaging in a series of purportedly improper corporate transactions. (¶ 146.) Those allegations are insufficient to plead that any Defendant "benefited in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08.

a.     **Stock Sale Allegations**

In an attempt to create the appearance of a fraudulent motive, Plaintiffs list stock sales made over a two-and-a-half year period by one Defendant, eight non-Defendant "insiders," and two "insider" entities, Incsight and Bosma (which are allegedly controlled by Defendant Zhu). (¶ 147.) Notably, Plaintiffs do not point to any stock sales made by Defendants Chen, Tse or Lai. That these Defendants did not sell stock weighs heavily against any inference of a motive to defraud. *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006) (dispositive factor undercutting motive allegation was that some insiders, including individual defendants, did not sell during the class period). Moreover, Zhu's beneficial ownership holdings *increased* during the proposed class period, further undermining any inference of scienter.[13] *In re Sec. Capital Assurance, Ltd. Sec. Litig.*, No. 1:07-cv-11086-DAB, 2010 WL 1372688, at *24 (S.D.N.Y. Mar. 31, 2010) ("That Defendants increased their holdings during the Class Period, and did not sell their stock prior to a price drop 'suggest[s] the absence of any nefarious motives.'") (citation omitted) (alteration in original).[14]

---

[13]     *Compare* The9 2007 Form 20-F (Kutcher Decl. Ex. 5) at 66 (Zhu beneficially owns 6,007,334 shares) *with* The9 2008 Form 20-F (Kutcher Decl. Ex. 6) at 66 (Zhu beneficially owns 6,973,981 shares).

[14]     Plaintiffs attempt to link sales by Bosma to Zhu, asserting that Zhu had "significant influence and control, both directly and indirectly" over Bosma by virtue of a Voting Agreement

Similarly, The9 itself repurchased and retired approximately 4.3 million shares for $72 million during the period that Plaintiffs allege its stock was artificially inflated.  (*See* The9 2008 Form 20-F (Kutcher Decl. Ex. 6) at 29.)  The combination of The9's share repurchase program with an increase in holdings by Zhu, the Company's CEO, makes it "nonsensical to impute dishonest motives" to Defendants.  *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, No. 1:08-cv-08143-WHP, 2010 WL 961596, at *9 (S.D.N.Y. Mar. 17, 2010); *see In re Am. Int'l Group, Inc. Deriv. Litig.*, No. 1:07-cv-10464-LTS, 2010 WL 1245000, at *17 (S.D.N.Y. Mar. 30, 2010) ("This Court previously dismissed a similar claim on the grounds that the plaintiffs had failed to plead any particularized allegation regarding what motive the directors of a public company might possibly have to repurchase shares that they knew were overvalued and were likely to fall in price.").

With respect to stock sales by the single individual Defendant, all of Defendant Lee's "sales" were exercises of options made pursuant to a 10b5-1 plan, undercutting any inference that the trades were suspicious.[15]  *See In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d at 272 (sales made pursuant to Rule 10b5-1 trading plan "undermine[] any allegation that the timing or amounts of the trades was unusual or suspicious"); *In re IAC/InterActiveCorp Sec.*

---

between Incsight and Bosma.  (¶¶ 17(a), 147.)  However, the Voting Agreement, which is fully disclosed and attached to an SEC filing by The9, gives Zhu no ownership in or control over Bosma; rather it addresses the allocation of board seats among The9's two largest shareholders.  (*See* 11/26/04 Voting Agreement (cited in ¶ 17(a)) (Kutcher Decl. Ex. 44) at 1-6.)  Plaintiffs allege no facts supporting a claim that any Bosma stock sales were initiated by, or personally benefited, Zhu.  In addition, in what appears to be a sleight of hand, Plaintiffs list stock sales for "Gary Lai ('G. Lai'), a director," (¶¶ 147-48) – but not for Defendant George Lai, who is only referenced to two other times in the Complaint, and then only as "Defendant Lai." (¶¶ 17(d), 98.)  Stock sales made by "G. Lai," who is not a defendant and is not related to Defendant Lai, cannot support an inference of motive for Defendant George Lai.

[15]    Lee's stock sales were disclosed in Form 144s (Notice of Proposed Sales of Securities) filed with the SEC, which make clear that they were made pursuant to a 10b5-1 plan.  (Kutcher Decl. Exs. 35-43.)

*Litig.*, 478 F. Supp. 2d at 604 (trades under 10b5-1 plan "do not raise a strong inference of scienter"). Moreover, Defendant Lee is alleged to have last "sold" stock thirteen months before the non-renewal was announced, a huge temporal disconnect. *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) (explaining that a lapse of "approximately four months between . . . substantial sales and the revelation of the alleged falsity [ ] inescapably attenuates any inference of scienter"); *City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) ("The 10-plus week gap between the defendants' sales and the Company's disclosure of accounting problems is not strongly suspicious."). Indeed, Lee's last sale of stock – which was her largest – occurred *after* she left the Company, further undermining any inference of scienter. *See In re Corning Sec. Litig.*, No. 6:01-cv-06580-CJS, 2004 WL 1056063, at *29 (W.D.N.Y. Apr. 9, 2004), *aff'd*, No. 04-2845-cv, 2005 WL 714352 (2d Cir. Mar. 30, 2005).

Finally, the most basic factual allegations are missing with respect to all of these alleged stock sales. Plaintiffs merely list the amount sold over a period of time without any attempt to link those sales to misleading statements or other suspicious activity. *See In re Bristol-Myers Squib Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) ("[E]xecutive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent."); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 595 (S.D.N.Y. 2006) (holding that Plaintiffs must allege specific facts establishing that trading was unusual or suspicious). There are no allegations that any sales were made after Defendants came into information contradicting a public statement. *In re Axis Capital Holdings*, 456 F. Supp. 2d at 596 ("Timing is more typically an indicia of fraud where sales occur shortly after insiders allegedly learn undisclosed adverse information or made affirmative misrepresentations, or shortly before corrective disclosures are

17

made in the market.") (citation omitted).  And Plaintiffs do not allege profits made, percentage of

holdings sold, or unusual volumes compared to pre-class period sales.  *See In re Take-Two*

*Interactive Sec. Litig.*, 551 F. Supp. 2d at 275.

### b.    Corporate Transaction Allegations

Having failed to allege motive based on suspicious sales, Plaintiffs point to a grab bag of

corporate transactions, suggesting that they somehow support a strong inference of scienter.  In

fact, the transactions alleged are typical of nearly every corporation.  *See In re Bristol-Myers*

*Squib*, 312 F. Supp. 2d at 560 ("Plaintiffs' motive allegations here amount to nothing more than

a pejorative characterization of . . . ordinary corporate desires.").  The9 declared a "special cash

dividend" that was paid to all stockholders (¶151); adopted a "poison pill" (¶ 146); enacted an

equity compensation plan (¶ 149);[16] elected to follow "home country practices" (¶ 149); entered

into operating agreements with related companies (¶¶ 152(d), (e)); and loaned money to certain

employees (¶ 152(g)).  Plaintiffs allege no facts to support a claim that these transactions were

tied to the purported fraud, or that the Individual Defendants benefited in any "concrete and

personal" way from them.  *See, e.g.*, *In re Bristol-Meyers Squib*, 312 F. Supp. 2d at 561

("[T]hese 'motives' are nothing more than ordinary and prudent corporate desires.").

Plaintiffs' allegations of purported "shady" and "illegal" transactions are equally

deficient.  (¶¶ 42, 152(a)-(c).)  For example, the Complaint salaciously asserts "under-the-table"

agreements with Hewlett Packard that resulted in "kickbacks" to Mr. Zhu.  (¶¶ 6, 42(a), 81,

152(a).)  However, Plaintiffs provide no details about when these agreements were made, when

the kickbacks occurred, who was involved, how they were "under the table," or why such a

scheme provided a motive for Zhu to misrepresent the prospects for License renewal.  Similarly,

---

[16]    Tellingly, Plaintiffs do not allege that anyone received or sold shares in connection with
the equity compensation plan during the class period.  (¶ 149.)

Plaintiffs allege that in January 2008, The9 invested in a game development company, Ideas, with whom The9 "colluded" to transfer "funds, assets and employees" to another company, and for which "The9 executives received substantial financial benefits." (¶¶ 42(b), 152(b).)  But Plaintiffs do not allege who at The9 "colluded" with Ideas, how The9 participated in the transfer of "funds, assets and employees" to another company, or which "The9 executives" financially benefited (or even if any Individual Defendant was involved at all).  Again, there is nothing in the Complaint suggesting that these transactions were facilitated by or connected to Defendants' alleged false statements concerning License renewal. *See Shields*, 25 F.3d at 1130 ("To allege a motive . . . a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold."); *Faulkner v. Verizon Commc'ns, Inc.*, 189 F. Supp. 2d 161, 171 (S.D.N.Y. 2002) ("Plaintiff's attempt to infer a grand scheme . . . from such scant evidence is merely wishful and speculative.").[17]

### 2.    The Complaint Alleges No Facts To Support A Strong Inference Of Actual Knowledge Or Recklessness

Given insufficient allegations of motive, "the strength of the circumstantial allegations [of intent] must be correspondingly greater." *In re Bristol-Myers Squib*, 312 F. Supp. 2d at 562 (citation omitted).  Plaintiffs must "specifically allege defendants' knowledge of the facts or access to information contradicting their public statements." *Id.* (citation omitted).  Plaintiffs do not meet that high burden.

---

[17]    Even if these transactions had any relevance to the purported misstatements, the only support Plaintiffs provide for their allegations that the transactions were "illegal" or "shady" are the vague statements of CW4. (¶42(a)-(c).)  As discussed above, CW4 is inadequately identified only as a "senior executive and shareholder of The9" at some point during the class period. (¶ 40.)  Plaintiffs do not allege CW4's position at the Company, exactly when he was employed, or why he would have had any knowledge about these transactions – or any benefits that "The9 executives" may have received. *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008) (noting plaintiffs' obligation to plead with particularity, such that the Court can gauge "the probability that a person in the position occupied by the [Confidential Witness] would possess the information alleged") (citation omitted).

The Complaint contains no facts whatsoever to support an inference that Defendants Lee, Tse, Lai, or Chen knew of any specific information rendering their alleged statements false. Rather, the Complaint simply groups the Individual Defendants together and asserts they collectively "acted with scienter" and "possessed knowledge of facts or had access to information contradicting their public statements." (¶¶ 144-45.) Such generalized pleading of "access to information" is insufficient to allege scienter. *Kalnit*, 264 F.3d at 142 (holding that allegation of "access to information" was not sufficient if the information did not sufficiently indicate defendants' knowledge of misstatement); *Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, 572 (S.D.N.Y. 2009) ("[P]laintiff's Complaint fails to identify a single document, communication, report, or piece of information received by or in the possession of any defendant that indicates that [the company's] business condition . . . was in any way different or weaker than what was disclosed to the market."); *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Group Ltd.*, No. 09-1370-cv, 2009 U.S. App. LEXIS 27949 (2d Cir. Dec. 21, 2009) (finding no strong inference of scienter when plaintiff failed "to allege that [d]efendants had access to information that *specifically* informed them" of information contradicting loss estimates).

With respect to Defendant Zhu, Plaintiffs add only that "[a]ccording to CW4," Zhu had "told Company executives in early 2007 that he viewed it as very unlikely if not impossible for The9 to be able to renew the WoW Contract" and that Zhu "understood that The9's relationship with Blizzard had been 'ruined' by early 2007." (¶ 40.) Putting aside the fact that CW4 is not sufficiently alleged to have been in a position to know this information (*see supra* at 9), Plaintiffs do not plead that CW4 actually heard Zhu make this statement, which "Company executives" also heard it, or why its context makes CW4's allegation credible. *In re Elan Corp.*, 543 F.

Supp. 2d at 220-21 (finding confidential witness statement "far too vague with respect to what information was actually communicated and what conclusions any defendant actually reached to support inference of scienter").

Similarly, allegations based on statements by CW1, CW2, and CW3 should not be credited. These CWs never worked for The9, and are offered only for speculation about a "strained relationship" between The9 and Blizzard – without any connection to what Defendants may have known about the facts they allege. (¶¶ 39, 51, 53.) For example, CW3 claims "Blizzard began training NetEase's customer service personnel about WoW in March 2009 [just days before non-renewal was announced] and it would have been determined prior to that time that WoW would be licensed to NetEase and not The9." (¶ 123.) Plaintiffs fail to plead that Defendants knew about this "fact" – or its link (if any) to non-renewal of the License.

### 3.      The Non-Fraudulent Inference Is The Most Cogent And Compelling

Plaintiffs' suggested inference that the Individual Defendants acted with fraudulent intent is not plausible, much less compelling. *Tellabs*, 551 U.S. at 314 (holding insufficient allegations of "facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent") (emphasis added). The lack of any concrete, personal benefit to Individual Defendants from the purported fraud makes Plaintiffs' suggested inference non-compelling and non-plausible. *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d at 529 n.21 (explaining that the failure "to allege a proper 'concrete and personal' benefit, as required by Second Circuit case law to allege 'motive and opportunity' to commit fraud . . . certainly makes competing, non-fraudulent inferences more 'compelling' for purposes of the *Tellabs* analysis."). The more cogent and compelling inference is that Defendants were optimistic they would be able to secure renewal of the License. The following facts support this compelling non-fraudulent inference:

- The9 and Blizzard were engaged in "intense" negotiations throughout 2008 and into early 2009, a reality that Plaintiffs do not deny. (*See, e.g.*, ¶¶ 94, 102, 108, 114, 126.)

- The9 continued to make significant investments in the game's operation. In April and October 2008, The9 added new servers dedicated to WoW, each costing CNY30-40 million. (*See* 5/20/08 The9 Conference Call Transcript (cited in ¶ 94) (Kutcher Decl. Ex. 28) at 4; and 11/18/08 The9 Conference Call Transcript (cited in ¶ 114) (Kutcher Decl. Ex. 30) at 2, 13.) In June 2008, the Company launched a cross-industry marketing campaign to enhance WoW's brand recognition. (8/8/08 The9 Conference Call Transcript (cited in ¶ 102) (Kutcher Decl. Ex. 29) at 3.) By the end of that year, The9 had "cranked up the dial on increasing sales and marketing" for the game, "more than doubl[ing] the personnel in ground promotion forces, as well as their training and monitoring system . . . ." (¶ 127.) These investments support the compelling inference that The9 believed it would renew the License. *Davidoff v. Farina*, No. 1:04-cv-07617-NRB, 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005) (finding no scienter where it "made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail").

- The9 was buying back its stock in 2007, 2008 and 2009, suggesting it believed the License would be renewed and the stock was under-valued. *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) ("[D]efendants' purchases of even more GSK stock during the relevant period signals only confidence in the future of their company . . . .").

- Market analysts thought renewal was likely because it would not make sense economically for Blizzard to transition to another operator. (*See, e.g.*, 2/22/08 Deutsche Bank report (cited in ¶ 91) (Kutcher Decl. Ex. 33) at 4 ("We believe it will be difficult for a new operator to take over WoW . . . we do not believe that Blizzard[] will risk losing a game franchise . . . generating RMB250m+ revenue per quarter because of migration delays.").)

The inference that the Defendants had no intent to defraud is far more compelling than any inference offered by Plaintiffs. *See Tellabs*, 551 U.S. at 314; *In re Elan Corp.*, 543 F. Supp. 2d at 217 (finding the more compelling inference that defendants were unaware of material information prior to its disclosure).

C.   **The Complaint Fails To Plead Loss Causation**

The Complaint should also be dismissed because Plaintiffs have failed to plead "loss causation" – "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell*, 396 F.3d at 172 (citation omitted); *see Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005); 15 U.S.C. § 78u-4(b)(4). To survive dismissal, a

complaint must allege facts sufficient to show "the market reacted negatively" to a disclosure revealing the falsity of a prior representation. *Lentell*, 396 F.3d at 175; *In re Winstar Commc'ns*, No. 1:01-cv-03014-GBD, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) ("[E]xposure of the falsity of the fraudulent representation . . . is the critical component of loss causation.").

Here, Plaintiffs allege their losses were caused by the drop in price of The9 shares following disclosure that the License would not be renewed in April 2009. However, they fail to plead that the market ever learned of a prior false statement. Instead, the most plausible reason for the drop in value of The9 shares is market reaction to the announcement that The9 would no longer be operating WoW in China. *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009) ("The all-but-inevitable decline in the price of [defendant's] stock price following the company's announcement that the FDA had not approved the [drug] application . . . was caused by the agency's failure to approve the drug – not by any 'corrective' disclosure of some prior untruth."). None of the announcements to which Plaintiffs cite constitutes a "corrective disclosure" under *Dura*.

**January 18, 2008 Announcement.** Plaintiffs allege that "[i]n response to reports on January 18, 2008, that The9's CFO, Defendant Lee, was leaving the Company . . . The9's ADS price dropped $2.87." (¶ 156.) The announcement says nothing about License renewal. Allegations that an executive is "leaving the Company," without more, cannot support loss causation. *See In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 513-14 (2d Cir. 2010).

**August 13, 2008 Announcement.** The announcement on August 13, 2008 "that NetEase would be licensing games from Blizzard" other than WoW does not reveal any falsity with respect to the statements about License renewal, and Plaintiffs do not even allege a connection. (¶ 157; *see In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) (finding

insufficient allegations to "conclude that any of the events revealed the truth about the subject of any of Defendants' alleged misstatements").)

**April 16, 2009 Announcement of Non-Renewal.** On April 16, 2009, Blizzard announced the License would not be renewed. (¶ 131.) Once again, this announcement did not disclose that any prior statements about the risks and prospects of renewal were not true when made. *See In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d at 511 (explaining that a disclosure is not corrective if it does not reveal the falsity of the alleged misstatements). In fact, to date there never has been a disclosure that Defendants knew about non-renewal earlier than they led the market to believe. The9's stock drop was more plausibly caused by Blizzard's decision not to renew the License – and the market's subsequent discounting of The9's future prospects – not the revelation of some prior false statement. *See Lentell*, 396 F.3d at 175.

**The9's 2008 Form 20-F.** The9's Form 20-F for 2008 did not reveal anything about the License that had not been revealed earlier, and therefore cannot serve as a "corrective disclosure." *See In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d at 511-12 (disclosed fact in the corrective disclosure must be new to the market); *see also Joffee v. Lehman Bros., Inc.*, 209 F. App'x 80, 81 (2d Cir. 2006). Nor did the impairments and charges reported in the 20-F correct a prior false statement. The 20-F announced that the impairments and charges were required "[a]s a result of" non-renewal – information that was unknown at the time The9 had last reported its financial information in February 2009. (¶¶ 124-25, 141.) In short, there was no indication Defendants knew prior to April 2009 that the License would not be renewed.

## II. THE COMPLAINT FAILS TO ESTABLISH CONTROL PERSON LIABILITY UNDER SECTION 20(a)

To plead a claim under Section 20(a) of the Exchange Act, a complaint must allege "(1) a primary violation of the Act by a controlled person, (2) direct or indirect control by the defendant

of the primary violator, and (3) 'culpable participation.'" *Coronel v. Quanta Capital Holdings, Ltd.*, No. 1:07-cv-01405-RPP, 2009 WL 174656, at \*24 (S.D.N.Y. Jan. 26, 2009) (citation omitted); 15 U.S.C. § 78t-(a). As described above, Plaintiffs have failed to establish a primary violation under Section 10(b). Similarly, for the reasons described above with respect to scienter (*see supra* at 14-19), Plaintiffs have not alleged that any of the purported "control persons" were "culpable" participants in any alleged fraud. *See In re Sec. Capital Assurance Ltd. Sec. Litig.*, 2010 WL 1372688, at \*32 (dismissing 20(a) claim). Accordingly, Plaintiffs' Section 20(a) claims must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated: May 28, 2010  
New York, New York

Respectfully submitted,  
LATHAM & WATKINS LLP

By: _____

Peter A. Wald (*pro hac vice*)  
David J. Schindler (*pro hac vice*)  
Ethan Brown (*pro hac vice*)  
Robert J. Malionek  
Matthew L. Kutcher

885 Third Avenue  
New York, New York 10022  
(212) 906-1200

*Counsel for Defendants The9, Ltd.,*  
*Xiaowei Chen, George Lai, Hannah Lee,*  
*Tony Tse and Jun Zhu*

25