# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ———————————————————— ) | | |
| LAWRENCE F. GLASER, on Behalf of Himself ) | Civil Action No. 1:09-cv-08904-RJH | |
| and All Others Similarly Situated, ) | (Consolidated) | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| vs. ) | | |
| ) | | |
| THE9, LTD., XIAOWEI CHEN, GEORGE ) | | |
| LAI, HANNAH LEE, TONY TSE and ) | | |
| JUN ZHU ) | | |
| Defendants ) | | |
| ————————————————————) | | |

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   STATEMENT OF FACTS ................................................................................... 3

III.  THE COMPLAINT IS NOT SUBJECT TO DISMISSAL .................................... 7

    A.    Standard of Review.................................................................................... 7
    B.    Defendants Made Materially False and Misleading Statement .................... 8

          1.    The CWs' Similar Accounts Confirm Public Reports Contrary to Defendants' Statements.................................................................................... 8
          2.    Defendants' False and Misleading Statements Are Not Protected By the PSLRA's Safe Harbor Provision ........................................................ 9

               a.    Past and Present Tense False Statements Are Not Immunized.................. 9
               b.    The9's Cautionary Language Was Boilerplate and Stale ........................ 12
               c.    Defendants Cannot Caution Against Knowingly False Statements.......... 14

          3.    There Was No Objective or Subjective Basis for Stated Beliefs...................... 15

    C.    Plaintiffs Adequately Allege that Defendants Acted with Scienter............................ 16

          1.    Defendants Had Motive and Opportunity to Commit Fraud ............................ 16
          2.    Plaintiffs Allege Strong Circumstantial Evidence of Recklessness.................. 17

               a.    Because the Facts Alleged Relate to The9's Core Business, They Support a Strong Inference of Scienter.................................................... 17
               b.    The Magnitude of The9's WoW-Related Write-Offs Gives Rise to a Strong Inference of Scienter .................................................................. 18
               c.    Admissions That The9 Began Renewal Discussions Much Later Than Represented Support a Strong Inference of Scienter ................................ 18
               d.    Witness Accounts Add to the Strong Inference of Scienter .................... 20
               e.    Resignations Support a Strong Inference of Scienter .............................. 21

    D.    Plaintiffs Sufficiently Allege Loss Causation............................................ 22
    E.    Plaintiffs Adequately Allege Control Person Liability................................ 25

IV.  CONCLUSION.................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) ................................................................. 24

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002) .................................................................... 18

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ............................................................................ 7

*Asher v. Baxter Int'l Inc.*,
   377 F.3d 727 (7th Cir. 2004) ....................................................... 9, 12, 14

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ............................................................... 24, 25

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009) ................................................. 15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................. 7

*Berson v. Allied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ................................................................. 17

*Central Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
   497 F.3d 546 (5th Cir. 2007) ................................................................. 16

*City of Sterling Heights Police and Fire Retirement Sys. v. Abbey National, PLC*,
   423 F. Supp. 2d 348 (S.D.N.Y. 2006) .................................................... 17

*Cornwell v. Credit Suisse Group*,
   689 F. Supp. 2d 629 (S.D.N.Y. 2010) .................................................... 21

*Cosmas v. Hassett*,
   886 F.2d 8 (2d Cir. 1989) ...................................................................... 17

*Dura Pharms, Inc. v. Broudo*,
   544 U.S. 336 (2005) ........................................................................... 7, 22

*Emergent Capital Investment Mgt., LLC v. Stonepath Group, Inc.*,
   343 F.3d 189 (2d Cir. 2003) ............................................................. 22, 24

*EP MedSystems, Inc. v. EchoCath, Inc.*,
    235 F.3d 865 (3d Cir. 2000) ................................................................ 14

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.*,
    376 F. Supp. 2d 385, 406 (S.D.N.Y. 2005) ........................................ 25

*Freudenberg v. E*Trade Fin. Corp.*,
    No. 07 Civ. 8538, 2010 WL 1904314 (S.D.N.Y. May 11, 2010) ................................ passim

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) .......................................................... 7, 16

*Grossman v. Novell, Inc.*,
    120 F.3d 1122 (10th Cir. 1997) ........................................................ 13

*Hall v. The Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008) .............................................. 21, 22

*Holmes v. Baker*,
    166 F. Supp. 2d 1362 (S.D. Fla. 2001) ............................................... 17

*Huddleston v. Herman & MacLean*,
    640 F.2d 534 (5th Cir. 1981),
    *aff'd*, 459 U.S. 375 (1983) ............................................................. 13

*Illinois State Bd. of Inv. v. Authentidate Holding Corp.*,
    No. 09-1751-cv, 2010 WL 889294 (2d Cir. Mar. 12, 2010) ........................................ 10, 14

*In re 21st Century Holding Co. Sec. Litig.*,
    No. 07-61057-CIV, 2008 WL 5749572 (S.D. Fla. Nov. 7, 2008) ...................... 13

*In re Ambac Financial Group, Inc.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ............................................ 20, 21

*In re America Service Group, Inc.*,
    No. 3:06-0323, 2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) .................................. 21-22

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) ......................................................... 15

*In re Ashanti Goldfields Sec. Litig.*,
    No. CV 00-0717, 2004 WL 626810 (E.D.N.Y. Mar. 30, 2004) .......................... 17

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................. 17

*In re Biogen Idec. Inc. Sec. Litig.*,
   No. 05-10400, 2008 WL 4810045 (D. Mass. Oct. 25 2008) ................................................ 16

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005) .......................................................................... 25

*In re Boeing Sec. Litig.*,
   40 F. Supp. 2d 1160 (W.D. Wash. 1998) ......................................................................... 10

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   No. 07 Civ. 5867, 2008 WL 3884384 (S.D.N.Y. Aug. 20, 2008) ...................................... 24

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002) ........................................................................................ 8

*In re Cardinal Health, Inc. Sec. Litig.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) .......................................................................... 16

*In re Federal Nat'l Mortgage Assoc. Sec. Derivative and "ERISA" Litig.*,
   503 F. Supp. 2d 25 (D.D.C. 2007) ................................................................................. 16

*In re Gilead Sciences Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ..............................................................................23-24

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005) .......................................................................... 17

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) .......................................................................... 18

*In re Omnicom Group, Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ....................................................................................... 23

*In re Openwave Sys. Sec. Litig.*,
   528 F. Supp. 2d 236 (S.D.N.Y. 2007) ..................................................................... 23, 24

*In re Parmalat Sec. Litig.*,
   375 F. Supp. 2d 278 (S.D.N.Y. 2005) .......................................................................... 24

*In re Parmalat Sec. Litig.*,
   414 F. Supp. 2d 428 (S.D.N.Y. 2006) .......................................................................... 25

*In re Parmalat Sec. Litig.*,
   497 F. Supp. 2d 526 (S.D.N.Y. 2007) ..................................................................24-25

*In re Priceline.Com Inc. Sec. Litig.*,
    342 F. Supp. 2d 33 (D. Conn. 2004) ................................................................. 14

*In re Read-Rite Corp. Sec. Litig.*,
    335 F.3d 843 (9th Cir. 2003) ........................................................................... 18

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) .............................................................................. 18

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) .............................................................. 21

*In re Sec. Litig., BMC Software, Inc.*,
    183 F. Supp. 2d 860 (S.D. Tex. 2001) ............................................................. 12

*In re Semgroup Energy Partners, L.P.*,
    No. 08-MD-1989, 2010 WL 1816434 (N.D. Okla. Apr. 30, 2010) .................... 15

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    No. C 99-00109, 2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) ....................... 13

*In re Stone & Webster, Inc., Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005) ............................................................................ 10

*In re Sunbeam Sec. Litig.*,
    89 F. Supp. 2d 1326 (S.D. Fla. 1999) ................................................................. 9

*In re Turbodyne Techs., Inc. Sec. Litig.*,
    No. CV9900697, 2000 WL 33961193 (C.D. Cal. Mar. 15, 2000) ....................... 9

*In re Vivendi Universal S.A.*,
    No. 02 Civ. 5571, 2004 WL 876050 (S.D.N.Y. Apr. 22, 2004) ......................... 24

*In re Vivendi Universal, S.A. Sec. Litig.*,
    634 F. Supp. 2d 352 (S.D.N.Y. 2009) ............................................................... 24

*In re Williams Sec. Litig.*,
    339 F. Supp. 2d 1206 (N.D. Okla. 2003) ..................................................... 13, 15

*In re Winstar Comms.*,
    No. 01 CV 3014, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) .......................... 23

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003) ............................................................... 24

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ...................................................................................... 19, 20

*Lentell v. Merrill Lynch & Co. Inc.*,
    396 F.3d 161 (2d Cir. 2005) ................................................................................ 22, 24, 25

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) ........................................................................................... 14

*Lormand v. US Unwired*,
    565 F.3d 228 (5th Cir. 2009) .................................................................................... passim

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) .................................................................................... 10, 14

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
    No. CV 06-6863, 2008 WL 7084629 (C.D. Cal. July 10, 2008) ....................................... 21

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ........................................................................... 18

*Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.*,
    No. 02 CIV. 1230, 2002 WL 31027550 (S.D.N.Y. Sept. 10, 2002) .................................. 15

*No. 84 Employer-Teamster Jt. Council Pension Trust Fund v. Am. West Holding Corp*,
    320 F.3d 920 (9th Cir. 2003) ......................................................................................... 17

*Novak v. Kasaks*,
    216 F.3d 300, 307 (2d Cir. 2000) ......................................................................... 6, 16, 20

*Olsen v. Pratt & Whitney Aircraft Div.*,
    136 F.3d 273 (2d Cir. 1998) ........................................................................................... 25

*P. Stolz Family Partnership L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004) ............................................................................................. 10

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010) ............................................................................................. 6

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006) ............................................................................. 25

*Rehm v. Eagle Fin. Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) ................................................................................... 9

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004) .................................................................. 13

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000) .................................................................... 18

*Sawant v. Ramsey,*
    570 F. Supp. 2d 336 (D. Conn. 2008) .................................................... 12

*S.E.C. v. Conaway,*
    No.: 2:05-CV-40263, 2010 WL 318283 (E.D. Mich. Jan. 20, 2010) .................................... 8

*S.E.C. v. First Jersey Sec., Inc.,*
    101 F.3d 1450 (2d. 1996) ........................................................... 6, 24, 25

*Slayton v. American Express Co.,*
    604 F.3d 758 (2d Cir. 2010) ........................................................... passim

*Stavros v. Exelon Corp.,*
    266 F. Supp. 2d 833 (N.D. Ill. 2003) ...................................................... 13

*Stevelman v. Alias Research Inc.,*
    174 F. 3d 79 (2d Cir. 1999) .............................................................. 16, 17

*Stocke v. Shuffle Master, Inc.,*
    615 F. Supp. 2d 1180 (D. Nev. 2009) ........................................................ 16

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,*
    250 F.3d 87 (2d Cir. 2001) ................................................................ 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    127 S. Ct. 2499 (2007) .................................................................. 16, 17

*Varghese v. China Shenghuo Pharm. Holdings, Inc.,*
    672 F. Supp. 2d 596 (S.D.N.Y. 2009) ..................................................... 21, 24

*Virginia Bankshares, Inc. v. Sandberg,*
    501 U.S. 1083 (1991) ..................................................................... 15

## Statutes

15 U.S.C. §78u-4(b)(1)(B) ...................................................................... 8
15 U.S.C. §78u-5(c)(1)(A) ...................................................................... 9

## I.     INTRODUCTION

For more than two years after The9 Ltd.'s ("The9" or the "Company") founder, Chairman and CEO, Jun Zhu, told top executives that The9's most important business relationship with Blizzard Entertainment, Inc. ("Blizzard") was ruined, defendants[1] knowingly and recklessly made false and misleading statements about the renewal of a license from Blizzard to operate a popular online video game, the World of Warcraft ("WoW"), in China. Plaintiffs Lawrence F. Glaser, Chen Kuang, and the Class are entitled to recover losses sustained when the risk of the fraud materialized in non-renewal of the license and associated write-offs.

Although the license period for WoW was from 2005 through 2009, the relationship between The9 and Blizzard was fraught with tension from the outset.  Defendants, however, concealed the truth -- denying problems existed or that various occurrences had a negative impact upon renewal of the WoW license.  Even before Zhu privately admitted to upper management that the gravy train – the WoW license that generated over 90% of The9's Class Period revenues – would only last until the license expired, gaming websites reported user complaints about The9's operation of the game and Blizzard's unhappiness with The9's execution.  While he publicly touted excellent relations with Blizzard, Zhu hedged his bets, selling 15% of The9 to Blizzard arch-rival Electronic Arts, Inc. ("EA") and agreeing to operate a game that competed with WoW.  In response, Blizzard announced exploration of deals with The9's rivals.  Despite a tepid public statement of harmony in 2007 (just before a big new release), the relationship deteriorated.  In August 2008, when Blizzard licensed several games to rival NetEase, concerns were voiced that The9 would lose the WoW license to NetEase (which it ultimately did).  Denying these "rumors," The9 threatened to sue those who said otherwise.

---

[1] In addition to Zhu, defendants are: (1) The9; (2) CFO and SVP Hannah Lee; (3) Tony Tse, CFO after Lee; (4) CFO number three, George Lai; and (5) Xiaowei Chen, President from May 16, 2008 to the end of the Class Period, which runs from November 15, 2006 through July 15, 2009.

In this highly-charged environment, statements concerning the renewal took on great importance – and defendants knew it. The statutory safe harbor enacted by the Private Securities Litigation Reform Act of 1995 ("PSLRA") is not a license to lie or make statements contradicting facts known by the speaker. The Complaint includes accounts from former employees of both The9 and Blizzard. These confidential witnesses confirm that defendants knew, or should have known, that Blizzard would not renew The9's license long before April 16, 2009, the day the market learned Blizzard awarded the license to NetEase.

The arguments raised in defendants' motion to dismiss are without merit. Their heavy reliance on the PSLRA's safe harbor is misplaced because most of defendants' statements were statements of present and historical fact that do not qualify for protection. Moreover, the disclaimers they rely upon were not meaningful, as their language was not substantive and specific as required, too remote in time, or warned of risks that had already materialized.[3]

 Plaintiffs more than adequately plead scienter. The complaint alleges that defendants personally benefited from the fraud: several engaged in illegal and related-party transactions and, collectively, insiders sold $125 million of the The9's securities during the Class Period. Circumstantial evidence of recklessness is also alleged. The WoW license was The9's core business, generating well over 90% of its Class Period revenues. Witnesses at Blizzard and The9 confirm facts known by defendants when they falsely or misleadingly spoke. Also, the magnitude of the belated 2008 write-offs stemming from non-renewal of the WoW license – which wiped out 72% of net income, resignations of successive CFOs coupled with admissions of internal control weaknesses, and the admitted misstatement about when renewal negotiations actually commenced, are also indicia of scienter. Finally, loss causation is sufficiently alleged,

---

[3] Defendants place the text of the safe harbor risk warning language at issue in a 10-page exhibit to a supporting declaration. *See* Declaration of Matthew L. Kutcher ("Kutcher Decl."), at Ex. 1.

as the risks of defendants' false portrayal of The9 and its relationship with Blizzard materialized and caused damages to the Class.  For these reasons, the Court should deny defendants' Motion.

## II.    STATEMENT OF FACTS

The9 develops and operates licensed massively multiplayer online role-playing games and advanced casual games through its affiliates or subsidiaries in China.  ¶¶2, 16.[4]  The9's stock is traded in the form of American Depository Shares ("ADSs") on the NASDAQ, under the symbol "NCTY."  *Id*. at ¶16.  On February 3, 2004, an affiliate of The9 obtained an exclusive license from Vivendi Universal Games ("Vivendi") (later amended to add Blizzard as a party) to operate WoW in China for four years after its launch (the "WoW Contract").  This occurred on June 5, 2005; thus the WoW Contract was set to expire on June 7, 2009.  ¶¶2, 3, 16, 29, 30.

Prior to the launch, The9 did not generate meaningful revenue.  ¶¶3, 31.[5]  Almost all of The9's Class Period revenues were from the operation of WoW.[6]  Specifically, in 2006, 2007, and 2008, 99%, 92%, and 91% of The9's revenues, respectively, were attributed to the operation of WoW in China, including game playing time, merchandise and related revenues.  ¶¶3, 16, 43, 63.  Thus, The9's business rested upon the WoW license.  ¶¶3, 16, 116, 133, 140.

Although WoW was very popular in China, tensions between The9 and Vivendi surfaced early on concerning The9's failure to properly manage WoW.  ¶¶4, 35, 39, 45, 56.  For example, because of "severe time delays, long-queue times, and frozen servers," a gaming website reported that "[g]ame unions have threatened to quit playing WoW."  ¶34.  Then, in April 2006,

---

[4] References ("¶") are to the Consolidated Complaint, filed March 19, 2010 ("Complaint").

[5] Net revenue for 3Q2005 – the first full quarter that reflected revenue from WoW – grew by 2,096% year-over-year to $22.8 million, with WoW accounting for $22.3 million.  ¶32.  The9 does business primarily in China and reports its financial performance in Renminbi ("RMB") and US Dollars.  ¶32 n.2.  Unless otherwise indicated, all financial figures are in US dollars.  *Id.*

[6] *See* ¶¶3, 16, 31, 49, 54, 71, 76, 87, 93, 101, 113, 116, 124, 140.

when The9 announced it would operate Guild Wars, a WoW competitor, Vivendi responded by announcing that it was exploring business opportunities with other partners in China. ¶¶37-38.

A dispute also arose over whether The9 was entitled to *The Burning Crusade*, an expansion pack for WoW, with Vivendi indicating it could turn it into a new game and license it to a new partner. ¶¶30, 35, 36. In November 2006, Zhu assured investors the WoW Contract already granted The9 an exclusive license to soon-to-be-released *Burning Crusade* expansion pack ¶44. While Zhu convinced investors and analysts of his position (¶46), causing The9's price to climb – and allowing entities controlled by Zhu to dump $36 million worth of ADSs (¶¶47-48) – the contract was later amended before The9 released *The Burning Crusade*.[7]

By early 2007, the mounting problems between The9 and Blizzard led Zhu to privately confide in senior executives, such as CW4 (also a shareholder), that The9's relationship with Vivendi had soured to the point that it was very unlikely, ***if not impossible***, for the WoW Contract to be renewed. For this reason, CW4 explained, Zhu was looking for a partner (other than Blizzard) to support the Company. ¶40. Soon after, on May 21, 2007, The9 announced EA had made a $167 million investment, purchasing nearly 15% of The9's shares and licensing various games to The9. ¶52. CW2, a Blizzard licensing manager during the Class Period, stated that "loyalty" was important to Blizzard and that this move was viewed as The9 being disloyal. ¶53. Zhu assured investors that EA's investment would not pose a conflict, mischaracterizing relations with Blizzard as "very good" when this was far from the truth. ¶¶57, 59.

Shortly thereafter, in August 2007, rumors again spread that The9 faced early termination for poor operation of WoW. ¶67. As they were about to debut *The Burning Crusade*, Blizzard and The9 issued a joint statement denying any rift; but inside sources continued to report

---

[7] The contract was again amended, in March 2008, concerning WoW's next expansion pack, *Wrath of the Lich King*. ¶30.

otherwise to the media.   ¶¶68, 70.  Witnesses confirm that both The9 and Blizzard knew that renewal was unlikely.   For example, CW1 was employed by Blizzard in 2005-2006 and thereafter was an industry consultant.  CW1 researched for clients whether The9 would renew the WoW Contract.  CW1 stated Blizzard was unhappy with The9's operation of WoW and thought WoW would be a bigger success if another entity handled the game.  ¶39.

In November 2007, Zhu was asked whether The9 was in "active discussions" with Blizzard concerning renewal or whether they would begin later.  Zhu responded that after *The Burning Crusade*'s release, the parties had started negotiations.   (Chen later stated that discussions did not begin until in May 2008.  ¶114.)[8]   Zhu stated that he was "very confident" the license would be renewed.   ¶77.  Analysts were fooled and were encouraged by these developments.  ¶¶79, 80.  When asked in February 2008, Zhu again stated the relationship was "always…very good" and he was "very confident" that the license would be renewed; The9's shares rose 9.6% on the news.  ¶¶88, 90.  One analyst noted that it was the third time Zhu had assured the market of renewal, making his outlook positive. ¶91.

Asked in May 2008, a date later said to have been the start of talks, Chen described negotiations as "very close," "ongoing" and "very intense."  The9 again convinced analysts renewal would occur.  ¶¶94, 96; *see also* ¶99 (renewal seen as "highly likely" after "discussions with management").  Yet again, on August 8, 2008, Chen told investors that The9 held one week of wide-ranging, closed-door meetings with Blizzard's top management; Chen also assured the market the EA relationship would not impede renewal.  Analysts believed Chen.  ¶¶102, 104.

Days later, Blizzard licensed several games to rival NetEase.  Investors feared the WoW license would be lost.  (Indeed, insider Bosma sold 500,000 ADSs for $11.3 million.)  The9's

---

[8] Defendants' recharacterization of this misstatement as the difference between informal and formal talks, Motion at 5 and 13, is, at best, a factual dispute not proper for a pleading motion.

ADSs fell 20%.  ¶¶105-07.  On September 5, 2008, The9 denied "unfounded" rumors that it lost the license to NetEase, assured investors it was "actively conducting" negotiations, and threatened to sue those saying otherwise.  The9's ADSs rose $1.40.  ¶¶108-09.   Management once again convinced investors – through analysts – that renewal was at hand.  ¶¶111-12.[9]  In the November 2008 and February 2009 conference calls, Chen only stated that talks were ongoing, but in a January interview, expressed no concern about the Blizzard-NetEase deal and no urgency concerning contract renewal.  ¶¶114, 126, 119 (The9 was "not in a hurry").

According to CW1, by February 2009, industry insiders believed that Blizzard would contract with NetEase instead of The9.  ¶122.  A Global Customer Service Training Manager at Blizzard, CW3 was directly involved with the transfer of Chinese licensing rights for WoW to NetEase and helped NetEase "ramp up" its customer service organization in anticipation of becoming the licensee of WoW.  Whereas customer service training began in March 2009, the licensing decision had to have been made earlier.  ¶123.

On April 15, 2009, public reports indicated that Blizzard had awarded the WoW Contract to NetEase. ¶¶9, 129.  Thereafter, The9 and Blizzard formally announced, separately, the non-

---

[9] Contrary to Defendants' assertion (Motion at 7 n.5), analyst statements and press reports that describe their false and misleading statements, *e.g.*, ¶¶79, 80, 91, 96, 111, can be attributed to defendants. *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (corporate officials may be sued for false and misleading information disseminated through analysts' reports).  This is true even if statements are not expressly attributed to the officers themselves.  *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 154 (2d Cir. 2010) (so holding).  Defendants also argue that Zhu's and Chen's statements cannot be attributed to Tse, Lee or Lai, and that plaintiffs do not allege a false statement during Tse's tenure.  Motion at 7 n.4.  However, one need not speak to be held primarily liable if he/she had knowledge of the fraud and assisted in its perpetration. *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1471 (2d Cir. 1996); *Freudenberg v. E*Trade Financial Corp.*, No. 07 Civ. 8538, 2010 WL 1904314, at *21 (S.D.N.Y. May 11, 2010).  A "high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements."  *Id.* at *21.  Here, Lee was present when Zhu or Chen made false and misleading statements, ¶¶44, 49, 55, 57, 59, 77, 102 (*see* Kutcher Decl., Exs. 23-26, 29), and Lai was present when Chen made false and misleading statements.  ¶¶114, 126; Kutcher Decl., Exs. 30, 31.  Plaintiffs allege false statements were made during Tse's tenure ¶¶94, 99; Kutcher Decl., Ex. 28.

renewal.  In the 3-day period from April 14 to 16, 2009, The9's stock dropped 32%, $4.27 per ADS, on heavy trading volume.  ¶¶9, 134.  The9's price dropped again in July 2009:  first on the announcement that operating income for 2008 would be greatly reduced from the figure earlier reported, due to the loss of the WoW Contract  (¶¶9, 137), and again after The9's Form 20-F, filed July 15, 2009, in fact reduced the net income figure by a staggering 72%.  ¶¶9, 142.[10]

## III.    THE COMPLAINT IS NOT SUBJECT TO DISMISSAL

### A.    Standard of Review

To survive a motion to dismiss, a plaintiff's request for relief need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), *i.e.*, plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  A court must "accept all factual allegations in the complaint as true and must consider the complaint in its entirety," *Slayton v. American Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010), drawing "all reasonable inferences in the plaintiffs' favor."  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

To state a claim under §10(b) of the Securities Exchange Act of 1934, one must allege: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, *i.e.*, a causal connection between the misrepresentation and the loss.  *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  Defendants only challenge the elements of falsity, scienter, and loss causation.

---

[10] On Sept. 28, 2009, The9 announced it was replacing PricewaterhouseCoopers Zhong Tian CPAs Ltd. Co. with Deloitte Touche Tohmatsu CPA Ltd.  *See* Declaration of Robin B. Howald in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Howald Decl."), Ex. 1. On March 19, 2010, The9 indicated Chen's contract would not be renewed.  *Id.* at Ex. 2.

**B.    Defendants Made Materially False and Misleading Statements**

Under the PSLRA, a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B).  Plaintiffs satisfy this standard, alleging defendants made numerous statements falsely and misleadingly representing the status of The9's business, its relationship with Blizzard, generally, and of the license renewal in particular.  ¶¶44, 55, 57, 59, 68, 71, 77, 88, 94, 99, 102, 108, 114, 119, 124, 126-27.  The Complaint also sets forth particularized facts demonstrating why those statements were false and misleading.  ¶¶45, 51, 53, 56, 58. 60, 69, 72, 78, 89, 95, 100, 103, 110, 115, 120, 125, 128.

**1.    The CWs' Similar Accounts Confirm Public Reports Contrary to Defendants' Statements**

The CW accounts are contemporaneous, consistent, and corroborate each other - a reliable indication of falsity.  *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 29-30 (1st Cir. 2002):

> **CW4**, senior executive at and shareholder of The9 during the Class Period, stated that CEO Zhu told executives in early 2007 that it was very unlikely, if not impossible, for The9 to be able to renew the license.  Knowing this, Zhu looked for, and obtained, an investment from another video game company.  ¶¶40, 51.

> **CW1**, a Blizzard employee from 2005-2006 and thereafter an industry consultant researching for clients the status of the WoW license renewal, stated that Blizzard was unhappy with the manner in which The9 handled WoW and that, by February 2009, industry insiders knew Blizzard would not renew the license. ¶¶39, 122;

> **CW2**, a Class Period licensing manager at Blizzard, stated that Blizzard had a negative view of EA's investment in the The9 and that The9's perceived disloyalty made renewal of the WoW Contract unlikely.  ¶¶53, 102, 103; and

> **CW3**, a Blizzard Global Customer Service Training Manager, began training NetEase's customer service personnel by March 2009.  ¶123.

The witness accounts are also consistent with contemporaneous reports of discord.  *E.g.*, ¶¶38, 67, 70.  Both falsity and scienter may be shown by a defendants' denial of published reports.  *See S.E.C. v. Conaway*, No.: 2:05-CV-40263, 2010 WL 318283, at *20, *24, *65-*69,

*93 (E.D. Mich. Jan. 20, 2010); *In re Turbodyne Techs., Inc. Sec. Litig.*, No. CV9900697, 2000 WL 33961193, at *19 (C.D. Cal. Mar. 15, 2000); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1332, 1338 (S.D. Fla. 1999); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997). Contrary to defendants' argument that "rumors" are not sufficiently particularized to support a claim, Motion at 9-12, repeated denials that the parties' relationship had so deteriorated that The9 might lose the license mid-term or it would not be renewed, evidence falsity and scienter. ¶¶37-38, 67, 70, 84, 105, 108.[11]

2.     **Defendants' False and Misleading Statements Are Not Protected By the PSLRA's Safe Harbor Provision**[12]

a.     **Past and Present Tense False Statements Are Not Immunized**

The PSLRA's "safe harbor" only applies to statements "identified" as "forward-looking" and "accompanied by meaningful cautionary" language "identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §78u-5(c)(1)(A). "The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement...." *Slayton*, 604 F.3d at 771; *Lormand v. US Unwired*, 565 F.3d 228, 244-45 (5th Cir. 2009); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004). Defendants carry the burden to show they provided "meaningful cautionary language." *Slayton*, 604 F.3d at 773.

---

[11] Defendants also misrepresented the status of negotiations. *Compare* ¶77 (11/16/07 Zhu: "we started discussions with them regarding the renewal of the contract") *with* ¶114 (11/18/08 Chen: "we have been conducting the talks with Blizzard since actually May this year").

[12] Defendants do not contend their statements in the following communications are protected by meaningful cautionary language: the Nov. 16, 2006, and Feb. 24, 2009, conference calls; the Aug. 3, 2007 article in *China IT & Telecom Report*; the June 25, 2008, Oppenheimer research report; the Jan. 15, 2009, gaming news Website 17173.com interview; and The9's Feb. 23, 2009, press release. ¶¶44, 68, 99, 119, 124, 126-27. Thus, defendants concede that these statements are neither forward-looking nor protected by the PSLRA's safe harbor provision.

Neither the statutory safe harbor nor its predecessor, the "bespeaks caution" doctrine, apply to statements of current or historical fact, the misrepresentation of which cannot be cured by cautionary language. *P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004). Because "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present," *Makor Issues & Rights, Ltd. v. Tellabs Inc*., 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs II*"), it is not "sensibl[e]" to apply the safe harbor when "the allegation of falsehood relates to non-forward-looking aspects of the statement." *In re Stone & Webster, Inc., Sec. Litig*., 414 F.3d 187, 213 (1st Cir. 2005). For this reason, one cannot make a statement of present or historical fact and claim it to be the "assumption" underlying a prediction. *Ill. St. Bd. of Inv. v. Authentidate Holding Corp.*, No. 09-1751-cv, 2010 WL 889294, at *3 (2d Cir. Mar. 12, 2010); *In re Boeing Sec. Litig.*, 40 F. Supp. 2d 1160, 1169 (W.D. Wash. 1998) (to do so "...would allow the exception to swallow the rule. Virtually any factual assertion … would be subject to safe harbor protection"). Thus, the following statements are actionable:

- Now **we are active** in discussion rather than renegotiation with Blizzard, **refining** the marketing arrangement and the timetable for the Burning Crusade in China Market. The first line of communication **has always been ongoing** since day one of our operation of the World of Warcraft and we'll continue to communicate with them in the coming two and a half years." (¶44);

- "All in all, we believe The9 **is** well positioned for sustainable growth in the rapidly evolving Chinese online games market." (¶55);

- "And the relationship between the two parties **are** very good..." (¶59);

- "The media reports of disagreements between The9 and Blizzard Entertainment **are** groundless," Blizzard and The9 announced. "Blizzard Entertainment and The9's cooperation **has been** smooth and friendly, and the two parties **are striving** to protect the interest of Chinese players. We **are preparing** for an earlier release of the WoW expansion, Burning Crusade." (¶68);

- "Before Q3 we have been concentrating on cooperation discussion with Blizzard regarding the launch of the Burning Crusade. But after that was launched **we started discussions** with them regarding the renewal of the contract as you mentioned." (¶77);

10

- "Management stated it **has already initiated** the renewal discussions..." (¶80);

- "So regarding your current question regarding the WoW renewal, what I can say is WoW **has been** in very strong growth during the past few years and also **we are always** in very good relationship with Blizzard.   And **we always have** a very common unanimous opinion regarding the operation of WoW in China." (¶88);

- "[**W**]**e have been** in very close discussions with Blizzard and Blizzard's headquarters, about the extension of this license.  This is all I can tell you. That the discussions **are ongoing** and very intense…" (¶94);

- "As we have mentioned in – during our last call, we at The9 **have been** in very active discussions with Blizzard top management.  And we most recently **have completed** one week of closed door discussion in Hong Kong and **we're continuing** our negotiations….we **are** in very active discussion with top management from Blizzard....We have discussed the issue and we have both agreed that **it's** a non-issue…EA's shareholding in The9 **does not present** a threat or negative conflict of interest to our renewing the license….[I]n the discussion that we carried out with top management of Blizzard, not only **are we discussing** renewing the license, but one thing that's very good that's coming out of the discussions is how we can strengthen our communications between The9 and Blizzard so that we can continue to push WoW's performance upward." (¶102);

- "Recently, there have been rumors that surfaced regarding the contract negotiations. These rumors **are** completely unfounded." (¶108);

- "The renewal of the license will be in this June.  Because we have to wait until the contract due to renew it.  **We are not in a hurry now.**  (¶119); and

- At this point **we're working** very actively to make every preparation possible from content to technical and we hope to launch it [Wrath of Lich King] as soon as possible ….  **We're now actively preparing** for its launch in China.  (¶126) (emphasis added).

In addition, The9's financial reporting for fiscal 2008, initially provided in February 2009, was false when announced as it was subject to a massive restatement by the time The9's Form 20-F was filed in July.  ¶¶124-25, 141-42.  Defendants' citation to AU §560, an auditing standard for "Subsequent Events" (Motion at 13 n.10), actually supports plaintiffs' position. Financial statements are only adjusted when an event, here the license expiration in June 2009 – which occurred after the end of fiscal 2008 but before the filing of the Form 20-F in July 2009 –

reflects conditions *in existence* at the close of the reported period. AU §560.03-.04. Howald

Decl. at Ex. 3. Thus, the taking of numerous impairment charges – that reduced net income

72%, from $51 million to $14 million – is an admission that the non-renewal was known by the

end of 2008, and that defendants' statements made thereafter were false and misleading.[13]

### b.    The9's Cautionary Language Was Boilerplate and Stale

Any of defendants' statements concerning renewal that may be viewed as forward-

looking are not protected by the statutory safe harbor because they were not accompanied by

meaningful risk warnings. "To avail themselves of safe harbor protection under the meaningful

cautionary language prong, defendants must demonstrate that their cautionary language was not

boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772; *Lormand*, 565 F.3d

at 246-47. Here, as already-existing tensions between the parties escalated during the Class

Period, for both competitive and operational reasons, risk warnings in SEC filings remained

unchanged and The9's press release and conference call disclaimers were identical. *See* Kutcher

Decl., Ex. 1.[14] "The consistency of the defendants' language over time despite the new

information they received … belies any contention that the cautionary language was tailored to

the specific future projection." *Slayton*, 604 F.3d at 773; *Lormand*, 565 F.3d at 245; *Asher*, 377

F.3d at 734. Rather, as these disclaimers could be appended to any press release, they were

"mere boilerplate." *Sawant v. Ramsey*, 570 F. Supp. 2d 336, 342-43 (D. Conn. 2008); *In re Sec.*

*Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 906-10 (S.D. Tex. 2001).

Also, disclaimers contained in The9's SEC filings only warned of potential risks related

---

[13] Defendants referenced AU §560.07, concerning the realization of assets such as receivables and inventories. However, only $3.9 million of the charges related to those items. ¶141.

[14] The language was so boilerplate that in an attempt to argue that the statements made during The9's Feb. 22, 2008 and May 20, 2008, earnings calls were protected by meaningful cautionary language, defendants inadvertently referred investors to language in The9's 2007 Form 20-F, which was not filed until June 30, 2008. Kutcher Decl., Ex. 1 at 3-6; Howald Decl., Ex. 6 at 85.

to non-renewal of the license even though such risks had already materialized and/or were greater in magnitude than represented.  "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."  *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd*, 459 U.S. 375 (1983); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (protection not afforded to one who warns "there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away"); *Lormand*, 565 F.3d at 246-48. Here, plaintiffs allege that the risk of non-renewal had materialized by early 2007.  ¶¶40, 51 (Zhu's statements to executives that the relationship was ruined; renewal would be very unlikely, if not impossible; and investment was needed to replace lost WoW revenues).  "Cautionary language can never be 'meaningful' if it warns of risks that have already materialized."  *In re 21st Century Holding Co. Sec. Litig.*, No. 07-61057-CIV, 2008 WL 5749572, at *13 (S.D. Fla. Nov. 7, 2008); *Freudenberg*, 2010 WL 1904314, at *20 (S.D.N.Y. May 11, 2010).

Additionally, reference back to The9's Form 20-Fs is inadequate because "[r]emote cautions are less likely effective[] to qualify predictions."  *Grossman v. Novell, Inc.*, 120 F.3d 1122, 1123 (10th Cir. 1997); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1231-32 (N.D. Okla. 2003) (warnings issued two and ten months prior to misrepresentations "were too remote to imply any caution").[15]  Because the total mix of information affecting the WoW license renewal was constantly changing in a negative way – *e.g.*, Zhu telling senior executives in early 2007 that renewal was nearly impossible, disputes over *The Burning Crusade*, the EA investment in The9 and Vivendi's Activision investment, severe operational problems in 2007, and

---

[15]  *See also Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 844 (N.D. Ill. 2003); *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1222 (D. Kan. 2002); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, No. C 99-00109, 2000 WL 1727377, at *10 (N.D. Cal. Sept. 29, 2000).

Blizzard's deal with NetEase in August 2008 – warnings given in yearly Form 20-Fs were too remote in time to constitute meaningful cautionary language for separate representations.[16]

Finally, dismissal based upon cautionary language "requires a stringent showing" by defendants, *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005), "[such] that reasonable minds could not disagree that the challenged statements were not misleading." *Id.* at 946-48; *Lormand*, 565 F.3d at 248. "[A]ny issuer could list its lines of business, say 'we could have problems in any of these,' and avoid liability for statements implying that no such problems were on the horizon even if a precipice was in sight." *Asher*, 377 F.3d at 733; *Slayton*, 604 F.3d at 771 n.8. For this reason, what constitutes "meaningful cautionary language" is "difficult if not impossible" to determine, particularly "at the pleading stage, before plaintiffs have access to discovery." *Asher*, 377 F.3d at 727, 729, 734; *In re Priceline.Com Inc. Sec. Litig.*, 342 F. Supp. 2d 33, 53 (D. Conn. 2004). Thus, application of the PSLRA's safe harbor "is not so obvious as to be decided as a matter of law." *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 877 (3d Cir. 2000); *Authentidate*, 2010 WL 889294, at *3.

### c.    Defendants cannot caution against knowingly false statements

According to CW4, a former executive and shareholder, it was patently clear that defendants had actual knowledge of the falsity of the renewal statements made in 2007 (and beyond) at the time they were made. ¶¶40, 51, 107. The safe harbor provision does not immunize such statements. *Tellabs II*, 513 F.3d at 705; *Freudenberg*, 2010 WL 1904314, at *21.

---

[16] *E.g.*, The9 filed its 2005 Form 20-F/A on Oct. 12, 2006 (Howald Decl., Ex. 4 at 96) – more than seven months before its May 22, 2007, conference call (¶¶55, 57, 59). The 2006 Form 20-F on was filed on June 28, 2007 (Howald Decl., Ex. 5 at 101), two months before the Aug. 29, 2007, press release (¶71), nearly five months before the Nov. 16, 2007, conference call (¶77), eight months before the Feb. 22, 2008, conference call (¶88); and nearly 11 months before the May 20, 2008, conference call (¶94). The9 filed its 2007 Form 20-F on June 30, 2008 (Howald Decl., Ex. 6 at 85), more than two months before the Sept. 5, 2008, press release (¶108), nearly five months before its Nov. 18, 2008, conference call (¶114); and eight months before its Feb. 23, 2009, press release (¶124) and Feb. 24, 2009, conference call (¶¶126-27).

### 3.    There Was No Objective or Subjective Basis for Stated Beliefs

A projection or statement of belief contains at least three implicit factual assertions: (1) that the statement is genuinely believed; (2) that there is a reasonable basis for that belief; and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989). As explained in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991), even "conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." Here, to the extent the statements were phrased as opinions or beliefs, based upon CW4's personal interactions with Zhu, which show that Zhu did not believe Blizzard would renew the WoW license, it is clear that defendants did not genuinely believe their statements concerning: (a) the status of renewal negotiations;[17] and (b) the quality of the parties' ongoing relationship, including the effect of the EA investment thereon. *See* ¶57 ("I believe the partnership with EA and our relationship with Blizzard will be no conflict.") [18]

---

[17] *See* ¶77: "very confident"; ¶84: "don't expect a change in WoW negotiations or timing;" ¶88: "very confident that we believe we can renew the contract", ¶99: "highly likely" (analyst after meeting with management); and ¶102: "we hope that we will have results very soon").

[18] Defendants also argue that statements about The9's being "well-positioned for sustainable growth" and for "continuing performance and growth" (¶¶55, 71, 102) are not actionable. Motion at 13. However, nearly identical statements have been held actionable. *See Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.*, No. 02 CIV. 1230, 2002 WL 31027550, at *6-*7 (S.D.N.Y. Sept. 10, 2002); *see also Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1181 (S.D. Cal. 2009); *Williams*, 339 F. Supp. 2d at 1228. Here, The9 could not be well-positioned for substantial growth without WoW. Defendants further contend that several statements are inactionable corporate optimism. Motion at 11-14. However, such statements, *e.g.*, ¶¶55, 56, 59, 60, 68, 69, 71, 72, 88, 89, 102, 103, are actionable because material, nondisclosed information undermined their truth. *Novak*, 216 F.3d at 315; *In re Semgroup Energy Partners, L.P.*, No. 08-MD-1989, 2010 WL 1816434, at *12 (N.D. Okla. Apr. 30, 2010).

15

### C.   Plaintiffs Adequately Allege that Defendants Acted With Scienter

Plaintiffs may establish scienter in one of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." *Novak*, 216 F.3d at 307. "Either set of allegations will suffice to satisfy the necessary scienter element of a securities fraud claim." *Stevelman v. Alias Research Inc.*, 174 F. 3d 79, 84 (2d Cir. 1999).[19] Plaintiffs adequately allege scienter under both prongs of the test.

### 1.   Defendants Had Motive and Opportunity to Commit Fraud

"To show motive and opportunity, plaintiffs must allege a likelihood that defendants could realize 'concrete benefits' through the deception." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001); *Ganino*, 228 F.3d at 170. Plaintiffs have done so. Knowing that they had until June 2009 to reap as much financial benefit as possible while The9 was flush with WoW cash, defendants and entities controlled by Zhu: (1) sold $125 million dollars worth of artificially inflated stock (¶¶147-48);[20] (2) engaged in lucrative related-party transactions (¶¶152(a)-(g)), including personal loans and kick-backs; and (3) drained millions of

---

[19] "[C]ourts must consider the complaint in its entirely .... The inquiry ... is whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007) (emphasis in original); *Slayton*, 604 F.3d at 766. A strong inference arises if, a reasonable person would "deem the inference of scienter at least as strong as any opposing inference[.]" *Tellabs*, 127 S. Ct. at 2511. Moreover, when the inferences are equally strong, under *Tellabs* a tie goes to plaintiffs. *Lormand*, 565 F.3d at 254-55.

[20] Existence of a 10b5-1 trading plan (Motion at 16-17) is an affirmative defense; it cannot raise an inference against scienter. *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009); *In re Fed. Nat'l. Mortgage Assoc. Sec. Deriv. and ERISA Litig.,* 503 F. Supp. 2d 25, 48 (D.D.C. 2007); *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 734 (S.D. Ohio 2006). Lee's 10b5-1 plan was adopted during the Class Period (Kutcher Decl., Exs. 35-39, 42), providing no defense on a motion to dismiss. *Freudenberg*, 2010 WL 1904314, at *26; *Central Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 (5th Cir. 2007); *In re Biogen Idec, Inc. Sec. Litig.*, No. 05-10400, 2008 WL 4810045, at *14 (D. Mass. Oct. 25 2008).

dollars in cash from The9 in January 2009 with a first-ever cash dividend – valued at $29,410,000, or $1.11 per share.  ¶121.  Also in January 2009, the Board adopted a shareholder rights plan, *a.k.a.* a poison pill, to prevent a third-party from acquiring control of The9 in the event its shares plunged after the market learned of the non-renewal.  ¶¶8, 117-118, 146.

Opportunity to commit fraud can be inferred from, *inter alia*, officers' access to financial information to which the general public did not have access.  *Stevelman*, 174 F.3d at 86. Defendants here clearly had access to such information about The9.  ¶¶18-22, 144, 170, 177.[21]

## 2.  Plaintiffs Allege Strong Circumstantial Evidence of Recklessness

### a.  Because the Facts Alleged Relate to The9's Core Business, They Support a Strong Inference of Scienter

"When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made."  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489-92 (S.D.N.Y. 2004); *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989).  "When information is at the core of a company's business, it may be properly ascribable to senior officers."  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 628 (S.D.N.Y. 2005); *City of Sterling Heights Police and Fire Retirement Sys. v. Abbey National, PLC*, 423 F. Supp. 2d 348, 361-62 (S.D.N.Y. 2006); *see also Berson v. Allied Signal Tech., Inc.*, 527 F.3d 982, 988-89 (9th Cir. 2008) ("absurd to suggest" defendants not aware of facts so "prominent").

---

[21] A lack of stock sales by Chen, Tse, and Lai does not negate an inference of scienter.  "[T]he absence of a motive allegation is not fatal."  *Tellabs*, 127 S. Ct. at 2511.  "Scienter can be established even if the officers who made the misleading statements did not sell stock…"  *No. 84 Employer-Teamster Jt. Council Pension Trust Fund v. Am. West Holding Corp*, 320 F.3d 920, 944 (9th Cir. 2003).  Also, contrary to defendants' argument (Motion at 15-16), courts reject a general rule that insider purchases negate scienter.  *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1378 (S.D. Fla. 2001); *In re Ashanti Goldfields Sec. Litig.*, No. CV 00-0717, 2004 WL 626810, at *5 (E.D.N.Y. Mar. 30, 2004) (net purchases do not necessarily negate scienter).

Here, there can be no dispute that not only was the WoW Contract the core of The9's business, but that it was almost its entire business.  The license generated revenues of 99%, 92%, and 91%, respectively, in 2006, 2007, and 2008.  ¶138.  It is presumed that Lee, Tse, Lai and Chen – the latter of whom spoke on the The9's behalf concerning the negotiations – knew what Zhu had told CW4 and other top executives, to wit, the license would not be renewed.  ¶¶40, 51.

### b. The Magnitude of The9's WoW-Related Write-Offs Gives Rise to a Strong Inference of Scienter

The magnitude of the write-offs related to loss of the WoW license – causing previously-reported net income to shrink by 72% – adds to the strong inference of scienter alleged.  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000); *Freudenberg*, 2010 WL 1904314, at *25.  After originally reporting $51.1 million in net income for 2008, The9 restated that figure to $14.2 million when it filed its 2008 Form 20-F, claiming that loss of the WoW license required massive equipment impairment and other related charges.  ¶¶124-25, 141-42.  That the write-offs concern Th9's central contract also supports a finding of scienter.  *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638-39 (E.D. Va. 2000).  The fact that non-renewal was deemed a subsequent event requiring adjustment of 2008's results, indicates that the loss of the WoW license was "a condition[] that existed at the date of the balance sheet" – *i.e.*, December 31, 2008.  *See* AU §560.03 (Howald Decl., Ex. 3).

### c. Admissions That The9 Began Renewal Discussions Much Later Than Represented Support a Strong Inference of Scienter

A "later statement may suggest that a defendant had a contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement."  *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 76-83 (1st Cir. 2002); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007).  Here, to falsely suggest license renewal was

likely, Zhu stated negotiations had commenced long before they did.  During a November 16, 2007, conference call, when asked whether The9 was in "active discussions" with Blizzard to extend the license, Zhu responded affirmatively: "[A]fter [*The Burning Crusade*] was launched we started discussions with them regarding the renewal of the contract as you mentioned."  ¶77.  Zhu's false statement caused analysts covering The9 to report positively about renewal.   ¶¶79-80 ("Management stated it has already initiated the renewal discussions….").[22]

On November 18, 2008, however, Chen stated "we have been conducting the talks with Blizzard since actually ***May this year***" – months after the fall of 2007 date initially provided by Zhu.   ¶¶114, 115 (emphasis supplied).[23]   Defendants answered questions during every conference call about the status of license renewal negotiations; they cannot suggest they were unaware of when the negotiations started.  *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009).  Thus, the later admissions "directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions, *i.e.*, they are evidence that the defendants actually knew earlier that the course of action would turn out badly." *Lormand*, 565 F.3d at 254.[24]

---

[22] Scienter is also evidenced by the failure to correct misstatements made by analysts.

[23] The Company's 2008 Form 20-F stated that negotiations commenced in April 2008.  ¶138.

[24] As in *Avaya*, defendants here may be held liable as long as what they knew about the true state of negotiations – or lack thereof – made obvious the risk that their positive statements about negotiations and renewal would mislead investors.  564 F.3d at 270.  ("Given the specificity and repetition of the analysts' questions, [defendant's] position as Chief Financial Officer, and the alleged state of [the Company's] business at the time the questions were asked, there is a strong inference that [the CFO's] behavior reached this threshold of recklessness.")

### d.    Witness Accounts Add to the Strong Inference of Scienter

Plaintiffs have adequately alleged that CW accounts are indicative of scienter.[25] Information from confidential witnesses adds to a strong inference of scienter "provided [the confidential witnesses] are described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314; *Freudenberg*, 2010 WL 1904314, at *23-*24; *In re Ambac Financial Group, Inc.,* 693 F. Supp. 2d 241, 268 n.31 (S.D.N.Y. 2010).  Here, plaintiffs have adequately described each of the CWs with sufficient particularity to support the probability that persons in the identified positions would possess the information alleged.

CW1 worked for Blizzard from 2005-2006, and thereafter served as a video game industry consultant, specifically researching whether Blizzard would renew the WoW license. ¶39.  Accordingly, CW1's investigation would put CW1 in a position to know that Blizzard was unhappy with the manner in which The9 handled WoW.  ¶¶39, 122.  Similarly, CW2 served as a licensing manager at Blizzard during the Class Period.  ¶53.  As such, CW2 was in a position to know Blizzard's view of the impact of EA's investment on the relationship between Blizzard and The9.  ¶¶53, 102, 103.  CW3, who served as a Global Customer Service Training Manager at Blizzard, was directly involved with Blizzard's transfer of Chinese licensing rights for WoW to NetEase, and helped NetEase "ramp up" its customer service organization in anticipation of NetEase becoming the licensee for WoW.  ¶123.  Thus, CW3 was in a position to know that Blizzard began training NetEase's customer service personnel by March 2009.  *Id.*

CW4 was a senior executive and shareholder of The9 during the Class Period.  ¶40.  As a top insider, CW4 was in a position to know that CEO Zhu told Company executives in early

---

[25] *See* ¶¶39-40, 42, 51, 53, 102-03, 107, 122-23, 152, and Section III.B.1, above.

2007 that he viewed it as very unlikely, if not impossible, for The9 to be able to renew the WoW Contract and that an investment from another source would be needed.   Indeed, CW4 was present when Zhu made these statements.   ¶¶40, 51, 107.   CW4 was also in a position to know about and describe various illegal and/or related-party transactions in which certain defendants engaged to benefit themselves at shareholders' expense.   ¶¶42, 152.   The confidential witnesses are thus described "well enough to allow the Court to conclude that a person in the position of each of the witnesses would have had access to the information alleged."   *Cornwell v. Credit Suisse Group*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010); *Freudenberg*, 2010 WL 1904314, at *23-*24; *Ambac,* 693 F. Supp. 2d at 268 n.31.

### e.    Resignations Support a Strong Inference of Scienter

Resignations, although not themselves sufficient, add to a pleading of circumstantial evidence of fraud.   *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008).   Even resignations "not accompanied by an extraordinary punishment" can be "highly probative of scienter."   *Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6863, 2008 WL 7084629, at *9 (C.D. Cal. July 10, 2008).   Here, CFO and SVP Lee announced her resignation on January 18, 2008.   ¶85.   Just a few months into his tenure, Lee's replacement – defendant Tse –also resigned.   ¶98.   The Form 20-F, filed in July 2009, admitted The9 had inadequate internal controls over financial reporting during the Class Period which necessitated the hiring of a new CFO, a new financial director and a new internal audit director to address the problems.   ¶150. Then, on September 28, 2009, The9 announced it was also replacing its outside auditor, PricewaterhouseCoopers, with Deloitte.   Howald Decl., Ex. 1; *see Hall*, 580 F. Supp. 2d at 233 (holding that an auditor's departure can "add to the overall pleading of circumstantial evidence

of fraud"). Finally, on March 19, 2010, The9 announced Chen's contract would not be renewed. Howald Decl., Ex. 2. "Such house-cleaning and reforms do not follow innocent mistakes." *In re America Service Group, Inc.*, No. 3:06-0323, 2009 WL 1348163, at *58 (M.D. Tenn. Mar. 31, 2009). Thus, all of these departures add to the strong inference of scienter alleged.[27]

### D.    Plaintiffs Sufficiently Allege Loss Causation

In securities fraud actions, a plaintiff must plead and prove "'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342; *Emergent Capital Investment Mgt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). To do so, a plaintiff must allege "the *subject* of the fraudulent statement of omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original).

Here, Plaintiffs allege that defendants deceived investors as to the state of The9's overall business -- with respect to the renewal of the WoW license (*e.g.*, ¶¶77, 88, 94, 108, 119), licensing other games, and operating its own proprietary games. ¶¶52, 57, 61, 71, 101. When the risks posed by defendants' dissembling materialized with the resignation of highly-touted (¶85) CFO and SVP Hannah Lee, execution of a Blizzard-NetEase deal in August 2008, non-

---

[27] Defendants' purported innocent inferences are not compelling. Motion at 21-22. The fact that renewal talks occurred does not undermine the allegations that defendants thought that renewal was highly unlikely. Defendants also contend that they made investments in preparation for renewal. Motion at 22. However, these investments were also for other games. *See, e.g.*, ¶127; Kutcher Decl., Ex. 31 at 14. Additionally, The9's stock buyback does not negate scienter because, as explained in n.21, *supra*, purchases of stock by defendants do not necessarily negate an inference of scienter. Finally, the fact that analysts considered renewal likely *supports* an inference of scienter because defendants successfully misled the market.

renewal of the WoW license in April 2009, and a massive reduction of 2008 net income in July

2009, attributed to the non-renewal, The9's ADSs declined each time. ¶¶85, 106, 130, 142:

- In response to reports on January 18, 2008, that CFO Lee was leaving The9 – just a few weeks after the end of FY07, the first year for which outside auditors were required to certify the adequacy of The9's internal controls – The9's ADS price dropped $2.87, from $21.76 to $18.89, a decline of more than 13%. ¶¶85, 156;[28]

- In response to the Blizzard and NetEase licensing agreement announced on August 13, 2008, which increased the likelihood that Blizzard would not renew the WoW Contract, shares of the Company's ADSs fell $4.67 per ADS, or 20%, from a close of $22.83 per ADS before the announcement, to close at $18.16 per ADS, on extremely heavy trading volume. ¶¶106, 157;

- In response to reports on April 15, 2009, that The9 would not be renewing the WoW Contract, shares of the Company's ADSs fell $3.26 per ADS, or 25%, from a close of $13.22 per ADS before the reports, to close at $9.96 per ADS, on extremely heavy trading volume. ¶¶9, 130, 157;

- In response to announcements before the stock market opened on April 16, 2009, that The9 would not obtain renewal of the WoW Contract, shares of the Company's ADSs fell $1.01 per ADS, or 10%, from a close of $9.96 per ADS before the announcement, to close at $8.95 per ADS, on extremely heavy trading volume. ¶¶9, 132, 158. (During the three day period from April 14 to 16, 2009, The9's ADSs dropped by $4.27 per ADS, or approximately 32%, from $13.22 per ADS to $8.95 per ADS, on extremely heavy trading volume. ¶¶9, 134, 158);

- On July 1, 2009, The9 reported that its earlier-reported 2008 financial results would be radically altered to reflect, primarily, the loss of the WoW Contract in 2009. ¶¶9, 137-142, 159.[29]  From June 30, 2009, through July 16, 2009, the day after the 2008 Form 20-F was filed, reporting, *inter alia*, net income of $14.2

---

[28] Courts have rejected defendants' argument that executive departures cannot serve as a basis to establish loss causation.  *See In re Winstar Comms.*, No. 01 CV 3014, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) (holding that "the market may learn of possible fraud [from] a number of sources" such as "resignations of CFOs or auditors …"); *Lormand*, 565 F.3d at 264 n.32. Defendants' citation to *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010) is misplaced.  In *Omnicom*, the court did not categorically hold that departure allegations in isolation can never support loss causation as defendants suggest.  Motion at 23.  Rather, the court held that such allegations in that particular case were insufficient.  *Omnicom*, 597 F.3d at 513-14.

[29] Defendants claim the 2008 Form 20-F did not reveal anything new and thus cannot serve as a corrective disclosure.  Motion at 24.  Not so.  It revealed the precise amount of charges related to the WoW Contract.  ¶141.  Courts, moreover, have held that such a determination "is one for the jury to make."  *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 253 (S.D.N.Y. 2007).

million – a 72% reduction from the earlier-reported figure of $51.1 million – The9's ADS price fell from $10.15 to $8.68, almost 14.5%.  ¶¶9, 137-142, 159.

These allegations plausibly support plaintiffs' theory of loss.  Consequently, a Rule 12(b)(6) dismissal is inappropriate.  *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008); *Varghese*, 672 F. Supp. 2d at 609; *Openwave*, 528 F. Supp. 2d at 252-53.[30]

Defendants argue that plaintiffs have not sufficiently alleged loss causation because defendants' announcements on January 18, 2008, August 13, 2008, April 26, 2009, and those contained within the Company's 2008 Form 20-F, purportedly do not constitute corrective disclosures that demonstrate the falsity of prior false statements.  Motion at 23-24.  However, a *mea culpa* is not required.  *See., e.g., Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) ("If a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements"); *Lormand*, 565 F.3d at 264 n.32; *Freudenberg*, 2010 WL 1904314, at *28.  In accordance with *Lentell*, 396 F.3d at 173, all that need be alleged is that the "risk allegedly concealed by defendants [ ] materialized and arguably caused the decline in shareholder value." *Freudenberg*, 2010 WL 1904314, at *27; *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-06 (S.D.N.Y. 2005).[31]

---

[30] "Loss causation may be pleaded on a theory of partial disclosures." *See Lormand*, 565 F.3d at 261 n.31; *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008); *In re Vivendi Universal S.A*., No. 02Civ5571, 2004 WL 876050, at *7 (S.D.N.Y. Apr. 22, 2004).

[31]  In any event, a determination of loss causation usually "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent,* 343 F.3d at 197; *see also Lentell*, 396 F.3d at 174 (as a general matter, "the chain of causation is a matter of proof at trial"); *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 365 (S.D.N.Y. 2009) (holding that "causation is fundamentally a factual matter").

### E.    Plaintiffs Adequately Allege Control Person Liability

A control person liability claim under §20(a) has two elements: "(1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant."  *In re WorldCom, Inc. Sec. Litig*., 294 F. Supp. 2d 392, 414 (S.D.N.Y. 2003).[32] Allegations of control are not averments of fraud and need not be pleaded with particularity.  *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006); *BISYS*, 397 F. Supp. 2d at 451-52.  As plaintiffs have alleged a primary violation and that Zhu, Lee, Tse, Lai and Chen exercised control over The9 (¶¶18-22, 144, 170, 177), a §20(a) claim is stated.

## IV.    CONCLUSION

For the reasons stated above, the Court should deny the Motion.  In the event the Court is inclined to grant the Motion, plaintiffs respectfully request leave to amend to cure any deficiencies.  *See Olsen v. Pratt & Whitney Aircraft Div.*, 136 F.3d 273, 276 (2d Cir. 1998) ("Plaintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint").

Dated: July 12, 2010                           GLANCY BINKOW & GOLDBERG LLP

                                               *s/Robin B. Howald*
                                               Robin B. Howald
                                               1430 Broadway, Suite 1603
                                               New York, NY  10018
                                               Telephone:  (212) 382-2221
                                               Facsimile:  (212) 382-3944

---

[32] Despite reference to culpable participation in *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) and *First Jersey*, 101 F.3d at 1472, district courts in this Circuit do not require such allegations to state a §20(a) claim.  *See In re Parmalat Sec. Litig.*, 497 F. Supp. 2d 526, 532 n.42 (S.D.N.Y. 2007).  *Parmalat* noted that both *ATSI*'s and *First Jersey*'s references to culpable participation were *dicta*.  *Id.*; *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 191 (S.D.N.Y. 2006); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 450-51 (S.D.N.Y. 2005); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 406 (S.D.N.Y. 2005).  Even if culpable participation is required, plaintiffs have alleged it.  ¶¶44, 55, 57, 59, 68, 71, 77, 88, 94, 99, 102, 108, 114, 119, 124, 126-27.

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
Facsimile:  631/367-1173

*Co-Lead Counsel for Plaintiffs*

WALDEN LAW FIRM, PLLC
RICHARD E. WALDEN
8201 Cantrell, Suite 315
Little Rock, AR  72227
Telephone:  501/907-7000
888/220-7933 (fax)

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court.  I am over the age of 18 and not a party to the within action.  My business address is 1430 Broadway, Suite 1603, New York, New York 10018.

On July 12, 2010, I caused to be served the following:

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED COMPLAINT**

**DECLARATION OF ROBIN B. HOWALD IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED COMPLAINT**

on the parties shown on the attached Service List by posting the above-referenced documents on the ECF website, for electronic service pursuant to ECF rules, and, in the case of those persons not listed as recipients of electronic service, by instead placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States mail at New York, New York.  They are:

Ethan J Brown
David J. Schindler
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071

Executed on July 12, 2010, at New York, New York.  I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*s/Robin B. Howald*
Robin B. Howald

# Mailing Information for a Case 1:09-cv-08904-RJH

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **John Daniel Castiglione**
  john.castiglione@lw.com

- **Robin Bronzaft Howald**
  hobbit99@aol.com,info@glancylaw.com

- **Evan Jay Kaufman**
  ekaufman@rgrdlaw.com

- **Robert John Malionek**
  robert.malionek@lw.com,jessica.bengels@lw.com,jason.grossman@lw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Joseph Frank Russello**
  jrussello@rgrdlaw.com

- **Peter A. Wald**
  peter.wald@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Ethan J Brown**
Latham & Watkins LLP (LA)
355 South Grand Avenue
Los Angeles, CA 90071

**Lionel Z. Glancy**
Law Offices of Lionel Z. Glancy
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067

**Michael Goldberg**

```
Glancy Binkow & Goldberg, LLP (CA)
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
```

**David J. Schindler**
```
Latham & Watkins LLP (LA)
355 South Grand Avenue
Los Angeles, CA 90071
```