UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAWRENCE F. GLASER, on Behalf of Himself
and All Others Similarly Situated,

                              Plaintiff,

          -against-

THE9, LTD., XIAOWEI CHEN, GEORGE LAI,
HANNAH LEE, TONY TSE, and JUN ZHU,

                              Defendants.

09 Civ. 08904 (RJH)

**<u>MEMORANDUM OPINION
AND ORDER</u>**

Richard J. Holwell, District Judge:

Lead Plaintiffs Lawrence F. Glaser and Chen Kuang bring this putative class action against defendants The9 Ltd. ("The9"), Xiaowei Chen, George Lai, Hannah Lee, Tony Tse, and Jun Zhu, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Exchange Act Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Exchange Act Section 20(a), 15 U.S.C. § 78t(a).  Plaintiffs allege that between November 15, 2006, and July 15, 2009 (the "Class Period"), defendants fraudulently misrepresented facts relating to the likelihood of their renewal of a certain extremely profitable exclusive license granted them by a third company.  Defendants now move to dismiss.  For the reasons set forth below, and specifically because plaintiffs fail to adequately plead scienter, defendants' motion is GRANTED in its entirety; and plaintiffs are granted leave to replead their complaint.

## I. FACTUAL SETTING

For the purposes of the present motion, the following facts—drawn from the complaint, documents incorporated by reference therein, Securities Exchange Commission ("SEC") public disclosure documents, and documents known to the plaintiffs and upon which they relied in bringing this action[1]—are taken as true.

### A. Background

Lead Plaintiffs Lawrence F. Glaser and Chen Kuang seek to represent the class of persons who purchased The9's American Depositary Shares ("ADS") and options during the Class Period, November 15, 2006, through July 15, 2009. (Compl. ¶¶ 15, 23.) Defendant The9, incorporated in the Cayman Islands with its principal place of operations in China, operates multiplayer online video games[2] in China. (*Id*. ¶ 16; Def.'s Mem. at 3.) The9's stock trades as ADS on NASDAQ. (Compl. ¶ 16.) As relevant to this action The9 contracts with video game developers, such as non-parties Blizzard Entertainment Inc. ("Blizzard") and Electronic Arts, Inc. ("EA"), to provide and run the networks and servers on which those developers' multiplayer online video games are played. (*See id*. ¶¶ 29, 34, 52.) Defendant Jun Zhu is a co-founder of The9, and was the company's Chief Executive Officer ("CEO") during the Class Period. (*Id*. ¶ 17(a).) Defendant Hannah Lee was The9's Chief Financial Officer ("CFO") and Vice President ("VP") from January 2004 through February 2008. (*Id*. ¶ 17(b).) Defendant Tony Tse followed as The9's CFO through June 2008. (*Id*. ¶ 17(c).) Defendant George Lai was

---

[1] *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[2] A multiplayer online video game differs from a game played solely by one individual in front of a screen in that in the former the player logs into a virtual network and then plays the game with or against other individuals also logged into the network.

The9's CFO from July 2008 through the end of the Class Period.  (*Id.* ¶¶ 1, 17(d).)

Defendant Xiaowei Chen was The9's President from May 2008 through the end of the

Class Period.  (*Id.* ¶ 17(e).)[3]

On February 3, 2004, The9 entered into a contract (the "WoW Contract") with

Blizzard's parent company, Vivendi Universal Games ("Vivendi"), to be the exclusive

operator of Vivendi's game World of Warcraft[4] ("WoW") in China.  (*Id.* ¶ 29.)  The

WoW Contract, which was amended in January 2007 to replace Vivendi with Blizzard,

was to expire on June 7, 2009.  (*Id.* ¶¶ 29-30.)  The9 launched WoW in China on June 5,

2005; and in the third quarter of 2005, The9's revenues rose 2,096% to $22.8 million.

(*Id.* ¶¶ 29, 32.)  Of that amount, The9 attributed $22.3 million to WoW.  (*Id.* ¶ 32.)  WoW

would go on to account for over 90% of The9's revenues in 2006, 2007, and 2008.  (*Id.* ¶

16.)

In March 2006, a gaming news website reported that tensions had arisen between

The9 and Blizzard over whether operation of WoW's first expansion pack, Burning

Crusade, was included in the original deal.  (*Id.* ¶ 36.)  And in April 2006, The9

contracted with NCsoft Corporation ("NCsoft") to operate NCsoft's game Guild Wars, a

competitor of WoW, in China.  (*Id.* ¶ 37.)  Later in April, a different gaming news

website reported its belief that Blizzard would "evaluate" partners other than The9 for

operation of WoW in China.  (*Id.* ¶ 38.)  Moreover, plaintiffs' Confidential Witness One

---

[3] Zhu, Lee, Tse, Lai, and Chen are collectively referred to as the "Individual Defendants."

[4] World of Warcraft is a "massively multiplayer online role-playing game," or "MMORPG."  In an
MMORPG, each player takes the role of an individual avatar and interacts with other players' avatars in,
and also interacts with, a massive virtual world.  "Expansion packs" and/or "patches," such as those
discussed in this opinion, add geography and content to the virtual world, keeping the world dynamic and
keeping players playing.  Multiplayer online games, including MMORPGs, earn revenues by requiring
players to purchase the game and also pay monthly or hourly playing fees, or both monthly and hourly fees.

("CW1")[5], a Blizzard employee in 2005 and 2006, alleges that Blizzard was displeased with The9's overall handling of WoW and that Blizzard expected WoW to generate larger revenues in China than it had.  (*Id.* ¶ 39.)  Plaintiffs claim these tensions "increas[ed] the likelihood that The9 would not renew the WoW Contract when it was set to expire in June 2009."  (*Id.*)

## B.  The Class Period

### 1.  Alleged Misstatements and Omissions During the Class Period

The Class Period begins on November 15, 2006 and ends on July 15, 2009.  (*Id.* ¶¶ 1, 43.)  Plaintiffs allege that defendants, specifically Zhu and Chen, made fraudulently misleading statements during that period that fall generally into three categories.  The first category consists of statements allegedly indicating defendants' beliefs that renewal of the WoW Contract was likely.  The second is made up of statements allegedly representing either that The9's relationship with Blizzard was good, or that that relationship had not deteriorated as indicated by various online rumors.  The last category consists of statements to the effect that The9's prospects for growth were optimistic.

On November 16, The9 released its third quarter 2006 financial results and held a conference call.  (*Id.* ¶¶ 43-44.)  Before the call, The9's Investor Relations ("IR") Manager, stated:

> Before we start I would like to read you the Safe Harbor statement. During the course of today's call certain projections or forward looking statements may be made regarding The9's future financial performance or future events.  We wish to caution you that such statements or predictions are based on current information and expectations and actual results may differ materially from those projected in the forward looking statements.

---

[5] Plaintiffs complaint details allegations of four confidential witnesses.  These witnesses are hereinafter referred to as CW<number>.

> We would also like to refer you to documents that the Company has filed
> with the [SEC].  These documents contain additional information
> concerning factors that could cause actual results to differ materially from
> those contained in the management's projections or forward looking
> statements.

(Kutcher Decl. Ex. 23 at 2 (this passage, stated as above, is hereinafter referred to as

"The9's Conference Call Safe Harbor Statement").)

During the November 16, 2006 call, an analyst asked Zhu when Zhu expected

Burning Crusade—the WoW expansion pack—to launch in China and whether The9 and

Blizzard had had any "new negotiations" regarding Burning Crusade.  (Compl. ¶ 44.)

Zhu replied that the companies had "always believed that Burning Crusade is part of our

original licensing agreement," and that "[d]uring the four years of exclusive license

there's no possibility that a company other than The9 can operate Burning Crusade in

China."  (*Id*.)  Zhu went on to say that The9 and Blizzard were "active in discussion"

concerning "the marketing arrangement and the timetable for the Burning Crusade in

China," and that "we'll continue to communicate with them in the coming two and a half

years."  (*Id*.)  Plaintiff alleges those statements were false and misleading because they

misrepresented or failed to disclose that

> (i) there were tensions between The9 and Blizzard . . . ; (ii) there was a
> significant undisclosed risk that The9 would not be able to renew the
> WoW Contract . . . ; (iii) the Individual Defendants and other Company
> insiders understood that there was likely a finite amount of time to
> financially benefit from WoW; and (iv) the Individual Defendants and
> other Company executives engaged in a scheme to personally benefit from
> WoW before the expiration of the WoW Contract.

(*Id*. ¶ 45.)  The9's ADS increased from $4.92 to $28.36, a twenty-one percent rise, on

November 16.  (*Id*. ¶ 47.)  At the same time, Incsight, Ltd. ("Incsight"), a company

owned by Zhu sold 86,499 shares of The9 for about $2.37 million between November 15

and November 24, 2006, at an average price of approximately $27.42 per share.  (*Id*. ¶¶ 17(a), 48, 148.)

Despite alleged appearances, however, according to CW4, a former executive at The9, "Zhu told Company executives in early 2007 that he viewed it as very unlikely if not impossible for The9 to be able to renew the WoW Contract."  (*Id*. ¶ 40.)  CW4 also claims that "Zhu understood that The9's relationship with Blizzard had been 'ruined' by early 2007."  (*Id*.)  In addition on May 21, 2007, EA, a competitor to Blizzard in the video game development industry, purchased 15% of The9's shares for $167 million. (*Id*. ¶ 52.)  EA also granted The9 the exclusive right to publish one of EA's games, FIFA Online, a multiplayer online soccer video game, in China.  (*Id*.)  CW2, a licensing manager at Blizzard during this period, alleges that "'loyalty' was important for Blizzard and the investment by EA in The9 would have been viewed as The9 not being loyal to Blizzard."  (*Id*. ¶ 53.)

Zhu addressed the EA investment, among other issues, on a May 22, 2007 conference call announcing The9's first quarter 2007 earnings.  As with the November 16, 2006 call, the IR Manager stated The9's Conference Call Safe Harbor Statement at the start of the May 22, 2007 call.  (Kutcher Decl. Ex. 25 at 1-2.)  Later on the call Zhu stated, "we believe The9 is well positioned for sustainable growth."  (Compl. ¶ 56.)  Zhu also denied that EA's investment would "have any impact on our relationship with Blizzard" because the companies' games were focused on different genres.  (*Id*. ¶ 57.) Finally, to an analyst's question about the possibility of extending the WoW Contract past June 2009, Zhu said, "the relationship between [Blizzard and The9 is] very good, but currently we haven't talked about things beyond '09."  (*Id*. ¶ 59.)  The9's ADS increased

$4.76, or 12%, to $44.23 on May 22.  (*See id.* ¶ 62.)  The ADS reached a Class-Period high of $51.97 on July 13, 2007.  (*Id.* ¶ 64.)  Despite the alleged additional misstatements detailed below, however, the ADS' price declined, at first dramatically and then steadily, through the end of the Class Period, July 15, 2009.  The9's ADS traded in the mid-$45 range in August 2007; in the $30s in October 2007; at $25 by the end of November 2007; around $20 in January and February 2008; near $25 in May 2008; around $18 and $19 in August and September 2008; at $13 in April 2009 before Blizzard announced that it would not renew the WoW contract with The9; at $10 directly after that announcement; and at $8.68 at the Class Period's close in July 2009.  (*Id.* ¶¶ 65, 75, 83, 85, 90, 97, 106, 110, 157, 159.)

On June 28, 2007, The9 filed its Form 20-F[6] for the fiscal year ending December 31, 2006, with the SEC.  The9 Limited, Annual Report (Form 20-F) (June 28, 2007) (hereinafter the "Fiscal 2006 20-F"); (*see also* Kutcher Decl. Ex. 4.)  Therein under "Risk Factors" The9 noted (1) its "limited relevant operating history," which makes it "difficult to evaluate our prospective business," (The9 had formed in 2000 and only launched its first MMORPG in February 2003); and (2) the "potential failure[s]" to "successfully launch and operate new online games licensed to us," or to "license . . . additional online games."  In addition, specifically concerning risk factors related to WoW, the Fiscal 2006 20-F stated

> If we are unable to maintain a satisfactory relationship with Blizzard or
> any other online game developer that has licensed a game to us, or if
> Blizzard or any of our other online game licensors either establishes
> similar or more favorable relationships with our competitors in violation
> of its contractual arrangements with us or otherwise, our operating results
> and our business would be harmed, because our business depends

---

[6] The SEC's Form 20-F is, essentially, the equivalent of a domestic company's Form 10-K—an annual report summarizing a public company's performance—filed by foreign issuers.

> significantly upon our exclusive licenses to operate WoW . . . . [W]e
> cannot assure you that Blizzard or any of our other online game licensors
> will renew its license agreement with us . . . . Any deterioration of our
> relationship with Blizzard or any of our other online game licensors could
> harm our future results of operations or the growth of our business.

Fiscal 2006 20-F at 9.

On August 3, 2007, reports again surfaced of rumors on gaming websites concerning tensions between Blizzard and The9. (Compl. ¶ 67.) According to the news articles, however, Blizzard and The9 jointly announced that "'[t]he media reports of disagreements between The9 and [Blizzard] are groundless, . . . [Blizzard] and The9's cooperation has been smooth and friendly.'" (*Id.* ¶ 68 (quoting the article quoting the joint announcement).) Then on August 29, The9 released its second quarter 2007 financial information and an accompanying press release, stating, "with all the [] high-caliber games to be launched in the future, we are confident that The9 will continuously capitalize on its unparalleled game portfolio so as to achieve long-term sustainable growth." (*Id.* ¶ 71.) The August 29 press release contained a safe harbor statement similar to those stated at the start of the conference calls, but which also specifically included that "forward-looking statements can be identified by terminology such as 'will,' 'expects,' 'anticipates,' 'future,' 'intends,' 'plans,' 'believes,' 'estimates' and similar statements." (Kutcher Decl. Ex. 14 at 11.) The safe harbor provision went on:

> A number of important factors could cause actual results to differ
> materially from those contained in any forward-looking statement.
> Potential risks and uncertainties include, but are not limited to, The9's
> limited operating history as an online game operator, political and
> economic policies of the Chinese government, the laws and regulations
> governing the online game industry, information disseminated over the
> Internet and Internet content provides in China, intensified government
> regulation of Internet cafes, The9's ability to retain existing players and
> attract new players, license, develop or acquire additional online games
> that are appealing to users, anticipate and adapt to changing consumer

preferences and respond to competitive market conditions, and other risks and uncertainties outlined in The9's filings with the [SEC].

(*Id.* (this passage, stated as above, is hereinafter referred to as "The9's SEC Filing Safe Harbor Statement").)

The9 launched the WoW expansion pack, Burning Crusade, in September 2007. (Compl. ¶ 75.)  Then on November 16, 2007, The9 released its third quarter 2007 financial results and held a conference call.  Like the November 16, 2006, and May 22, 2007 calls, this call began with the IR Manager reading The9's Conference Call Safe Harbor Statement.  (Kutcher Decl. Ex. 26 at 1.)  Later in the call, Zhu responded to an analyst's question about extending the WoW Contract.  Zhu said, "after [Burning Crusade] was launched we started discussions with [Blizzard] regarding the renewal of the contract as you mentioned.  But so far we don't have any comment.  But we are very confident to eventually renew the contract of WOW with Blizzard."  (Compl. ¶ 77; Kutcher Decl. Ex. 26 at 7.)

Lee resigned as The9's CFO on January 18, 2008, and was replaced by Tse. (Compl. ¶¶ 17(c), 85.)  On February 22, 2008, The9 released its fourth quarter 2007 financial results and held a conference call.  As with the prior conference calls, the IR Manager read The9's Conference Call Safe Harbor Statement.  (Kutcher Decl. Ex. 27 at 2.)  Later, in response to an analyst's questions regarding license renewal, Zhu stated, "WoW has been in very strong growth during the past few years and also we are always in very good [sic] relationship with Blizzard. . . . So I was very confident that we believe that we can renew the contract in '09."  (Compl. ¶ 88.)  Then, when The9 held a conference call to release its first quarter 2008 financial results on May 20, 2008, also preceded by a reading of The9's Conference Call Safe Harbor Statement, an analyst again

asked about developments in renewal negotiations.  (Kutcher Decl. Ex. 28 at 1-2, 13.)

The9's President, defendant Chen, answered, "our current license will expire in June

2009 and we have been in very close discussions with Blizzard and Blizzard's

headquarters, about extension of the license.  This is all I can tell you.  That the

discussions are ongoing and very intense and that's all I can tell you."  (Compl. ¶ 94.)

      Tse resigned as The9's CFO on June 7, 2008, and was replaced by Lai.  (*Id*. ¶ 98.)

Then on June 30, 2008, The9 filed its Form 20-F for the fiscal year ending December 31,

2007.  The9 Limited, Annual Report (Form 20-F) (June 30, 2008) (hereinafter the "Fiscal

2007 20-F"); (*see also* Kutcher Decl. Ex. 5.)  In highlighting risks similar to those

mentioned in the Fiscal 2006 20-F, the document stated,

> [the WoW Contract] will expire on June 7, 2009.  Since the launch of
> WoW in June 2005, we have derived substantially all of our revenues
> from WoW.  If we are unable to renew this license . . . our future results of
> operations will be materially adversely affected.  We intend to vigorously
> pursue negotiations for the renewal of the WoW license, which
> negotiations are currently underway.

Fiscal 2007 20-F at 6.  The form went on to detail the risk presented by potential

deterioration of The9's relationship with Blizzard, previously mentioned in the Fiscal

2006 20-F.  Fiscal 2007 20-F at 6-7.

      On August 8, 2008, The9 released its second quarter 2008 financial results, and

held a conference call, again preceded by The9's Conference Call Safe Harbor Statement.

(Kutcher Decl. Ex. 28 at 2.)  In response to an analyst's question on renewal negotiations,

Chen stated, "we at The9 have been in very active discussions with Blizzard . . . and

we're continuing our negotiations and we hope that we will have results very soon.  At

this point, I cannot release any details, but let me just say that we are in very active

discussion."  (Compl. ¶ 102.)  Chen also discussed The9's relationship with Blizzard,

saying, "EA's shareholding in The9 does not present a threat or negative conflict of interest to our renewing the license. . . . [And] one thing that's very good that's coming out of the discussions is how we can strengthen our communications between The9 and Blizzard." (*Id.*)  Chen concluded, "we're very positive and optimistic about WoW's continuing performance and growth in China." (*Id.*)

Though apparently negotiating with The9 about renewal of the WoW Contract, on August 12, 2008, Blizzard announced that it had agreed to license three different games to NetEase.com, Inc. ("NetEase"), a competitor of The9. (*Id.* ¶ 105.)  The next day, Bosma sold an additional 500,000 shares of The9 for approximately $11.3 million. (*Id.* ¶ 107.)  Thereafter, more rumors appeared that Blizzard would not renew the WoW Contract with The9. (*Id.* ¶ 108.)  The9 responded by press release on September 5, 2008, stating, "The9 is currently in contract negotiations regarding [WoW's] future operations in China.  Recently there have been rumors that surfaced regarding the contract negotiations.  These rumors are completely unfounded.  The9 encourages all parties to refrain from believing in such rumors.  The9 is actively conducting the contract extension negotiations." (*Id.*)  The press release concluded with The9's SEC Filing Safe Harbor Statement. (Kutcher Decl. Ex. 20 at 1.)  Then on November 18, 2008, The9 released its third quarter 2008 financials and held a conference call, again at the start of which the IR Manager read The9's Conference Call Safe Harbor Statement. (Compl. ¶ 114; Kutcher Decl. Ex. 30 at 1-2.)  On the WoW Contract's renewal, Chen stated, "we have been conducting the talks with Blizzard since actually May this year. . . . [W]e have no comment on the timing as well as the key issues under discussion." (Compl. ¶ 114.)  Finally, on January 15, 2009, Chen was interviewed at a gaming convention. (*Id.* ¶ 119.)

Chen was asked, "How do you see the cooperation between Blizzard and NetEase?  How will The9 doing [sic] with World of Warcraft?"  (*Id.*)  He answered,

> The cooperation between Blizzard and NetEase is a natural outcome, which is also a normal business deal.  I wish them get [sic] better and better.  If we had not licensed WoW, The9 would be a company without WoW.  The renewal of license [sic] will be in this June.  Because we have to wait until the contract due [sic] to renew it.  We are not in a hurry now.

(*Id.*)

On February 23, 2009, The9 released its fourth quarter 2008 and fiscal year 2008 financial results.  (*Id.* ¶ 124.)  The press release, which contained The9's SEC Filing Safe Harbor Statement, indicated that gross profits had increased thirty-five percent and net income forty-five percent from 2007, and attributed those increases to WoW revenues.  (*Id.*; Kutcher Decl. Ex. 20 at 11.)  Plaintiffs contend that, in addition to being false and misleading for disclosing neither the tensions between Blizzard and The9 nor The9's management's alleged belief the company would be unable to renew the license, the financial results were false and misleading because The9 had "massive write-offs for FY08" when the non-renewal of the WoW Contract was eventually announced.  (Compl. ¶ 125.)  The9 held a conference call to discuss the fourth quarter 2008 financials on February 24.  (*Id.* ¶ 126.)  After the IR Manager read The9's Conference Call Safe Harbor Statement, Chen responded to questions on WoW Contract renewal negotiations, on when The9 would launch WoW's second expansion pack, Wrath of the Lich King ("WLK"), and on related marketing efforts.  (Kutcher Decl. Ex. 31 at 2, 6, 10.)  Chen stated,

> [W]e cannot disclose any detail regarding that ongoing negotiation of renewal. . . . We are actively preparing for the localization of [WLK] and the material has already been submitted for authorities' review.  At this point we're working very actively to make every preparation possible

12

> from content to technical and we hope to launch it as soon as
> possible. . . . We're now actively preparing for its launch in
> China. . . . [But] I cannot principally agree . . . that it looks like we're
> launching [WLK] in Q2.  The launch date of [WLK] has not been
> determined yet at this point. . . . We think that the key thing actually to
> attract new users for [] [WLK] . . . is not necessarily just advertisement but
> actually providing access to players.

(Compl. ¶¶ 126-127.)

After leaving Blizzard in 2006, CW1 became an investment consultant specializing in the video game industry.  (*Id.* ¶ 39.)  According to him, "it was widely believed" by February 2009 "that Blizzard would not renew the WoW Contract with The9," but would instead license the game to NetEase, despite Chen's statements apparently to the contrary.  (*Id.* ¶ 122.)  Supporting this allegation is the report of CW3, a "Customer Service Training Manager" at Blizzard, that Blizzard began training NetEase personnel in WoW customer service in March 2009.  (*Id.* ¶ 123.)  CW3 claims that "The9 would have known these facts."  (*Id.*)  Then on April 15, "unofficial reports emerged" that Blizzard had decided to license WoW to NetEase following the termination of The9's license.  (*Id.* ¶ 129.)  On April 16, Blizzard and NetEase issued a joint announcement to the same effect.  (*Id.* ¶ 131.)  The9 issued a separate statement with the same information also on April 16.  (*Id.*)  Over April 15 and 16, The9's ADS price fell from $13.22 on April 14 to $8.95 at the end of trading on April 16.  (*Id.* ¶¶ 130, 132, 134.)

On July 1, 2009, The9 filed a Form 6-K reporting that "as a result of the non-renewal of the [WoW Contract], as well as [other factors] . . . [The9] will record impairment and certain other charges in its financial statements for the year ended December 31, 2008."  (*Id.* ¶ 137.)  The filing indicated that net income would be between

fifty-five percent and seventy-five percent lower than as stated in the February 2009

financial results report.  (*Id.*)  On July 15, The9 filed it Form 20-F for the fiscal year

ended December 31, 2008, which noted a seventy-two percent decrease in revenues

between 2007 and 2008, several impairments and other charges to its 2008 financial

statements, and concluded,

> [t]hrough end [sic] of March 2009, [The9] and Blizzard were conducting
> ongoing negotiations, which formally commenced in April 2008 with
> respect to [The9] continuing to operate WoW in mainland China.  On
> April 16, 2009, [The9] learned that WoW [sic] license would be licensed
> to another China-based online game company, [sic] [The9] believed that
> an agreement by which [The9] would continue to operate WoW beyond
> the expiration of the then existing license was imminent. [sic]

(*Id.* ¶¶ 138-142.)

This filing marks the end of the Class Period.  Between July 1 and July 15, The9's

ADS price fell from $10.15 to $8.68.  (*Id.* ¶ 142.)  Plaintiffs claim that (1) defendants'

misstatements and omissions caused The9's ADS price to be inflated during the Class

Period; and (2) the disclosures starting with Lee's resignation and ending with the report

of alterations of the 2008 financial reports caused that price to fall from $21.76 on

January 18, 2008, to $8.68 on July 16, 2009.  (*Id.* ¶¶ 154-159.)

### 2. Allegations Supporting Scienter

Plaintiffs allege that during the Class Period, The9 and the Individual Defendants

engaged in several fraudulent, illegal, or otherwise "shady" (*Id.* ¶ 152(c)) transactions.

Plaintiffs claim that since defendants knew or recklessly disregarded that The9 would not

be able to renew the WoW Contract, and that The9 and Blizzard were not on amicable

terms, these transactions support an inference that The9's management acted with scienter.

Plaintiffs first point to the around $28 million in sales of The9 stock made by Incsight—which was owned by Zhu—during the Class Period.[7]  (*See id.* ¶¶ 17(a), 148.) Plaintiffs' complaint fails to provide a full picture of these sales, however, and on motion to dismiss the court may look to SEC filings to fill those gaps.  *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 n.182 (S.D.N.Y. 2006).  As of March 31, 2006, Zhu owned 6.6 million shares of The9, all of which were held by Incsight, representing 27 percent of The9's outstanding shares.  The9 Limited, Annual Report (Form 20-F) (June 30, 2006) (hereinafter the "Fiscal 2005 20-F") at 74.  One year later, as of March 31, 2007, Zhu owned slightly over 6 million shares, all but 7 thousand held by Incsight, representing 20.5 percent of The9's outstanding shares.  *See* Fiscal 2006 20-F at 78.  Zhu's holdings did not change between March 31, 2007 and March 31, 2008.  Fiscal 2007 20-F at 66-67.  As of May 31, 2009, however, Zhu's ownership had increased to 7 million shares, 5.85 million being held by Incsight, representing 26 percent of shares then outstanding.  *See* The9 Limited, Annual Report (Form 20-F) (July 15, 2009) (hereinafter

---

[7] Plaintiffs also allege that a company called Bosma, Ltd. ("Bosma") sold around 3 million shares for around $85 million during the class period.  (Compl. ¶ 148.)  Plaintiffs suggest that those amounts should be included in calculating Zhu's share ownership since "Incsight had a longstanding voting agreement with Bosma . . . pursuant to which Zhu exerted substantial influence over Bosma's interaction with [The9]."  (*Id.* ¶ 17(a); *see id.* ¶¶ 48, 107, 147.)  The voting agreement, however, did not give Zhu any ownership in Bosma's The9 holdings; it merely required that Bosma and Incsight "agree[] to vote their respective shares to ensure that [The9's] board of directors consists of: (i) one director designated by Incsight, so long as it holds 5% or more of [The9's] total outstanding shares, which initially shall be [Zhu]; (ii) one director designated by Bosma, so long as it holds 5% more of [The9's] total outstanding shares, which initially shall be Stephen Law; (iii) two individuals mutually acceptable to Incsight and Bosma, but who are not otherwise affiliated with either of them, [The9], or any of [The9's] shareholders; and (iv) an additional individual who is not affiliated with either Incsight, Bosma, [The9], or any of [The9's] shareholders."  Fiscal 2006 20-F at 77.  Because the agreement concerned only voting for The9's board of directors, and did not involve beneficial ownership of shares at all, the Court does not include Bosma's holdings or ADS transactions in Zhu's.

the "Fiscal 2008 20-F") at 66-67.[8]  Thus though Incsight's holdings decreased by a net of

about 750,000 shares during the Class Period, Zhu's share ownership actually increased

by 400,000 shares during the Period.  Finally, between November 2007 and June 2009,

The9 itself repurchased approximately 4.3 million shares of its stock for approximately

$72 million.  Fiscal 2008 20-F at 29.

Plaintiffs also point to around $12 million in sales made by The9's directors and

management between December 2006 and September 2008.  (*See* Compl. ¶ 148.)  These

sales include $3 million by defendant Lee between that December 2006 and March 2008.

(*See id*.)  Lee's sales were made pursuant SEC Rule 10b5-1(c)[9] and disclosed to the SEC

on Form 144s.  (Kutcher Decl. Exs. 35-43; Def.'s Mem. at 16 n.15.)  Other than Lee, no

individual defendant named in this action is alleged to have sold any shares during the

class period.

Defendants also allegedly benefitted from certain manipulations of The9's stock

structure and policies.  On November 20, 2008, The9's board of directors increased the

total shares available for option purchase rights from 2.5 million to 4.5 million.  (*Id*. ¶

149.)  Then on January 8, 2009, The9 adopted a shareholder rights plan under which

shareholders would be entitled to purchase, essentially, two shares for the price of one

should an outside entity acquire fifteen-percent or more of The9's voting securities (the

---

[8] Incsight's last alleged sale occurred on September 18, 2008.  (Compl. ¶ 148.)  And Zhu is not alleged to have made any sales in his own name.  Thus Zhu's ownership did not decrease between May 31, 2009, when he owned 7 million shares, and July 15, 2009, the end of the Class Period.

[9] Rule 10b5-1(c) allows, *inter alia*, corporate insiders to trade otherwise restricted securities if the trader can demonstrate that material inside information known to him or her was not a factor in the trading decision.  *See* Exchange Act Release No. 34-43154, at *23-24.  This might be the case if, for example, before becoming aware of the information, the trader had adopted a written plan for trading in the security. 17 C.F.R. § 240.10b5-1(c)(1)(i)(A)(3).  As relevant to this opinion, prior to her Rule 10b5-1(c) trades, Lee would have had to "propose" those trades to the SEC on a Form 144.  *See* United States Securities and Exchange Commission, *Rule 144: Selling Restricted and Control Securities*, http://www.sec.gov/investor/pubs/rule144.htm.

"Poison Pill").  (*Id.* ¶ 117.)  Plaintiffs allege that The9 "enacted the rights plan to prevent

a third-party from acquiring control of [The9] in the event its shares plunged after the

market learned that the [The9] would not be renewing the WoW Contract."  (*Id.* ¶ 118.)

Finally, on January 21, 2009, The9 declared a cash dividend, to be paid on February 9, of

$1.11 per share.  (*Id.* ¶¶ 121, 151.)

     Plaintiffs also contend that defendants benefitted from certain "related party

transactions with [The9]."  (*Id.* ¶ 152.)  These transactions, described only in vague terms

in the complaint, include (1) Zhu receiving $8 million in kickbacks from purchases of

computer equipment from Hewlett-Packard Company; (2) The9 executives receiving

"substantial financial benefits" from a written-off investment in a Korean game

development company, Ideas; (3) The9 acquiring twelve percent of another Korean game

development company, G10; (4) The9 jointly operating its online video games, including

WoW, with a separate company partly owned by Zhu, Shanghai IT; (5) a The9 subsidiary

granting Zhu and certain employees of the subsidiary stock options; (6) The9 granting

Incsight equity warrants; and (7) The9 loaning $1.65 million to other "employees" to

establish their own game development companies.  (*Id.* ¶ 152(a)-(g).)


## II.  DISCUSSION

### A.  Standard for Rule 12(b)(6)

     To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough

facts to state a claim to relief that is plausible on its face."  *Starr v. Sony BMG Music

Entertainment*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Bell Atlantic Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). If the factual averments permit no reasonable inference stronger than the "mere possibility of misconduct," the complaint should be dismissed. *Starr*, 592 F.3d at 321 (quoting *Iqbal*, 129 S. Ct. at 1950). Thus, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557). In applying this standard of facial plausibility, the Court accepts all factual allegations as true, but it does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Id.* On a motion to dismiss, the Court may properly consider documents referenced in or integral to the complaint, as well as public filings with the SEC. *In re IAC/Interactivecorp*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007).

### B.  Section 10(b) and Rule 10b-5 Claims

#### 1.  Scienter Requirement

"To state a claim under § 10(b) and Rule 10b-5, 'a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. American Express Co.*, 724 F. Supp. 2d 447, 458 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007)). Plaintiffs must also "satisfy the heightened pleading standard of Fed. R. Civ.

P. 9(b), which requires that 'the circumstances constituting fraud . . . be stated with particularity.'" *Id*. (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).  "Thus '[a] plaintiff cannot base securities fraud claims on speculation and conclusory allegations.'"  *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 297 (S.D.N.Y. 2010) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).

In addition to Rule 9(b), plaintiffs must also satisfy the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").  *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  "In order to plead scienter adequately under the PSLRA, a plaintiff must plead 'with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind.'"  *Id*. at 198 (emphasis in original).  For Section 10(b) and Rule 10b-5 claims, "the required state of mind is 'a mental state embracing intent to deceive, manipulate, or defraud.'"  *Fort Worth Employers' Retirement Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 225 (S.D.N.Y. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)).  "[T]o qualify as a 'strong inference,' the inference of scienter must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"  *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 314).  "In determining whether this inference can be reasonably drawn, courts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged."  *Id*.  Thus, the court "must assess 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation,

meets that standard.'"  *Local No. 38*, 724 F. Supp. 2d at 458 (quoting *Tellabs*, 551 U.S. at

323).  "Moreover, the facts alleged must support an inference of an intent to defraud the

plaintiffs rather than some other group."  *ECA*, 553 F.3d at 198 (citing *Kalnit*, 264 F.3d at

140-41)).  In the Second Circuit, "[t]he requisite scienter can be established by alleging

facts to show either (1) that defendants had the motive and opportunity to commit fraud,

or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.*; *In

re MRU Holdings Sec. Litig.*, ___ F. Supp. 2d___, 2011 WL 650792, at *12 (S.D.N.Y.

Feb. 17, 2011).

### a.  Motive and Opportunity

To satisfy "motive and opportunity," plaintiffs must allege that defendants

"benefitted in some concrete and personal way from the purported fraud."  *ECA*, 553

F.3d at 198.  Motives "common to most corporate officers, such as the desire for the

corporation to appear profitable and the desire to keep stock prices high to increase

officer compensation, do not constitute 'motive' for the purposes of this inquiry."[10]  *Id.*

Instead, "[s]ufficient motive allegations must entail concrete benefits that could be

realized by one or more of the false statements and wrongful nondisclosures alleged."  *In

re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557 (S.D.N.Y. 2010).  Plaintiffs must

allege a "unique connection between the fraud and the [benefit]."  *ECA*, 553 F.3d at 201

n.6.  In other words, the particular fraud alleged must specifically enable the schemes or

business plans plaintiffs contend conferred concrete and personal benefits on the

defendants.  *Compare ECA*, 553 F.3d at 201 (finding no motive when, *inter alia*, alleged

---

[10] "Opportunity," which generally requires that defendants had access to inside corporate information, *see Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 86 (2d Cir. 1999), is not contested in this case.

misstatements, which plaintiffs contended were meant to inflate stock price to make

eventual acquisition of a target company easier, occurred several years prior to the

acquisition and therefore could not reasonably be said to contribute to the ease of that

acquisition), *with In re SLM*, 740 F. Supp. 2d at 557-58 (finding motive when imminent

merger would have been "torpedoed," costing company $2 billion and individual

defendant $225 million, if stock price were to drop below a certain level, and when fraud

allegedly kept stock price above that particular level).  In addition, as with the other

scienter pleading requirements, "mere conclusory allegations" connecting fraud to

benefits for purposes of motive are insufficient.  *Biovail Corp.*, 615 F. Supp. 2d at 225.

"[M]otive can be shown, however, 'when corporate insiders allegedly make a

misrepresentation in order to sell their own shares at a profit.'"  *In re Citigroup Inc. Sec.

Litig*., ___ F. Supp. 2d ___, 2010 WL 4484650, at *22 (S.D.N.Y. Nov. 9, 2010) (quoting

*ECA*, 553 F.3d at 198).  "However, the mere fact that insider stock sales occurred does

not suffice . . . , [instead][p]laintiffs must establish that the sales were 'unusual' or

'suspicious.'"  *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270

(S.D.N.Y. 2009) (internal quotation marks and citation omitted).  Whether trading was

unusual or suspicious turns on factors including (1) the amount of net profits realized

from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider

defendants' sales; (4) the number of insider defendants selling; (5) whether sales occurred

soon after statements defendants are alleged to know to be misleading; (6) whether sales

occurred shortly before corrective disclosures or materialization of the alleged risk; and

(7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans.  *See In

re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001); *In re SLM*, 740 F.

Supp. 2d at 557-58; *In re Gildan Activewear*, 636 F. Supp. 2d at 270-72; *In re AXIS Capital Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 596 (S.D.N.Y. 2006). Plaintiffs must allege not only the insider defendants' selling activity during the relevant period, but also those defendants' *net profits* as opposed to *gross proceeds*, as well as overall percentage changes in defendants' holdings. *See In re eSpeed*, 457 F. Supp. 2d at 290 ("The Complaint also omits necessary information concerning (1) the percentage increase in each defendants' holdings during the class period; and (2) the profit from defendants' sales. In particular, plaintiffs plead that Amaitis and Noviello realized 'gross proceeds' of $2.8 million, but the Complaint does not disclose whether either made any *profit* from the sales."). When a complaint alleges only "incomplete information" concerning insider sales, the court is "free to consider" defendants' SEC filings to fill gaps on motion to dismiss. *Id*. at 290 n.182.

### b.  Strong Circumstantial Evidence

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *In re Citigroup*, 2010 WL 4484650, at *22. Under this theory, "a plaintiff must show that the defendant's conduct is at the least[] conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Gissin v. Endres*, 739 F. Supp. 2d 488, 503 (S.D.N.Y. 2010) (internal quotation marks omitted).

For purposes of this action plaintiffs must "specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements." *Id*.[11]  Plaintiffs "must *specifically identify* the reports or statements that are contradictory to the statements made," or must "provide specific instances in which Defendants received information that was contrary to their public declarations."  *Plumbers & Steamfitters*, 694 F. Supp. 2d at 299 (emphasis in original) (internal quotation marks omitted).  The allegations must show both "(1) *specific* contradictory information [that] was available to the defendants (2) *at the same time* they made their misleading statements."  *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (emphasis in original).  Thus, "broad reference to raw data," and "generalized forecasting and speculation" in the media is insufficient.  *Plumbers & Steamfitters*, 694 F. Supp. 2d at 299, 300 ("[a]lthough a plaintiff may use [news articles] in pleadings, 'the news articles cited still must indicate particularized facts about a defendant's conduct.'" (quoting *Miller v. Lazard, Ltd*., 473 F. Supp. 2d 571, 585 (S.D.N.Y. 2007))).  Likewise, allegations that "information was the sort of [data]" that "would have been reviewed by the Individual Defendants are too speculative to give rise to a strong inference of scienter."  *Local No. 38*, 724 F. Supp. 2d at 462 (stating that such "bland assertions . . . offer nothing concrete and are not allegations of fact"); *see also In re PXRE*, 600 F. Supp. 2d at 538 ("Here, Plaintiff argues that the individual Defendants *must have known* of Matusiak's concerns, due to their positions in PXRE, and due to PXRE's 'intimate corporate culture.'  The Court finds that such allegations fail to support an inference that Defendants knew, or had access to, Matusiak's concerns." (emphasis in

---

[11] A plaintiff may also allege that defendants engaged in deliberate misconduct, *see In re Citigroup*, 2010 WL 4484650, at *22, or that "defendants failed to check information they had a duty to monitor," *Gissin*, 739 F. Supp. 2d at 503; but plaintiffs here make no such allegations or arguments.

original)).  Finally, plaintiffs cannot rely on information generally known or available to the public to support to support circumstantial scienter allegations.  *See In re Security Capital Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 595-96 (S.D.N.Y. 2010) ("Any allegation that Defendants' statements and omissions were made recklessly because Defendants were aware of the housing market crisis fails . . . . Plaintiffs were just as aware of the housing market crisis as they allege Defendants were, but they did not act on that information to sell their stock as the price declined.")

On the other hand, actual identification of reports or other documents indicating defendants' recklessness as to their public statements' truth or falsity suggests an inference of scienter strong enough to survive motion to dismiss.  *See, e.g.*, *In re Citigroup*, 2010 WL 4484650, at *26 (strong inference of scienter satisfied when, *inter alia*, plaintiffs identified a specific "March 2007 report from Citigroup's quantitative credit strategy and analysis group allegedly describ[ing] the risks the subprime meltdown posed to the holders of CDO super senior tranches."); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 481-82 (S.D.N.Y. 2010) (finding scienter when the complaint "identifie[d] specific reports or documents that would have indicated that The Officers' public statements regarding the wells and Canadian Superior's inability to meets its financial obligations beginning late 2008 were inaccurate.").  Alternatively, a plaintiff may highlight inconsistencies between defendants' corporate activity and alleged misstatements.  *See In re Citigroup*, 2010 WL 4484650, at *26-27 ("the Complaint details a number of actions Citigroup took that indicate awareness of the CDO risk. . . . [Plaintiffs'] claims concern a series of statements denying or diminishing Citigroup's CDO-exposure and the risks associated with it. . . . This incongruity between word and

deed establishes a strong inference of scienter.").  But consistency between defendants'
corporate activities and public statements will cut against the inference of scienter.  *See
In re Security Capital Assurance*, 729 F. Supp. 2d at 596 (finding inference of fraudulent
intent undermined when complaint alleged that insider defendants were taken by surprise
by financial analysts' inquiries into subject matter of alleged misstatements and thereafter
conducted extensive investigations into the truth of those statements; i.e., surprise that
statements might be misleading combined with investigations into the truth of those
statements created inference that defendants did not believe the statements to be false
when made).

Plaintiffs may also buttress an argument for strong circumstantial evidence with
information obtained from confidential sources.  *See Local No. 38*, 724 F. Supp. 2d at
455-56 (doing so); *In re PXRE*, 600 F. Supp. 2d at 526 (same).[12]  For a court to credit
such information, confidential sources must be "described in the complaint with
sufficient particularity to support the probability that a person in the position occupied by
the source would possess the information alleged."  *Novak*, 216 F.3d at 314.  Thus a
neurologist who tested and was "intimately involved" with a company's key drug is not

---

[12] It appears that a split exists in this District as to whether the use of confidential witnesses to plead
securities fraud cases remains viable following the Supreme Court's decision in *Tellabs*.  *Compare In re
MRU*, 2011 WL 650792, at *14 (Berman, J.) ("Plaintiff's reliance on 'confidential witnesses' . . . 'must be
discounted' because '[i]t is hard to see how information from anonymous sources could be deemed
compelling or how [the Court] could take account of plausible opposing inferences.  Perhaps these
confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist.'"
(alterations in original) (citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007)
(citing *Tellabs*, 551 U.S. at 314))), *with In re PXRE*, 600 F. Supp. 2d at 526 (Sullivan, J.) (quoting
*Higginbotham*, but stating, "[t]he Court declines to follow this approach absent guidance from the Second
Circuit, and will continue to consider allegations based on information provided by confidential sources
without discounting those allegations due *solely* to the anonymity of the information's source," and
collecting cases).  Because the Court determines here that, even after reviewing the confidential witness
allegations plaintiffs fail to adequately plead scienter, it need not take a side on the issue.  Nevertheless, it
seems prudent to wait for instruction from the Second Circuit before fully discounting all confidential
witness allegations—allegations which the Circuit has explicitly allowed the use of since at least its
decision in *Novak* in 2000.

described sufficiently so that his allegations support an inference of scienter on behalf of the company's management because the descriptive allegations say nothing as to whether the neurologist actually communicated with management or what management's reaction to the neurologist's information was. *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 203, 220 (S.D.N.Y. 2008); *see also Local No. 38*, 724 F. Supp. 2d at 460 (discounting confidential sources "employed in rank-and-file positions . . . [who] had no contact with the Individual Defendants."); *Feasby v. Industri-Matematik Int'l Corp.*, 99 Civ. 8761, 2003 WL 22976327, at *4 (S.D.N.Y. Dec. 19, 2003) (discounting scienter allegations of "former employees" of software developer because "nowhere [] does the Complaint describe the position held by or work assignments of the former employee or consultant sources, or any other information that would support an inference that the sources would possess the information attributed to them.")  Indeed, even confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants claimed against in the case, or else that the witness was privy to the individual defendants' knowledge. *See In re Doral Financial Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (discounting "former Doral interal auditor['s]" statement "that he personally attended [Doral] Audit Committee meetings where representatives from defendant PwC were in attendance and the reports of Internal Audit Department [which raised questions about the sufficiency of Doral's internal control] were discussed," as "so vague as to be meaningless" because the Doral auditor did not identify the PwC representatives' positions, when the meetings occurred, or how the reports were discussed), *aff'd*, 344 F. App'x 717 (2d Cir. 2009); *In re American Express Co. Sec. Litig.*, No. 02 Civ. 5533, 2008 WL 4501928, at *8

(S.D.N.Y. Sept. 26, 2008) ("Plaintiffs have also failed to allege any facts showing that the confidential sources—[several executives at American Express Financial Advisors]—had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period.").

Courts however will credit confidential source allegations, generally, in two situations.  The first is when those sources' positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations.  *See, e.g.*, *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 392 (S.D.N.Y. 2007) (vice president in charge of insurance claim adjudication was sufficiently described to make allegations as to management's awareness of inadequacies in the company's "internal data-gathering system."); *In re ECVI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 93, 97 (S.D.N.Y. 2006) (school's dean of admissions and two admissions officers are sufficiently described to speak to school president's knowledge of fraudulent admissions practices the president himself was alleged to have implemented).   Second, when "independent [adequately plead] factual allegations" corroborate a confidential source's statements, the requirement of a description of the source's job is loosened.  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 493 n.10 (S.D.N.Y. 2004) (citing *Novak*, 216 F.3d at 314); *In re Elan Corp.*, 543 F. Supp. 2d at 207 (noting "the corroborative nature of other facts" as a factor relevant to the description requirement);[13] *cf. Ladmen Partners, Inc. v.*

---

[13] In fact, *Novak* did not explicitly lower the description requirement when other facts corroborate confidential sources' allegations going to defendants' scienter.  Rather, *Novak* removed a requirement that confidential sources be *named* when corroborative facts exist.  216 F.3d at 314 ("Accordingly, where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that defendants' statements were false."). Regardless, as indicated, several courts have cited corroborating facts when crediting poorly-described confidential sources.

*Globalstar, Inc.*, No. 07 Civ. 976, 2008 WL 4449280, at *16 (S.D.N.Y. Sept. 30, 2008) (allegation "dependent on information purportedly obtained at an unspecified date from 'confidential sources'" failed because the complaint "offer[ed] no other corroborative facts.").

Two final requirements exist to credit confidential witness testimony.  First, as is obvious, confidential sources cannot be used to "merely parrot[] . . . conclusory allegations contained in the complaint."  *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007).  Second, as with all allegations going to scienter, confidential source allegations must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants "were aware" of certain information, and mere allegations that defendants "would have" or "should have" had such knowledge is insufficient.  *See Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (affirming district court's discounting of confidential source allegations because though source "confirmed that a Kmart officer or board member could obtain access to" the conflicting information, the source "had no knowledge of whether [individual defendants] actually accessed or reviewed the reports."); *Local No. 38*, 724 F. Supp. 2d at 461 ("a close examination of [the sources'] statements reveals the absence of any allegation that such data had been presented to management around the time of Defendants' allegedly misleading statements . . . [the] allegations do not establish what specific contradictory information the Individual Defendants received or when they received it."); *In re Sierra Wireless*, 482 F. Supp. 2d at 376 (discounting statements of defendant's subsidiary's founder because no allegation that he was privy to defendant's management's policies or discussions); *In*

*re Citigroup*, 2010 WL 4484650, at *33 ("Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity.").

### c.  Competing Inferences Requirement of *Tellabs*

Finally, the law is clear that whichever path plaintiffs pursue to plead scienter, plaintiffs must plead an inference of scienter that is at least as strong and compelling as "any competing inferences rationally drawn from all the facts alleged, taken collectively."  *ECA*, 553 F.3d at 198.  In other words, the pleadings must satisfy both (1) either the "motive and opportunity" or the "strong circumstantial evidence" requirement; and (2) *Tellabs*' requirement that the inference drawn from the facts is at least as compelling as any other rational inference.  *Biovail*, 615 F. Supp. 2d at 225 ("Regardless of the manner in which a plaintiff attempts to plead scienter, at the end of its evaluation, this Court must be convinced that the inference of scienter is at least as compelling as any competing inferences." (internal quotation marks omitted)); *In re PXRE*, 600 F. Supp. 2d at 528.

**2.  Application to This Case**

**a.  Motive and Opportunity**

Plaintiffs' allegations fail to support a strong inference of scienter based on motive; and even if the allegations did so, that inference is far weaker than the most compelling rational competing inference.

Plaintiffs contend that four allegations support their showing of motive: (1) insider stock sales generating $125 million in proceeds, (Pl.'s Opp'n at 16; Compl. ¶ 148); (2) the "related party transactions" including the investments in Hewlett-Packard equipment and the kickbacks received through those investments, the investments in two Korean game development companies, the joint operation of WoW with a The9 subsidiary, the granting of stock options, and the loans The9 made to its employees to start their own game development companies, (Pl.'s Opp'n at 16; Compl. ¶¶ 152(a)-(g)); (3) the stock dividend The9 declared in January 2009, (Pl.'s Opp'n at 16-17; Compl. ¶ 121); and (4) The9's adoption of its poison pill plan, (Pl.'s Opp'n at 17; Compl ¶ 117.).

The latter three allegations—those of related party transactions, the stock dividend, and the poison pill—are easily disposed of.  Plaintiffs do not even make any argument going to, and the Court does not see, any "unique connection," *ECA*, 553 F.3d at 201 n.6, between any statements going to the WoW Contract's likelihood of renewal, the quality of The9's relationship with Blizzard, or The9's general prospects for growth. (*See* Pl.'s Opp'n at 16-17.)  Plaintiffs' brief merely lists the transactions without articulating any connection whatsoever.  (*See id*.)  However, that the alleged fraud enabled The9 to complete business transactions, or enabled Individual Defendants to gain by increased value of stock options, is insufficient to allege motive.  *In re MRU*, 2011

WL 650792, at *12 ("universal" motives, such as "preserv[ing] a business relationship, and/or [] promot[ing] [defendants'] core business" fails to support motive); *In re SLM*, 740 F. Supp. 2d at 557 ("the desire to maintain a high stock price to increase executive compensation" fails to support motive) (citing *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009)).  The same is true regarding the increase of the probability or profitability of "the success of an investment."  *South Cherry*, 573 F.3d at 109.  And how the alleged fraudulent misstatements enabled the Hewlett-Packard kickback scheme, the joint parent-subsidiary operation of WoW, or the poison pill plan is entirely unapparent.

Plaintiffs' allegations concerning insider stock sales fail for several reasons.  First, those allegations demonstrate only gross proceeds without identifying net profits, and proceeds alone say nothing about a seller's motive.  *See In re eSpeed*, 457 F. Supp. 2d at 290.  Indeed, the only proceeds even running to Individual Defendants are the $28 million allegedly flowing to Zhu through Incsight's sales and the $3 million flowing to Lee through her Rule 10b5-1(c) sales.  (*See* Compl. ¶ 148.)  As to the latter, however, it is well established that "trades under 10b-5-1 plan 'do not raise a strong inference of scienter.'"  *In re Gildan Activewear*, 636 F. Supp. 2d at 272 (quoting *In re IAC*, 478 F. Supp. 2d at 604); *see also Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) ("Stock sales pursuant to Rule 10b-5 trading plans . . . [are] not suspicious.").[14]  And as to the

---

[14] In a footnote, plaintiffs cite cases from the Southern District of Ohio and the Districts of Nevada and D.C. apparently for the proposition that trading pursuant to a Rule 10b5-1 plan cannot be considered on motion to dismiss.  (Pl.'s Opp'n at 16 n.20).  To the extent that these cases make such holdings, that does not appear to be the law in this Circuit; nor does it appear to be uniform law without this District.  *See Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003) (finding, on motion to dismiss, that sales pursuant to Rule 10b5-1 trading plan undermines inference of scienter).  The Court declines to abandon the established law of this district.  Indeed, it appears that what plaintiffs point out is not that a court cannot look to evidence that trades were made pursuant to such plans when considering scienter for purposes of securities fraud, but that courts cannot look to that evidence when plead as an

former, even if Zhu realized some proceeds (and profit) from stock sales during the Class Period, his holdings of The9 ADS actually *increased* during that period from 6.6 million shares to 7 million shares.  In addition, no other Individual Defendant is even alleged to have sold stock during the Class Period.  Considering those facts, plaintiffs have failed to allege that the insider sales were "suspicious" or "unusual."  *Compare In re Scholastic*, 252 F.3d at 75 ("the failure of other defendants to sell their stock undermined the plaintiffs' theories that negative information was withheld to obtain a higher sell price."); *In re AXIS Capital*, 456 F. Supp. 2d at 595 (noting that sales of ten, eleven, and even twenty percent of holdings are not unusual), *and In re Health Mgmt. Systems, Inc. Sec. Litig.*, No. 97 Civ. 1965, 1998 WL 2832286, at *6 & n.3 (S.D.N.Y. June 1, 1998) (single individual defendant's sales of eighty-two percent of holdings not unusual when six other individual defendants' sales comprised only between three and twenty-five percent of each's individual holdings), *with In re Scholastic*, 252 F.3d at 75 (sales of eighty percent of holdings sufficiently unusual for single individual defendant), *and In re SLM*, 740 F. Supp. 2d at 558 (sufficiently unusual when individual defendant "dumped nearly all of his shares during the Class Period.").

Finally, even assuming, *arguendo*, that Incsight's sales were somehow sufficient to establish a plausible inference of motive, that inference is not as strong as the inference of non-fraudulent activity drawn from the facts viewed collectively.  Indeed, plaintiffs' own allegations undermine the inference plaintiffs advance.  True that Incsight sold about 486,000 shares as The9's ADS price rose from around $23 to its peak of $51.97.  (*See*

---

affirmative defense to a charge or claim of insider trading.  And even if the Court did not consider that Lee's sales were made pursuant to a Rule 10b5-1 plan, the buttressing that evidence would provide to plaintiffs' motive inference would still not make that inference as compelling as the competing inference of a lack of motive to defraud, discussed *infra*.

Compl. ¶¶ 47, 64, 148.)  But Incsight retained upwards of 6 million shares as that price

continuously fell to $8.68 at the Class Period's end.  (*See id*. ¶ 142); Fiscal 2008 20-F at

67.  It defies reason that an entity looking to profit on a fraudulently inflated stock price

would hold close to ninety percent of its shares as share prices fell, *while knowing that

the information illuminating the fraud was seeping into the market*.  The same is true

regarding both (1) Zhu's increase in beneficial holdings, and (2) The9's repurchase of 4.3

million of its own shares during the Class Period.  Zhu's increase in holdings and The9's

repurchase of shares, at a time during which, plaintiffs allege, The9 was overvalued and

heading towards financial ruin, raises precisely the contrary inference from the one

suggested by plaintiffs.  *See In re eSpeed*, 457 F. Supp. 2d at 290 n.182 (noting that

"dozens of cases dismiss[] complaints on scienter grounds where . . . stock sales were

found to be *de minimis* or [where] motive allegations were undermined by increases in

total holdings." (alterations in original)); *see also In re MRU*, 2011 WL 650792, at *12

("The Individual Defendants' purchase and retention of the shares . . . [is] inconsistent

with the allegation that [they] harbored information that the Company's financial health

was in grave jeopardy.") (internal quotation marks omitted);  *In re Adelphia Commc'ns

Corp. Secs. and Derivative Litig.*, No. 03 MD 1529, 2007 WL 2615928, at *3 (S.D.N.Y.

Sept. 10, 2007) ("Where [Plaintiffs'] view of the facts defies economic reason . . . it does

not yield a reasonable inference of fraudulent intent.") (citing *Kalnit*, 264 F.3d at 140-

41).

       The much stronger inference drawn from plaintiffs' allegations is that though the

possibilities existed that Blizzard might not renew the WoW Contract, that The9 and

Blizzard's relationship might sour, or that The9's prospects for future growth might turn

pessimistic, The9 and its management believed—or at least hoped—that The9 would renew the WoW Contract and would continue to grow.  Indeed, Zhu's increase in beneficial ownership, and The9's repurchase of shares and investments in equipment and subsidiaries, "signal[] only confidence in the future of [the] company."[15]  *In re MRU*, 2011 WL 650792, at *13.  Accordingly, even if there mere allegation of Incsight's stock sales could raise a plausible inference of scienter—which the Court holds it does not— that inference would not be as strong as the rational competing inference and plaintiffs' argument for motive would still fail.

### b.  Strong Circumstantial Evidence

As with their contentions regarding motive, plaintiffs' allegations supporting an inference of scienter based on circumstantial evidence also fail both in sufficiency and as compared to the rational competing inference.

Plaintiffs argue that five elements of their pleadings support an inference of scienter drawn from strong circumstantial evidence.  These are (1) that the confidential witness allegations indicate that the individual defendants knew of their statements' falsity; (2) that WoW was the "core operation" of The9's business; (3) that The9's Fiscal 2008 20-F eventually wrote down net income by seventy-two percent; (4) that on November 16, 2007, Zhu stated that "after [Burning Crusade] was launched, we started discussions with [Blizzard] regarding renewal of the [WoW Contract]," yet on November 18, 2008, Chen said, "we have been conducting the talks with Blizzard [regarding the

---

[15] Indeed an even more plausible inference is that Zhu increased his holdings between May 2008 and May 2009—as the price fluctuated between $25 and $10, after peaking at $51.97 in July 2007—believing that Blizzard would renew the WoW Contract, that The9's price would again shoot up, and that he would thereby turn an enormous profit.

WoW Contract's renewal] since actually May this year"; and (5) that Lee and Tse both resigned during the class period.  (Pl.'s Opp'n at 17-22.)  The Court addresses each allegation in turn, before considering them all in their entirety as per the requirement of *Tellabs*.

### i. Confidential Witness Allegations

Plaintiffs argue that they "have adequately alleged that CW accounts are indicative of scienter."  (Pl.'s Opp'n at 20.)  But three of the confidential witnesses—CW1, CW2, and CW3—worked for *Blizzard*, not The9, and plaintiffs make no allegation that those sources ever had any contact with anyone at The9, much less with the Individual Defendants.  CW1 and CW2 make allegations solely concerning the corporate environment at Blizzard—they do not make any contention that the "[un]happy[ness]," (Compl. ¶ 39), or "view[s]" (*id.* ¶ 53), of Blizzard were ever made known to The9.  And despite CW3's allegation that The9 "would have known" that Blizzard had started training NetEase personnel to operate WoW in March 2009, (*id.* ¶ 123), the law is abundantly clear that such allegations are insufficient to support scienter.  *See Campo*, 371 F. App'x at 217 (affirming district court's finding that allegation was insufficient because the confidential source did not allege "whether [any individual defendant] actually accessed or reviewed [the information]."); *Local No. 38*, 724 F. Supp. 2d at 461 (allegations insufficient in "the absence of any allegation that such data had been presented to management . . . [and in] not establish[ing] what specific contradictory information the Individual Defendants received or when they received it."); *In re Citigroup*, 2010 WL 4484650, at *33 ("[p]laintiffs cannot rely on assertions that the

information presented by confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support a finding" of scienter).  Indeed, reliance on CW3's allegation to support scienter is made entirely impossible due to plaintiffs' own pleadings.  CW3's allegation is that The9 would have known that Blizzard would not be renewing the WoW Contract when Blizzard started training NetEase personnel in March of 2009.  (Compl. ¶ 123.)  But the very last allegedly fraudulent statement was Chen's statement on a February 2009 conference call. In other words, CW3's allegation purportedly imputing scienter regarding Zhu and Chen's statements concerned information (the training of NetEase personnel) that only came into existence after every allegedly false statement was already made.

CW4 is perhaps a closer case, but as with the other sources, the Court concludes that his allegations must be discounted.  CW4 is described as a former "senior executive" of The9.  (*Id*. ¶ 40.)  He alleges that "Zhu told Company executives in early 2007 that he viewed it as very unlikely if not impossible for The9 to be able to renew the WoW Contract."  (*Id*.)  In addition, "Zhu understood that The9's relationship with Blizzard had been 'ruined' by early 2007."  (*Id*.)  Missing from the complaint, however, is any indication of what aspect of The9 or its management CW4 was involved in, what CW4's job duties entailed, what kind of access CW4 had to Zhu, in what form and context Zhu made his alleged statement, or how CW4 was privy to that statement.  Such lack of description is, alone, fatal to CW4's allegations.  *See Local No. 38*, 724 F. Supp. 2d at 460 (discounting confidential source allegations because no indication that the sources had any contact with any individual defendant); *In re American Express Co. Sec. Litig.*, 2008 WL 4501928, at *8 (same).  Plaintiffs' brief states, "CW4 was present when Zhu

36

made these statements." (Pl.'s Opp'n at 21 (citing Compl. ¶¶ 40, 51, 107).) But plaintiffs' complaint does not say that; and the Court can hardly consider assertions made in a legal brief, but not in a pleading. *Adams v. New York State Educ. Dep't*, ___ F. Supp. 2d ___, 2010 WL 4742168, at *10 n.4 ("Although Adams' opposition brief includes many facts not alleged in the fourth amended complaint . . . , the Court cannot consider such facts.") (citing *Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000)). Indeed, CW4's allegations are particularly uninformative because they (1) suggest that CW4 got his information not from Zhu but through intermediaries, thus undermining the likelihood that he had personal knowledge of his allegations; and (2) purport to read Zhu's mind. The Court also notes that the alleged statement by Zhu was made six months before Blizzard and The9 together issued a joint statement to the effect that their relations were "smooth and friendly," (Compl. ¶ 68), further undermining the inference that Zhu knew the companies' relationship was ruined when saying otherwise. Accordingly, CW4's allegations do not give rise to a strong inference of scienter.

### ii. Core Operations

Plaintiffs argue that "the fact that [allegedly false or misleading statements] concerned the core operations of [a] company supports the inference that the defendant knew or should have known the statements were false when made." (Pl.'s Opp'n at 17 (quoting *In re Atlas Air*, 324 F. Supp. 2d at 489).) However, that an allegedly fraudulent statement concerned "core operations," standing alone, is insufficient to support strong circumstantial evidence of scienter. Rather, the "core operations" doctrine bolsters the strength of the inference of scietner when plaintiffs have already adequately alleged facts

indicating that defendants might have known their statements were false.  *See In re Reserve Fund Sec. and Derivative Litig.*, 732 F. Supp. 2d 310, 323 (S.D.N.Y. 2010) (in discussing "core operations" argument, noting requirement that "accurate information . . . that contradicts or undermines Defendants' assurances as outlined in the Complaint" be "apparent" to the individual defendants "at the time the alleged false statements and omissions took place."); *In re eSpeed*, 457 F. Supp. 2d at 294 ("even if [the product in question] was sufficiently significant that knowledge of its true prospects can be imputed to the individual defendants, plaintiffs must still adequately allege that defendants lacked a reasonable basis for their optimism about [it].").

The only allegations in the complaint indicating that any defendant actually had knowledge going to the falsity of his or her statement are the allegations of CW4 that "Zhu told Company executives in early 2007 that he viewed is as very unlikely if not impossible for The9 to be able to renew the WoW Contract," and that "Zhu understood that The9's relationship with Blizzard had been 'ruined' by early 2007."  (Compl. ¶ 40.)[16] As discussed *supra*, however, the Court cannot credit CW4's allegations as CW4 is not described in sufficient detail to convince the Court that he would possess the information alleged.  Because plaintiffs present no other evidence supporting an inference that defendants were aware of contradictory facts when they made their statements, the mere fact that the WoW Contract was at the core of defendants' business does not support

---

[16] Though they do not, plaintiffs might have argued that the rumor reports on gaming websites alerted defendants to the inaccuracies of their statements.  This argument would have failed, however, as media reports that do not "indicate particularized facts," but instead "provide only generalized forecasting and speculation," do not support scienter allegations.  *Plumbers & Steamfitters*, 694 F. Supp. 2d at 300. Perhaps more importantly, "[t]he securities laws do not require—and good business practices do not suggest—that [companies] respond to every warble of the 24-hour news cycle."  *Id.* at 301.

strong circumstantial evidence of scienter—if indeed the "core operations" doctrine remains good law.[17]

### iii.  Size of the Write-Down

Plaintiffs argue that "[t]he magnitude of the write-offs related to the loss of the WoW license – causing previously-reported net income to shrink by 72% – adds to the strong inference of scienter alleged."  (Pl.'s Opp'n at 18 (citing *In re Scholastic*, 252 F.3d at 77).)  True that "the magnitude of defendant's post-class period write-off," can, with other factual allegations, "constitute[] sufficient pleadings as to recklessness."  *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000); *accord In re Scholastic*, 252 F.3d at 77 (finding that $24 million of "special charges," combined with allegation that product in question was being returned in great numbers by purchasers during period of those charges, undermines an inference that defendants were unaware of the falsity of their statements that product was selling well).  However, "[w]hile certainly a relevant factor, it is well established that the size of the fraud alone does not create an inference of scienter."  *In re PXRE*, 600 F. Supp. 2d at 545.  As with the "core operations" doctrine, absent facts indicating that defendants knew of the falsity of their statements, that an eventual write-off was large does not support the required strong inference of misbehavior.  *See Plumbers & Steamfitters*, 694 F. Supp. 2d at 302 ("the Complaint is

---

[17] It is questionable whether the "core operations" doctrine has survived the PSLRA at all.  *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron, Inc.*, ___ F. Supp. 2d ___, 2010 WL 3733909, at *14 (S.D.N.Y. Sept. 24, 2010) (Koeltl, J.) ("Whether a plaintiff may rely on the core operations doctrine in light of the PSLRA has not been decided by the Court of Appeals for the Second Circuit.  Those Courts of Appeals that have addressed the question have found that it is no longer viable in most situations." (internal citation omitted) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009) (rejecting "core operations" doctrine); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003) (same))).

bereft of factual allegations from which a reader could infer Defendants intentionally or recklessly failed to take write-downs on U.S. mortgage-backed securities.  Because the size of an alleged fraud alone does not create an inference of scienter, Plaintiff's repeated allegation concerning the magnitude of the write-downs [here $2.5 billion] is insufficient to plead scienter." (internal quotation marks omitted)); *In re PXRE*, 600 F. Supp. 2d at 545 (eighty percent write-down insufficient when no allegation that defendants had knowledge that that write-down was imminent or would be necessary); *see also Kalnit*, 264 F.3d at 143 (finding no inference of scienter due to write-off because defendants were not aware that they had a duty to disclose the allegedly illuminating information, because defendants lacked motive to defraud, and because the illuminating information was already known to the public).  As previously described, the complaint in this case does not indicate that defendants had knowledge of their statements' falsity at the time those statements were made.  Accordingly, that defendants wrote down seventy-two percent of their net income does not support the required strong inference of scienter.

### iv.  Zhu and Chen's Allegedly Contradictory Statements

Plaintiffs also contend that Zhu's November 2007 statement—that The9 had had discussions with Blizzard regarding the possibility of renewal of the WoW Contract after Burning Crusade launched in September 2007—is contradicted by Chen's November 2008 statement—that The9 had been conducting renewal talks since May 2008—and that that contradiction supports a strong inference of scienter.  (Pl.'s Opp'n at 18-19.) Plaintiffs argue that a "later statement may suggest that a defendant had a contemporaneous knowledge of the falsity of his [earlier] statement, if the later statement

directly contradicts or is inconsistent with the earlier statement." (*Id*. at 18 (citing *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003), *abrogation, on other grounds, recognized by South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008).) While a true statement of the law, plaintiffs' argument fails because they do not allege facts indicating that the earlier statement was "was false and misleading when made." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 191 (S.D.N.Y. 2010); *see also In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (discounting contradictory statements argument because "there is no allegation in the [complaint] that Nokia had contrary facts suggesting its sales would drop to the level that they ultimately did."). Moreover, the very cases plaintiffs rely on stress the importance that the later, allegedly corrective, statement directly contradict the earlier, allegedly false, statement. *See In re Read-Rite*, 335 F.3d at 847 (finding statement that certain of defendant's products were fully developed not contradicted by later "admissions" that (1) customer representing thirty-seven percent of sales would cease purchasing if further development was not undertaken; or (2) defendant's CEO rejected customer's ultimatum to same effect). But here, the complaint does not even allege that, in fact, no talks between The9 and Blizzard regarding renewal had occurred prior to May 2008. And it is not directly inconsistent that perhaps multiple rounds of talks began at different times. Indeed, it is not readily apparent even how a statement that the companies were in talks prior to those talks actually beginning—even if false—would suggest a misleading character of (1) statements concerning the quality of the companies' relationship, especially considering that it is undisputed that the companies did engage in a year of formal negotiations; or (2) optimistic statements about renewal was likely. Thus the

inconsistency suggested by the two statements is far too weak to buttress the "strong

circumstantial evidence" required for scienter.

### v. Resignations

Plaintiffs argue that "[r]esignations, although not themselves sufficient, add to a

pleading of circumstantial evidence of fraud."  (Pl.'s Opp'n at 21 (citing *In re Scottish*

*Re*, 524 F. Supp. 2d at 394 n.176).)  Again, though a true statement of the law,

resignations must be "highly unusual and suspicious."  *In re Scottish Re*, 524 F. Supp. 2d

at 394 n.176.  Such can be the case when independent facts indicate that the resignation

was somehow tied to the fraud alleged, that the resignation somehow alerted defendants

to the fraud, or that defendants' scienter was otherwise evident.  *See id.* at 394 (crediting

multiple resignations in addition to evidence indicating that defendants' fraud was

"tantamount to conscious misbehavior"); *Varghese v. China Shenghuo Pharm. Holdings,*

*Inc.*, 672 F. Supp. 2d 596, 603, 608 (S.D.N.Y. 2009) (crediting resignation when

independent director resigned after sending board of directors email highlighting the half-

dozen ways defendant corporation's governance standards were failing); *In re Sadia, S.A.*

*Sec. Litig.*, 643 F. Supp. 2d 521, 523-24, 534 (S.D.N.Y. 2009) (crediting resignations of

chairman and vice chairman that occurred less than two weeks *after* company's fraud was

revealed resulting in fifty percent drop in stock price and losses of $760 million).  Here,

at best plaintiffs can connect Lee and Tse's resignations to allegedly "inadequate internal

controls over financial reporting."  (Pl.'s Opp'n at 21 (citing Fiscal 2008 20-F).)  But

even if both (1) The9 did have inadequate internal controls over financial reporting, and

(2) Lee and Tse's resignations were actually tied to those inadequacies, plaintiffs still

have not come close to connecting those resignations to the fraud alleged in this case. True that inadequate internal controls might give rise to an inference of a troubled company. But the mere fact that The9 might be troubled does not imply that Zhu or Chen's statements concerning The9's relationship with Blizzard or its prospects for renewing the WoW Contract were false when made. And even if somehow the two could be connected—an argument plaintiffs do not attempt to make—plaintiffs themselves concede that resignations, without some indicia of highly unusual or suspicious circumstances, are insufficient to support the required strong circumstantial evidence of scienter.

### vi.  Competing Inferences

Because the Court finds that Plaintiffs have not alleged facts establishing an inference of strong circumstantial evidence supporting scienter, it need not compare that inference against the competing inference that The9 hoped to renew the WoW Contract and therefore made a concentrated effort to achieve that goal. In any event, that inference is stronger than any inference possibly gleaned from the five categories of evidence discussed just above for the same reasons discussed *supra* at Section II.B.2.a. Indeed, the competing inference of no conscious misbehavior is supported, in addition, by the facts that (1) Blizzard and The9 engaged in over a year of formal, protracted negotiations concerning renewal; and (2) though under no duty to do so, Blizzard and The9 *jointly* denied the vague internet rumors concerning their relationship and contract renewal. Even if plausible, which the Court holds it is not, plaintiffs' inference that defendants knew their statements were false when made is far less compelling than the inference that

43

defendants believed that they would be successful in renewing the WoW contract.  In other words, "[t]aken collectively, the facts alleged provide a 'plausible non-culpable explanation[] for the defendant[s'] conduct' that is more compelling than the inference of fraudulent intent—namely the competing theory that [defendants] [were] ultimately felled by [their] own ambitions."  *Gissin*, 739 F. Supp. 2d at 514 (quoting *Tellabs*, 551 U.S. at 310).

### C.  Section 20(a) Claims

Plaintiffs also bring claims against the Individual Defendants pursuant to the Exchange Act Section 20(a).  Such claims require "(a) a primary violation by a controlled person, (b) actual control by the defendant, and (c) the controlling person's culpable participation in the primary violation."  *In re Security Capital Assurance*, 729 F. Supp. 2d at 602.  Because plaintiffs here have failed to allege a primary violation, these claims are also dismissed.

### D.  Leave to Replead

"[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead."  *In re eSpeed*, 457 F. Supp. 2d at 298.  While the Court is uncertain that plaintiffs can cure the pleading deficiencies relating to scienter highlighted in this opinion, the Court grants plaintiffs thirty days from the date of this Opinion and Order in which to refile their complaint.

44

## III. CONCLUSION

For the reasons stated above, defendants' motion to dismiss is GRANTED in its entirety.  The Clerk of the Court is directed to close this motion [35] and close this case.


SO ORDERED

Dated: New York, New York
      March ___, 2011

Richard J. Holwell
United States District Judge